# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

YVONNE APODACA, on behalf of herself and
all others similarly situated,

       Plaintiff,

vs.                                     No. CIV 18-0399 JB/JHR

YOUNG AMERICA INSURANCE
COMPANY; LOYA INSURANCE
COMPANY and EP LOYA GROUP, LP,

       Defendants.

## MEMORANDUM OPINION[1]

**THIS MATTER** comes before the Court on the Motion of Defendant Young America Insurance Company to Dismiss Plaintiff's Second Amended Complaint, filed December 17, 2021 (Doc. 45)("Third MTD").  The Court held a hearing on July 14, 2022.  See Clerk's Minutes, filed July 14, 2022 (Doc. 65).  The primary issues are: (i) whether the Court should treat the Third MTD as a motion for summary judgment; (ii) whether the Court should predict that the Supreme Court of New Mexico would hold that the rule announced in its decision Crutcher v. Liberty Mutual Insurance Co., 2022-NMSC-001, 501 P.3d 433 ("Crutcher"), declaring such insurance policies as the one that Defendant Young America sold Plaintiff Yvonne Apodaca illusory, applies on a prospective only basis, and accordingly whether the Court should dismiss for failing to state a

---

[1]On September 21, 2022, the Court entered an Order denying the Motion of Defendant Young America Insurance Company to Dismiss Plaintiff's Second Amended Complaint, filed December 17, 2021 (Doc. 45).  See Order at 1-2, filed September 21, 2022 (Doc. 67).  In the Order, the Court states that it will "issue . . . a Memorandum Opinion at a later date more fully detailing its rationale for this decision."  Order at 1 n.1.  This Memorandum Opinion is the promised opinion.

claim Apodaca's claims for relief under a negligent misrepresentation theory, and for violations of New Mexico's Unfair Trade Practices Act ("UPA") and of New Mexico's Unfair Insurance Practices Act ("UIPA"), in Plaintiff Yvonne Apodaca's Class Action Second Amended Complaint for Breach of Statutory, Common Law, and Contractual Duties, filed March 1, 2019 (Doc. 30)("SAC"); (iii) whether the Court should dismiss for failing to state a claim Apodaca's claim for breach of contract and her claim for breach of the covenant of good faith and fair dealing; and (iv) whether the Court should dismiss her claims for declaratory judgment, injunctive relief, and punitive damages, and whether the Court should permit her to pursue reformation of the contract. The Court concludes as follows: (i) the Court will not treat the Third MTD as a motion for summary judgment; (ii) the Court predicts that the Supreme Court of New Mexico would hold that the rule its <u>Crutcher</u> decision announced does not apply on a prospective only basis, and accordingly the Court will not dismiss for failing to state a claim Apodaca's claims for negligent misrepresentation, UPA, and UIPA relief; (iii) the Court will dismiss Apodaca's breach of contract claim, but the Court will not dismiss her breach of the covenant of good faith and fair dealing claim; and (iv) the Court will not dismiss Apodaca's claims for declaratory judgment, injunctive relief, and punitive damages, but the Court will not permit Apodaca to seek reformation of the contract. Accordingly, the Court denies the Third MTD in part and grants it in part.

## **FACTUAL BACKGROUND**

The Defendants have filed the Third MTD under rule 12(b)(6) of the Federal Rules of Civil Procedure. <u>See</u> Third MTD at 1. The Court may consider the "sufficiency of the allegations within the four corners of the complaint after taking those allegations as true" when evaluating a MTD under rule 12(b)(6). <u>Mobley v. McCormick</u>, 40 F.3d 337, 340 (10th Cir. 1994). The Court also may consider: (i) documents that the complaint incorporates by reference, <u>see</u> <u>Tellabs, Inc. v.</u>

Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); (ii) "documents referred to in the complaint if the documents are central to the Plaintiffs' claim and the parties do not dispute the documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002); and (iii) "matters of which a court may take judicial notice," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322.  See Armstrong v. N.M. Disability Det. Servs., 278 F. Supp. 3d 1193, 1201 n.3 (D.N.M. 2017)(Browning, J.)(concluding that the Court could consider notices attached to the motion and not to the complaint, because the complaint referenced them, their adequacy was central to the plaintiffs' claims, and their authenticity was unquestioned).  See also Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322 ("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss.").  The Court takes its facts from Apodaca's SAC.  The Court provides these facts for background.  It does not adopt them as the truth, and it recognizes that these facts reflect the Plaintiffs' version of events.

Albuquerque, New Mexico, resident Apodaca was involved in a car accident with an intoxicated driver in Albuquerque on January 23, 2017.  See SAC ¶¶ 1, 17-21, at 1, 4-5.  Apodaca possessed a "minimum limits" policy -- the minimum liability insurance required by statute in New Mexico, valued at $25,000.00 per person and $50,000.00 per occurrence, and uninsured and underinsured motorist (UM/UIM) coverage[2] in the same amounts.  See SAC ¶¶ 26, 27, 32, at 5-6.

---

[2]The Supreme Court of New Mexico explains this motor vehicle insurance:

"Uninsured motorist (UM) insurance coverage protects drivers who are damaged by a tortfeasor who does not have automobile insurance. . . . [Underinsured motorist (UIM)] insurance coverage protects drivers who are hit by a tortfeasor who does not have enough auto insurance to cover the cost of the driver's injuries and damages. . . . Pursuant to the statute, a policyholder is underinsured when there is a difference between the injured driver's

The other driver also had a minimum limits liability policy, which paid out the full amount of $25,000.00 to Apodaca.  See SAC ¶ 26, at 5.  Apodaca then made a claim on her UM/UIM coverage, but Young America denied her claim, asserting that, as a result of the offset[3] due to the full payout from the tortfeasor driver's liability coverage, it owed Apodaca nothing on her UM/UIM policy.  See SAC ¶¶ 39-40, 43, 47, at 7-9.  Young America did not inform Apodaca when she purchased the UM/UIM policy that the policy would yield her no benefits in such situations as this one, namely, when she is involved in an accident with a tortfeasor whose liability coverage at least equals her UM/UIM coverage, as will occur when both parties possess minimum limits policies.  See SAC ¶ 47, at 8-9.

## PROCEDURAL HISTORY

Apodaca first brought suit in 2018 against Young America for its UM/UIM policy sales practices.  Apodaca's lawsuit has already been subjected to two motions to dismiss -- Young

---

uninsured/underinsured motorist insurance and the tortfeasor's liability insurance. . . .

New Mexico law requires every driver to carry auto liability insurance of at least $25,000 per person and $50,000 per occurrence and UM/UIM insurance coverage of at least the same amount. . . . This is described as a "minimum limits" policy because it is the absolute minimum amount of insurance that a driver is legally required to carry.

Crutcher, 2022-NMSC-001, ¶¶ 5-6, 501 P.3d at 434-35 (citing N.M.S.A. §§ 66-5-215(A)(1)-(2), 66-5-301(A), 66-5-301(B) and Progressive Nw. Ins. Co. v. Weed Warrior Servs., 2010-NMSC-050, ¶ 8, 149 N.M. 157, 160, 245 P.3d 1209, 1212).

[3]"[T]he . . . offset rule allows an accident victim's insurance company to subtract whatever the driver receives from the tortfeasor's insurance company from the payment due to its own policyholder."  Crutcher, 2022-NMSC-001, ¶ 9, 501 P.3d at 435 (citing Schmick v. State Farm Mutual Automobile Insurance Co., 1985-NMSC-073, ¶ 24, 103 N.M. 216, 222, 704 P.2d 1092, 1098).

America's Third MTD is thus its third.  The legal landscape changed significantly, however, with the Supreme Court of New Mexico's <u>Crutcher</u> decision.

        **1.**        **<u>Procedural History Prior to Young America's Third MTD, Including Two Judge Brack Memoranda Opinions and Orders.</u>**

Apodaca brought suit on behalf of herself and a proposed class of similarly harmed insurance customers in State court before Young America removed to federal court on the basis of jurisdiction conferred by the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1333(d), 1453.  <u>See</u> Notice of Removal at 1, filed April 27, 2018 (Doc. 1).  Apodaca then amended her initial complaint to include as defendants Young America's corporate parents, Loya Insurance Company ("Loya Insurance") and EP Loya Group, LP ("Loya Group"), alleging that the three Defendants were part of a joint venture to sell insurance.  First Amended Class Action Complaint for Breach of Statutory, Common Law, and Contractual Duties ¶¶ 8-10, at 2, filed June 4, 2018 (Doc. 9)("FAC").  The FAC asserted against the Defendants claims under the following theories: (i)  negligence; (ii) violations of the New Mexico UPA, N.M.S.A. §§ 57-12-2(D)(7), (D)(14), (D)(15), (D)(17), (E); (iii) violations of the New Mexico UIPA, N.M.S.A. §§ 59A-16-20(A) to (E), (G), (N); (iv) breach of contract; and (v) breach of the covenant of good faith and fair dealing.  <u>See</u> FAC ¶¶ 53-96, at 13-20.  Apodaca sought injunctive relief, declaratory relief, and punitive damages.  <u>See</u> FAC ¶¶ 97-104, at 20-22.

Young America first moved to dismiss Apodaca's complaint in August, 2018.  <u>See</u> Motion of Defendants to Dismiss Plaintiff's First Amended Complaint at 1, filed August 6, 2018 (Doc. 14)("First MTD").  The Honorable Robert C. Brack, Senior United States District Judge for the District of New Mexico, granted the First MTD in part and denied it in part; Judge Brack dismissed all of Apodaca's claims against Loya Insurance and Loya Group for failing to state a claim, because Apodaca did not allege adequately that Loya Insurance and Loya Group were

involved in a joint venture with Young America to sell insurance in New Mexico.  See Memorandum Opinion and Order at 4-8, filed January 16, 2019 (Doc. 27)("Jan. 16 MOO").  The Court also dismissed against Young America claims for breach of contract, for breach of the covenant of good faith and fair dealing, and for violations of the UIPA that Young America failed to acknowledge her claim, failed to have reasonable standards for investigating and processing claims, failed properly to pay her claim, failed to give an explanation for its denial of her claim, engaged in bad faith settling of claims and offered substantially less than similarly situated insureds are offered.  See Jan. 16 MOO at 14-15.  Judge Brack recast Apodaca's negligence claim as a negligent misrepresentation claim and allowed it to continue on that basis.  See Jan. 16 MOO at 11.

Judge Brack granted leave to amend, and Apodaca amended her pleading, producing the SAC.  See SAC at 1.  The Defendants filed a second motion to dismiss in April, 2019.  See Motion of Defendants to Dismiss Counts IV and V of Plaintiff's Second Amended Complaint and All Claims Against Defendants EP Loya Group, LP, and Loya Insurance Company, filed April 5, 2019 (Doc. 33)("Second MTD").  On the Defendants' Second MTD, Judge Brack again issued an order dismissing all of Apodaca's claims against Loya Insurance and Loya Group, reasoning that, despite additional factual allegations, Apodaca still failed to allege the three Defendants formed a joint venture to sell insurance and that, accordingly, she failed to state a claim against Loya Insurance and Loya Group.  See Memorandum Opinion and Order at 3-5, filed November 19, 2019 (Doc. 41)("Nov. 19 MOO").  Judge Brack denied without prejudice, however, Young America's motion to dismiss the claims against it pending the Supreme Court of New Mexico's decision in Crutcher, which answered a question that the Honorable Judith C. Herrera, Senior United States District Judge for the United States District Court for the District of New Mexico certified to the

Supreme Court of New Mexico, regarding the illusory character of such UM/UIM policies as that

sold by Young America to Apodaca.  See Nov. 19 MOO at 5-7.  See also Crutcher v. Liberty Mut.

Ins. Co., No. CIV 18-0412, 2019 WL 12661166 (D.N.M. Jan. 9, 2019)(Herrera, J.)("Crutcher

Certification Order").

> **2.**      **Judge Herrera's Certification Order to the Supreme Court of New Mexico,**
> **and the Supreme Court of New Mexico's Decision in Crutcher.**

Judge Herrera's Crutcher Certification Order was a response to numerous cases

commenced after the Court's decisions in Bhasker v. Kemper Casualty Ins. Co., 284 F. Supp. 3d

1191 (D.N.M. 2018)(Browning, J.)("Bhasker I"), and Bhasker v. Kemper Casualty Ins. Co., 361

F. Supp. 3d 1045 (D.N.M. 2019)(Browning, J.)("Bhasker II").  In the Bhasker I and Bhasker II

decisions, the Court predicted that the Supreme Court of New Mexico would find "UIM coverage

illusory when [an insured's] UM/UIM coverage is not greater than $25,000.00," because the Court

interpreted the Supreme Court of New Mexico as holding in the case Progressive Northwestern

Insurance Co. v. Weed Warrior, 2010-NMSC-050, 149 N.M. 157, 245 P.3d 1209 ("Weed

Warrior"), that "it is the UM, not the UIM, that compensates the injured driver for all damages up

to $25,000."  Bhasker I, 284 F. Supp. 3d at 1237.  See also Bhasker II, 361 F. Supp. 3d at 1147

n.38 ("In all cases where the tortfeasor's liability coverage is equal to or more than Bhasker's

minimum limits UIM coverage, Bhasker can recover nothing from the UIM [portion of his

UM/UIM] coverage.").  Judge Herrera noted in her certification order that five federal cases,

including her own, "ha[d] been filed in the wake of this Court's decision in Bhasker."  Crutcher

Certification Order, 2019 WL 12661166, at *4.  Accordingly, Judge Herrera certified to the

Supreme Court of New Mexico the following question:

> Under N.M. Stat. Ann. § 66-5-301, is underinsured motorist coverage on a
> policy that offers only minimum UM/UIM limits of $25,000 per person/$50,000
> per accident illusory for an insured who sustains more than $25,000 in damages

caused by a minimally insured tortfeasor because of the offset recognized in
<u>Schmick v. State Farm Mutual Automobile Insurance Company</u>, and, if so, may
insurers charge a premium for that non-accessible underinsured motorist coverage?

<u>Crutcher</u> Certification Order, 2019 WL 12661166, at *4.  The Supreme Court of New Mexico, in

<u>Crutcher</u>, answered both parts of the question in the affirmative -- such minimum-limits UM/UIM

policies are illusory as to their UIM components, but insurers may continue to offer such policies

so long as they disclose the illusory character to insurance customers.  <u>See</u> <u>Crutcher</u>, 2022-NMSC-

001, ¶ 32, 501 P.3d at 441.  Judge Brack put off a decision on Young America's Second MTD

arguments until <u>Crutcher</u>, and before the Supreme Court of New Mexico decided <u>Crutcher</u>, the

case was reassigned from Judge Brack to the Court.  <u>See</u> Staff Note, August 2, 2021 (Doc. 42)(text-

only entry).

   **3.**   **Apodaca's SAC's Extent Claims and Young America's Third MTD.**

   After the Supreme Court of New Mexico's decision in <u>Crutcher</u>, Young America a third

time moved to dismiss Apodaca's claims, <u>see</u> Third MTD at 1, leading to the present dispute.  The

claims in Apodaca's SAC that remain disputed and that Young America moves the Court to

dismiss are the following: (i) Count I's claims for negligent misrepresentation; (ii) Count II's claim

for violations of the UPA, N.M.S.A. §§ 57-12-2(D)(7), (D)(14), (D)(15), (D)(17), (E), 57-12-3;

(iii) Count III's claim for violations of the UIPA, N.M.S.A. § 59A-16-20(A); (iv) Count IV's claim

for breach of contract; and (v) Count V's claim for a breach of the covenant of good faith and fair

dealing.  <u>See</u> SAC ¶¶ 64-103, at 14-21.  Apodaca continues to seek injunctive relief, declaratory

relief, and punitive damages.  <u>See</u> SAC ¶¶ 104-111, at 21-22.

   Young America urges the Court to dismiss Apodaca's claims, because it maintains it

complied with the law applicable at the time that it sold Apodaca her insurance: "Prior to <u>Crutcher</u>,

New Mexico law allowed insurers to sell minimum-limits UM/UIM coverage and to charge a

premium for such coverage under the disclosures" in the policy which Young America provided Apodaca.  Third MTD at 12.  According to Young America, <u>Crutcher</u>'s disclosure requirement regarding the potentially illusory character of UIM coverage "appl[ies] only prospectively."  Third MTD at 13.  Young America argues that the Court should dismiss Apodaca's negligent misrepresentation, UPA, and UIPA claims, because she "cannot prove that Young America had a . . . duty [to disclose] at the time [she] purchased her policy."  Third MTD at 14, 16-18.

A second theme in Young America's argument is that the coverage it sold Apodaca is not illusory.  Unlike the policy in <u>Crutcher</u>, Young America points out, its UIM policy will "not always [be] cancelled out . . . if the insured gets into an accident with a minimally-insured tortfeasor," because its policy covers the difference between the insured's coverage limit and "the proceeds of the [tortfeasor's] liability . . . policy . . . after payment to other injured persons."  Third MTD at 15 (quoting Young America Insurance Company New Mexico Auto Policy at 11, filed December 17, 2021 (Doc. 45-1)("Policy")).  The Young America policy thus provides "tangible benefits" by making up the difference when the tortfeasor's liability coverage distribution to the insured is reduced by having to be shared with other persons injured by the tortfeasor.  Third MTD at 15.  Moreover, as <u>Crutcher</u> notes, there is "some value" in providing UM benefits, which Apodaca's UM/UIM plan offered.  Third MTD at 16 (quoting <u>Crutcher</u>, 2022-NMSC-001, ¶ 27, 501 P.3d at 440).  Young America argues that it therefore did not misrepresent the value of Apodaca's policy, and the Court should, for these further reasons, reject Apodaca's negligent misrepresentation, UPA, and UIPA claims.  <u>See</u> Third MTD at 14-15.

Young America urges the Court to dismiss Apodaca's breach of contract claims, highlighting Judge Brack's earlier dismissal of them.  <u>See</u> Third MTD at 19.  Young America, it says, did not provide Apodaca any less than was unambiguously the "amount due under the

contract," and it accuses Apodaca of seeking "reformation of the policy to 'get around the [statutory and contractual] offset provision.'"   Third MTD at 19 (quoting Jan. 16 MOO at 15)(alteration in original).   Similarly, Young America urges the Court to reject the SAC's covenant of good faith and fair dealing claim -- no good faith breach lies in "failure to explain the statutory framework for Young America's UIM coverage," Third MTD at 23, and Apodaca cannot rely on good faith and fair dealing "to impose a duty of disclosure on [an insurer] before the issuance of the polic[y]," Third MTD at 23 (quoting <u>Azar v. Prudential Ins. Co. of Am.</u>, 2003-NMCA-062, ¶ 53, 133 N.M. 669, 685, 68 P.3d 909, 925)(alterations in Third MTD).

As to Apodaca's claims for injunctive and declaratory relief, Young America argues these are "only available where [an] underlying claim is meritorious."   Third MTD at 23 (quoting <u>Kaywal, Inc. v. Avangrid Renewables, LLC</u>, 2021-NMCA-037, ¶ 34, 495 P.3d 550, 566).   As to her punitive damages claim, Young America asserts that Apodaca cannot demonstrate, beyond conclusory accusations, that it "knowingly" misrepresented her policy's value or that its conduct was willful and wanton.   Third MTD at 24.   Young America contends that conclusion is especially accurate given that its "conduct in applying the offset rule was squarely within the 'statutory scheme purposefully selected by the New Mexico Legislature.'"   Third MTD at 24 (quoting <u>Crutcher</u>, 2022-NMSC-001, ¶ 28, 501 P.3d at 440).

**4.   <u>Apodaca's Response</u>.**

On February 14, 2022, Apodaca filed her Plaintiff's Response to Defendant Young America Insurance Company's Motion to Dismiss Plaintiff's Second Amended Complaint and Memorandum in Support, filed February 14, 2022 (Doc. 50)("Response").   Apodaca contends that Young America incorrectly interprets <u>Crutcher</u> as announcing a merely prospective rule.   <u>See</u> Response at 15.   <u>Crutcher</u>, she argues, "did nothing to change long-established law that does not

permit insurers to misrepresent coverage available to consumers." Response at 15. She points to recent decisions from this District that have held <u>Crutcher</u> has retroactive effect. <u>See</u> Response at 16 (citing <u>Palmer v. State Farm Mut. Auto. Ins. Co.</u>, No. CIV 19-0301 (D.N.M. Feb. 4, 2022)(Riggs, J.)("<u>Palmer</u>"); <u>Thaxton v. GEICO Advantage Ins. Co.</u>, No. CIV 18-0306 (D.N.M. Feb. 11, 2022)(Riggs, J.)("<u>Thaxton</u>"). That she might have recovered on her UIM policy had multiple injured parties been involved misses the point, she argues, and, according to Apodaca, <u>Crutcher</u> rejected this argument as reason to hold such coverage not illusory. <u>See</u> Response at 18-19.

Apodaca asserts that Young America mischaracterizes her position as asserting that the offset rule should not apply rather than that the company is liable for "failing to adequately disclose to her . . . how [the offset] rule would apply . . . in the situation long anticipated by <u>Weed Warrior</u>," namely the insured's collision with a minimally insured tortfeasor. Response at 8 n.3 (citing <u>Weed Warrior</u>, 2010-NMSC-050, 149 N.M. 157, 245 P.3d 1209). Apodaca urges the Court to treat Young America's Third MTD as a motion for summary judgment under rule 12(d) of the Federal Rules of Civil Procedure, because the Third MTD refers to such matters outside the pleadings as Apodaca's policy documents and to caselaw such as <u>Crutcher</u>. <u>See</u> Response at 11-12. On this ground she seeks limited discovery. <u>See</u> Response at 12.

Language in her SAC, she argues, emphasizes her belief that she had contracted for UIM benefits in such situations as a collision with a minimally insured tortfeasor, and that Young America should have clearly expressed any exclusions. <u>See</u> Response at 26-27. She argues that any ambiguities, including that regarding the offset provision, are construed in the insured's favor. <u>See</u> Response at 26, 27, 30. As to her good-faith-and-fair-dealing claim, she maintains her SAC adequately pleads that Young America "breached the covenant . . . by failing to meet Ms.

Apodaca's reasonable expectations . . .  by charging a premium for coverage . . . not provided and by failing to inform her about the illusory nature of the coverage . . . sold to her."  Response at 34. She also asserts that punitive damages may be in order, regardless whether law permitted Young America's conduct.  Response at 35-36.

     **5.**     <u>**Young America's Reply**</u>.

The Reply in Support of Defendant Young America Insurance Company's Motion to Dismiss Second Amended Complaint, filed March 21, 2022 (Doc. 52)("Reply"), offers new arguments.  It disputes the interpretation of <u>Palmer</u>, where the Honorable Judge Kea Riggs, United States District Judge for the United States District Court for the District of New Mexico, holds that <u>Crutcher</u> is retroactive; Young America maintains that <u>Palmer</u> reads <u>Crutcher</u> as validating the policy it issued Apodaca.  <u>See</u> Reply at 1-2.  No disclosure duty arose from cases predating <u>Crutcher</u>, such as <u>Weed Warrior</u> or <u>Jordan v. Allstate Insurance Co.</u>, 2010-NMSC-051, 149 N.M. 162, 245 P.3d 1214 ("<u>Jordan</u>").  Reply at 1-2.  As to Apodaca's contract claim and good-faith-and-fair-dealing claim, Young America notes that Apodaca cannot call upon the "reasonable expectations" doctrine where, as here, there is no contractual ambiguity -- for example, because the gap-coverage provision in her policy is unambiguous -- and she cannot call upon the implied covenant doctrine where there is an express contract provision that is contrary to the alleged implied provision.  <u>See</u> Reply at 6-7, 9.  Young America maintains its Third MTD is characterized properly as a motion to dismiss rather than motion for summary judgment, because it properly relies on Apodaca's policy and such caselaw as <u>Crutcher</u>.  <u>See</u> Reply at 11-12.

     **6.**     <u>**July 14, 2022 Hearing on the Third MTD**</u>.

At the July 14, 2022, hearing, the parties stressed many of the arguments appearing in their briefs.  Young America noted that the breach-of-contract and good-faith-and-fair dealing claims

that Judge Brack had dismissed in his January 16, 2019, order had reappeared in essentially the same form in Apodaca's SAC.  See Transcript of Hearing at 7:21-8:23 (dated July 14, 2022), filed July 26, 2022 (Doc. 64)("Tr.")(Court, Vargo).  Noting that the Supreme Court of the United States of America case, Chevron Oil Co. v. Huson, 404 U.S. 97 (1971)("Chevron"), and the Supreme Court of New Mexico case, Beavers v. Johnson Controls World Services, Inc., 1994-NMSC-094, 18 N.M. 391, 881 P.2d 1376 ("Beavers"), present the controlling test for lower State courts and federal courts to determine the retroactive applicability of civil cases, Young America offered that no such test is required here, because Crutcher itself says that it applies prospectively only.  See Tr. at 9:14-20 (Vargo); id. at 21:5-13 (Vargo).  Young America contended that Judge Riggs in her opinions Thaxton, Palmer, and Schwartz v. State Farm Mut. Auto. Ins. Co., 584 F. Supp. 3d 1007, 1015 (D.N.M. 2022)(Riggs, J.)("Schwartz"), "in essence [] reads . . . words out" of Crutcher that suggest it only has prospective application, namely such phrases as "hereafter" and "we will now require" which appear in the Crutcher opinion.  Tr. at 10:17 (Vargo).  Crutcher, Young America contends, is unique in going beyond the statutory requirements as to how underinsured motorists are defined -- and the Supreme Court of New Mexico had on previous occasions been presented with a reasonable expectations argument but declined to adopt it.  See Tr. at 11:6-15, 13:3-24 (Vargo).  According to Young America, courts have consistently applied gap coverage before Crutcher without saying that it was misleading, and it urged the Court not to find that prior cases put the industry on notice as to problems using the statutory definition.  See Tr. at 15:6-8 (Vargo); id. at 22:17-23:15 (Vargo).  Young America maintained that it included language defining underinsured motorists drawn directly from New Mexico's statutory scheme and that it did so in good faith; it maintains that only now does Crutcher ask that insurers go beyond the statutory language in terms of their disclosures to consumers.  See Tr. at 31:3-10 (Vargo).

Apodaca, in turn, urged the Court to look to the reasoning of Judge Riggs' opinions in Thaxton, Palmer, and Schwartz, and of the case Belanger v. Allstate Fire & Casualty Ins. Co., 588 F. Supp. 3d 1249 (D.N.M. 2022)(Johnson, C.J.)("Belanger"), which the Honorable William P. Johnson, Chief United States District Judge for the United States District Court for the District of New Mexico decided.  See Tr. at 25:2-6 (Holt).  Apodaca argued that the use of such language in Crutcher as "hereafter" is not sufficient to make the Crutcher holding prospective only, and Apodaca reminded the Court that "the default [is] for retroactive application, unless the court says otherwise."  Tr. at 27:2-11, 29:1-2 (Holt).   Indeed, the Court, during the hearing, expressed concern that the Supreme Court of New Mexico's use of the word "hereafter" and the phrase "we will now require" so offhandedly does not make a rule prospective only, and overcome the presumption that rules in civil cases apply retrospectively.  See Tr. at 16:22-18:1 (Court).

The parties expanded on the subject of the appropriate remedy as to the contract and good-faith-and-fair-dealing claims.  These claims, Apodaca articulated at the hearing, were adequately amended after Judge Brack dismissed her earlier claims.  See Tr. at 38:19-24 (Holt).  Apodaca now articulated them thus:  "[T]here was an ambiguity and uncertainty in failing to explain the lack of benefits payable under the minimum limits UIM coverage. And the contract was breached by acceptance of premiums and failing to pay benefits after acceptance of those premiums."  Tr. at  38:20-24  (Holt).   Young  America  cautioned  that  Apodaca  seeks  a remedy -- reformation -- which is unavailable, because the contract as reformed would provide for excess coverage, an impermissible form of coverage in New Mexico.  See Tr. at 33:11- 34:22 (Vargo).  Instead, Young America asserted, Apodaca can at most receive recission of the contract. See Tr. at 35:19-20 (Vargo).  Apodaca responded that her coverage as reformed would not be illegal, because New Mexico law does not require gap coverage, but merely permits it.  See Tr. at

37:6-25 (Holt).  Moreover, she noted, Judge Riggs in the <u>Schwartz</u> case permitted the contract and good-faith-and-fair-dealing claims to continue, rejecting the defendant's motion to dismiss offered on similar grounds as Young America's.  <u>See</u> Tr. at 39:1-5 (Holt).  Chief Judge Johnson too allowed a similar claim, for reformation of contract, to proceed.  <u>See</u> Tr. at 40:17-25 (Holt).

## <u>LAW REGARDING DIVERSITY JURISDICTION AND</u> **ERIE**

Under <u>Erie</u>, a federal district court sitting in diversity applies "state law with the objective of obtaining the result that would be reached in state court."  <u>Butt v. Bank of Am., N.A.</u>, 477 F.3d 1171, 1179 (10th Cir. 2007).  <u>Accord</u> <u>Mem. Hosp. v. Healthcare Realty Tr. Inc.</u>, 509 F.3d 1225, 1229 (10th Cir. 2007).  The Court has held that, if a district court exercising diversity jurisdiction cannot find a Supreme Court of New Mexico "opinion that [governs] a particular area of substantive law[,] . . . [the district court] must . . . predict how the Supreme Court of New Mexico would [rule]."  <u>Guidance Endodontics, LLC v. Dentsply Int'l., Inc.</u>, 708 F. Supp. 2d 1209, 1224-25 (D.N.M. 2010)(Browning, J.).  "Just as a court engaging in statutory interpretation must always begin with the statute's text, a court formulating an <u>Erie</u> prediction should look first to the words of the state supreme court."  <u>Peña v. Greffet</u>, 110 F. Supp. 3d 1103, 1132 (D.N.M. 2015)(Browning, J.).[4]  If the Court finds only an opinion from the Court of Appeals of New

---

[4]In performing its <u>Erie</u>-mandated duty to predict what a State supreme court would do if faced with a case, <u>see</u> <u>Comm'r v. Estate of Bosch</u>, 387 U.S. 456 (1987), a federal court may sometimes contradict the State supreme court's own precedent if the federal court concludes that the State supreme court would, given the opportunity, overrule its earlier holding, <u>see</u> <u>Anderson Living Tr. v. WPX Energy Prod., LLC</u>, 27 F. Supp. 3d 1188, 1247 n.30 (2014)(Browning, J.).  Courts should, obviously, be reticent to formulate an <u>Erie</u> prediction that conflicts with State-court precedent; even if the prediction turns out to be correct, such predictions produce disparate results between cases filed in State and federal courts, as the old State supreme court precedent usually binds State trial courts.  The factors to which a federal court should look before making an <u>Erie</u> prediction that a State supreme court will overrule its prior precedent vary depending upon the case, but some consistent ones include: (i) the age of the State supreme court decision from which the federal court is considering departing -- the younger the State case is, the less likely it is that departure is warranted; (ii) the amount of doctrinal reliance that the State courts -- especially the

Mexico, while "certainly [the Court] may and will consider the Court of Appeal[s'] decision in making its determination, the Court is not bound by the Court of Appeal[s'] decision in the same way that it would be bound by a Supreme Court decision." Mosley v. Titus, 762 F. Supp. 2d 1298, 1332 (D.N.M. 2010)(Browning, J.)(noting that, where the only opinion on point is "from the Court of Appeals, . . . the Court's task, as a federal district court sitting in this district, is to predict what the Supreme Court of New Mexico would do if the case were presented to it")(citing Wade v. EMCASCO Ins., 483 F.3d 657, 666 (10th Cir. 2007)(explaining that, "[w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do" and that, "[i]n doing so, it may seek guidance from decisions rendered by lower courts in the relevant state")).[5]  The Court may also rely on Tenth Circuit decisions interpreting New Mexico

---

State supreme court -- have placed on the State decision from which the federal court is considering departing; (iii) apparent shifts away from the doctrine that the State decision articulates, especially if the State supreme court explicitly has called an older case's holding into question; (iv) changes in the composition of the State supreme court, especially if mostly dissenting justices from the earlier State decision remain on the court; and (v) the decision's patent illogic or its inapplicability to modern times.  See Peña v. Greffet, 110 F. Supp. 3d at 1132 n.17.  In short, a State supreme court case that a federal court Erie predicts will be overruled is likely to be very old, neglected by subsequent State-court cases -- perhaps because it is in a dusty corner of the common law which does not get much attention or have much application -- and clearly wrong.

[5]The Supreme Court has addressed what the federal courts may use when there is not a decision on point from the State's highest court:

The highest state court is the final authority on state law (Beals v. Hale, 4 How. 37, 54, 11 L.Ed. 865; Erie Railroad Co. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188, 114 A.L.R. 1487), but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State.  See Ruhlin v. New York Life Insurance Co., 304 U.S. 202, 209, 58 S.Ct. 860, 862, 82 L.Ed. 1290.  An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question.  We have declared that principle in West v. American Telephone and Telegraph Co., 311 U.S. 223, 61 S.Ct. 179, 85 L.Ed. 139, decided this day.  It is true that in that case an intermediate appellate court of the State had determined

law.  See Anderson Living Tr. v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1243 & n.30

(D.N.M. 2014)(Browning, J.).[6]  Ultimately, "the Court's task is to predict what the state supreme

_____

the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.

. . .  We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court (Erie Railroad Co. v. Hilt, 247 U.S. 97, 100, 101, 38 S.Ct. 435, 436, 62 L.Ed. 1003; Erie Railroad Co. v. Duplak, 286 U.S. 440, 444, 52 S.Ct. 610, 611, 76 L.Ed. 1214), and we think that the decisions of the Court of Chancery [the New Jersey trial court] are entitled to like respect as announcing the law of the State.

. . . .  The question has practical aspects of great importance in the proper administration of justice in the federal courts.  It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship.  In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts] appears to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

Fid. Union Tr. Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes omitted).  The Supreme Court has softened this position over the years; federal courts are no longer bound by state trial or intermediate court opinions, but "should attribute [them] some weight . . . where the highest court of the State has not spoken on the point."  Comm'r v. Estate of Bosch, 387 U.S. at 465 (citing King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)).  See 17A James Wm. Moore et al., Moore's Federal Practice § 124.20 (3d ed. 1999)("Moore's")("[F]ederal courts should follow decisions of intermediate state appellate courts unless persuasive data indicate that the highest state court would decide the issue differently . . . [and] federal courts should give some weight to state trial courts decisions.").

    [6]In determining the proper weight to accord Tenth Circuit precedent interpreting New Mexico law, the Court must balance the need for uniformity between federal court and State court interpretations of State law with the need for uniformity among federal judges.  If the Court adheres too rigidly to Tenth Circuit case law, ignoring changes undergone by a State's law in the ensuing years, then parties litigating State law claims will be subject to a different body of substantive law, depending on whether they litigate in State court or federal court.  This result frustrates the purpose of Erie, which held that federal courts must apply State court interpretations of State law, rather than their own, in part so that parties achieve a consistent result regardless of the forum.  This

consideration pulls the Court toward according Tenth Circuit precedent less weight and according State court decisions issued in the ensuing years more weight.  On the other hand, when the State law is unclear, it is desirable for there to at least be uniformity among federal judges as to its proper interpretation.  Otherwise, different federal judges within the same circuit -- or even the same district, as district courts' decisions are not binding, even upon themselves -- would be free to adopt differing interpretations of a State's law.  This consideration pulls the Court towards a stronger respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless whether it accurately reflects State law -- at least provides consistency at the federal level, so long as federal district judges are required to follow it.

The Court must decide how to weigh Tenth Circuit case law against more recent State court decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to Tenth Circuit precedent unless there is intervening case law directly on point from the State's highest court, on one end, and independently interpreting the State law, regarding the Tenth Circuit precedent as no more than persuasive authority, on the other.  The Court notes that, in striking this balance, it is generally more concerned about systemic inconsistency between the federal courts and the State courts than it is about inconsistency among federal judges.  Judges, even those within a jurisdiction with ostensibly identical governing law, sometimes interpret and apply the law differently from one another; this inconsistency is part and parcel of a common-law judicial system.  More importantly, litigants seeking to use forum selection to gain a substantive legal advantage cannot easily manipulate such inconsistency: cases are assigned randomly to district judges in this and many federal districts; and, regardless, litigants cannot know for certain how a given judge will interpret the State law, even if they could determine the identity of the judge pre-filing or pre-removal.  All litigants know in advance is that whomever federal district judge they are assigned will look to the entirety of the State's common law in making his or her determination -- the same as a State judge would.  Systemic inconsistency between the federal courts and State courts, on the other hand, not only threatens the principles of federalism, but litigants may more easily manipulate the inconsistency.  When the Tenth Circuit issues an opinion interpreting State law, and the State courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the State forum, or vice versa.

The Court further notes that district courts may be in a better position than the Tenth Circuit to be responsive to changes in State law.  Tenth Circuit decisions interpreting a particular State's law on a specific issue are further apart in time than the collective district courts' decisions are.  More importantly, the Tenth Circuit typically does not address such issues with the frequency that the State's courts do.   Accordingly, Tenth Circuit precedent can lag behind State law developments -- developments that the district courts may be nimble enough to perceive and adopt.  Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular State's law is wasted.  Other than Oklahoma, every State encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look.  Last, the Court notes, respectfully, that district courts may be in a better position than the Tenth Circuit to develop expertise on the State law of the State in which they sit.  Every federal judicial district in the nation, except the District of Wyoming, covers at most one State.  It is perhaps a more workable design for each district court to keep track of legal developments in the State law of its own State than it is for the Tenth Circuit to monitor separate legal developments in eight

- 18 -

States.  The Tenth Circuit used to follow this rationale in applying a clearly erroneous standard of review to district judge decisions of State law with no controlling State supreme court precedent. See Weiss v. United States, 787 F.2d 518, 525 (10th Cir. 1986); Rawson v. Sears, Roebuck, & Co., 822 F.2d 908, 923 (10th Cir. 1987)(McKay, J., dissenting)(collecting cases).  Since the mid-1980s, however, the Tenth Circuit has abandoned that rationale and applied a de novo standard of review to district judge decisions applying State law with no governing State supreme court precedent.  See Rawson v. Sears, Roebuck, & Co., 822 F.2d at 908.  See also id. at 923 (McKay, J., dissenting)(noting that the majority had abandoned the "sanctified" clearly erroneous standard or, the "so-called local-judge rule" in its analysis).  The Court regrets the Tenth Circuit's retreat from the clearly erroneous standard.

Having outlined the relevant considerations, the Court concludes that the proper stance on vertical stare decisis in the context of federal court interpretations of State law is as follows: the Tenth Circuit's cases are binding as to their precise holding -- what the State law was on the day the opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the Constitution of the United States of America possess.  A district court considering a State law issue after the publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based only on State court cases available to and considered by the Tenth Circuit, but it may come to such a conclusion based on intervening State court cases.

When interpreting State law, the Tenth Circuit does not and cannot issue a case holding that x is the law in New Mexico; it holds that the proper interpretation of New Mexico law, at the time the opinion is released, is x.  Its holdings are descriptive and not prescriptive -- interpretive and not normative.  Because federal judicial opinions lack independent substantive force on State law issues, but possess such force regarding federal law issues, the Court concludes that the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting State law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law.  The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing body of law was accurate.  The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to consider independently the whole body of State law that exists when the time comes that diversity litigants raise the issue in their courtrooms.  Giving such effect to the Tenth Circuit's interpretations of State law is at tension with Erie, giving independent substantive effect to federal judicial decisions -- i.e., applying federal law -- in a case brought in diversity.

Erie's purpose is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or State forum.  For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the States' highest court would rule if confronted with the issue."  Moore's § 124.22[3] (citing Comm'r v. Estate of Bosch, 387 U.S. at 465 ("[A]n intermediate appellate State court [decision] is a datum for ascertaining State law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the State would decide otherwise." (quoting West v. Am. Tel. & Tel. Co., 311 U.S. 223, 237 (1940))(emphasis in Comm'r v. Estate of Bosch)).  This statement may not be the most precise formulation if the goal is to ensure identical outcomes in State and federal

court -- the Honorable Milton I. Shadur, former United States District Judge for the Northern District of Illinois, looks to State procedural rules to determine in which State appellate circuit the suit would have been filed were it not in federal court, and then applies the State law as that State circuit court interprets it, see Abbott Labs. v. Granite State Ins. Co., 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(noting that the approach of predicting the State supreme court's holdings will often lead to litigants obtaining a different result in federal court than they would in State court, where only the law of the State circuit in which they filed -- and certainly not nonexistent, speculative State supreme court law -- governs) -- but it is a workable solution that has achieved consensus.  See Allstate Ins. Co. v. Menards, Inc., 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of State law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question.").  This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to consider State appellate and trial court decisions.  To the contrary, even non-judicial writings by influential authors, statements by State supreme court justices, the closeness of the vote on a prior case addressing the issue, and personnel changes on the court -- considerations that would never inform a federal court's analysis of federal law -- validly may come into play.  The question is whether the district courts must abdicate, across-the-board, the "would decide" aspect of the Erie analysis to their parent appellate courts when the Court of Appeals has declared an interpretation of State law.

The Erie doctrine results in federal cases that interpret State law withering with time.  While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption), expanding outward from the general (States must grant criminal jury trials) to the specific (the jury need not be twelve people, nor must it be unanimous) -- federal cases interpreting State law often become stale.  New State court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone.  The Supreme Court, which picks its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of State law.

The Court's views on Erie, of course, mean little if the Tenth Circuit does not agree.  In Wankier v. Crown Equipment Corp., 353 F.3d 866 (10th Cir. 2003), the Tenth Circuit said:

> Where no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do.  In performing this ventriloquial function, however, the federal court is bound by ordinary principles of *stare decisis*.  Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

Wankier v. Crown Equip. Corp., 353 F.3d at 866.  From this passage, it seems clear that the Tenth Circuit permits a district court to deviate from its view of State law only on the basis of a subsequent case "of the state's highest court."  The American Heritage Dictionary of the English Language 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the

court would do."  Wade v. EMCASCO Ins. Co., 483 F.3d at 666.  Accord Mosley v. Titus, 762

F. Supp. 2d at 1332 (citation omitted).

----

condition that; except under the circumstances that").  A more aggressive reading of the passage -- namely the requirement that the intervening case "resolv[e] the issue" -- might additionally compel the determination that any intervening case law must definitively and directly contradict the Tenth Circuit interpretation to be considered "intervening."

It is difficult to know whether the Honorable Michael W. McConnell's, then-United States Circuit Judge for the Tenth Circuit, limitation in Wankier v. Crown Equip. Corp. of "intervening decision" to cases from the highest State court was an oversight or intentional.  Most of the Tenth Circuit's previous formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts.  Even Koch v. Koch Industries, Inc., 203 F.3d 1202, 1231 (10th Cir. 2000), the primary authority upon which Wankier v. Crown Equipment Corp. relies, uses the more inclusive definition.  In fact, Wankier v. Crown Equipment Corp. quotes its relevant passage:

> In the absence of intervening Utah authority indicating that a plaintiff is not required to prove a safer, feasible alternative design, we are bound to follow the rule of Allen [v. Minnstar, Inc.], 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case interpreting an issue of Utah law], as was the district court.  "Following the doctrine of stare decisis, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or an intervening change in the state's law."  Koch v. Koch Indus., Inc., 203 F.3d at 1231.

Wankier v. Crown Equip. Corp., 353 F.3d at 867.

Regardless whether the decision to limit the intervening authority a district court can consider was intentional or not, the Tenth Circuit has picked it up and run with it.  In Kokins v. Teleflex, Inc., 621 F.3d 1297 (10th Cir. 2010), the Tenth Circuit, quoting Wankier v. Crown Equipment Corp., refused to consider an opinion from the Court of Appeals of Colorado holding directly the opposite of an earlier Tenth Circuit interpretation of Colorado law.  See Kokins v. Teleflex, Inc., 621 F.3d at 1297 ("[T]he Colorado Court of Appeals decided Biosera[, Inc. v. Forma Scientific, Inc., 941 F.3d 284 (Colo. Ct. App. 1998)], so it is not an 'intervening decision of the state's highest court.'" (emphasis in original)(quoting Wankier v. Crown Equip. Corp., 353 F.3d at 866)).

The Tenth Circuit has set forth a stringent restriction on its district courts' ability to independently administer the Erie doctrine.  More importantly, the Tenth Circuit's view may be at tension with the above-quoted Supreme Court precedent, as well as its own prior case law.  Moore's lists the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior federal appellate decision [interpreting state law] is persuasive."  Moore's § 124.22[4] (citing State Farm Mut. Auto. Ins. v. Travelers Indem. Co., 433 F.2d 311, 312 (10th Cir. 1970)).  Still, the Court is bound to abide by the Tenth Circuit's interpretation of Erie.

## NEW MEXICO LAW REGARDING NEGLIGENT MISREPRESENTATION

To prevail on a negligent misrepresentation in New Mexico courts, a plaintiff must show:

"(1) the defendant made a material representation to plaintiff, (2) the plaintiff relied upon the representation, (3) the defendant knew the representation was false or made it recklessly, and (4) the defendant intended to induce reliance by the plaintiff." Robey v. Parnell, 2017-NMCA-038, ¶ 31, 392 P.3d 642, 652 (citing Saylor v. Valles, 2003-NMCA-037, ¶ 17, 63 P.3d 1152, 1158).[7]

---

[7]The Supreme Court of New Mexico has not expressly adopted this four-part negligent misrepresentation definition, but has stated that New Mexico follows the Restatement (Second) of Torts § 552 (1977) when it comes to negligent misrepresentation. See Garcia v. Rodey, Dickason, Sloan, Akin & Robb, P.A., 1988-NMSC-014, ¶ 16, 750 P.2d 118, 122. That restatement section states:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
>
> (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered
>
> (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
>
> (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.
>
> (3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

Restatement (Second) of Torts § 552 (1977). The Court cannot discern a meaningful difference between the Court of Appeals of New Mexico's four elements and the Restatement (Second) of Torts § 552(1)-(2). Under those sections, a defendant is liable for negligent misrepresentation when he or she "supplies false information" to the plaintiff; the plaintiff "justifiabl[y] reli[es] upon the information"; the defendant "fail[ed] to exercise reasonable care or competence in obtaining or communicating the information"; and the defendant "intend[ed] the information to influence or

"The theory of liability for this tort is one of negligence rather than of intent to mislead." Sims v. Craig, 1981-NMSC-046, ¶ 4, 627 P.2d 875, 877 (citing W. Prosser, Handbook of the Law of Torts § 107 (4th ed. 1971)). See Ledbetter v.Webb, 1985-NMSC-112, ¶ 26, 711 P.2d 874, 879 (distinguishing negligent misrepresentation from the intentional torts of fraud or deceit). These elements do not require that the parties have entered into a contract or partnership. See Leon v. Kelly, No. CIV 07-0467, 2008 WL 5978926, at *7 (D.N.M. Dec. 8, 2008)(Browning, J.) ("Negligent misrepresentation is a tort, and while it requires a professional or business relationship to a certain degree, it does not require an actual contract or partnership."); Sims v. Craig, 1981-

---

knows that the recipient so intends" to use the information. Restatement (Second) of Torts § 552. Those elements mirror the Court of Appeals of New Mexico's negligent misrepresentation test.

The Restatement (Second) of Torts § 552 states, however, that those with a public duty to give information may be liable for negligent misrepresentation for statements made to "the class of persons for whose benefit the duty is created in any of the transactions in which it is intended to protect them." Restatement (Second) of Torts § 552(3). The Court could not locate a New Mexico case applying negligent misrepresentation liability based on the public duty theory. New Mexico's Uniform Jury Instructions for negligent misrepresentation mirror Court of Appeals of New Mexico's test:

> A party is liable for damages caused by his negligent and material misrepresentation.
>
> A material misrepresentation is an untrue statement which a party intends the other party to rely on and upon which the other party did in fact rely.
>
> A negligent misrepresentation is one where the speaker has no reasonable ground for believing that the statement made was true.

N.M.R.A., Civ. UJI 13-1632. Although this jury instruction does not mention the public duty theory of negligent misrepresentation, its omission is not determinative. See State v. Wilson, 1994-NMSC-009, ¶ 5, 796, 867 P.2d 1175, 1178 (stating that, although the Supreme Court of New Mexico's "adoption of uniform jury instructions proposed by standing committees . . . establishes a presumption that the instructions are correct statements of law, that fact alone is not sufficient precedent to tie the hands of the Court of Appeals"). Given the Supreme Court of New Mexico's express adoption of the Restatement (Second) of Torts' definition for negligent misrepresentation, see Garcia v. Rodey, Dickason, Sloan, Akin & Robb, P.A., 1988-NMSC-014, ¶ 16, 750 P.2d at 122, the Court sees no reason why the Supreme Court of New Mexico would not, given the chance, recognize a public duty theory of negligent misrepresentation, and predicts that it would.

NMSC-046, ¶ 4, 627 P.2d at 876-77 (holding that the plaintiff could bring an action for negligent misrepresentation although the plaintiff could not sue on the contract because the contract was void).

## LAW REGARDING THE NEW MEXICO UPA

The UPA provides private -- individual and class action -- remedies and civil penalties "for unfair, deceptive, or unconscionable trade practices."  Valdez v. Metro. Prop. & Cas. Ins., No. CIV 11-0507 JB/KBM, 2012 WL 1132414, at *19 (D.N.M. March 31, 2012)(Browning, J.)(citing Ouynh Truong v. Allstate Ins, 2010-NMSC-009, ¶ 22, 227 P.3d 73, 80)).  See N.M.S.A. § 57-12-3 ("Unfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce are unlawful."); N.M.S.A. § 57-12-10 (authorizing private suits); N.M.S.A. § 57-12-11 (authorizing the Attorney General of New Mexico to seek civil penalties).   In construing the UPA, "courts to the extent possible will be guided by the interpretations given by the federal trade commission and the federal courts."  N.M.S.A. § 57-12-4.

The term "unfair or deceptive trade practice" covers

an act specifically declared unlawful pursuant to the Unfair Practices Act, a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services or in the extension of credit or in the collection of debts by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person . . . .

N.M.S.A. § 57-12-2(D).  To succeed on an UPA claim of an unfair or deceptive trade practice, the plaintiff most show four elements:

First, the complaining party must show that the party charged made an "oral or written statement, visual description or other representation" that was either false or misleading.  *Ashlock*[v. Sunwest Bank of Roswell, N.A.], [1988-NMSC-026, ¶ 4,] . . . 753 P.2d [346,] 347.  Second, the false or misleading representation must have been "knowingly made in connection with the sale, lease, rental or loan of goods or services in the extension of credit or . . . collection of debts."  *Id*.  Third, the conduct complained of must have occurred in the regular course of the

- 24 -

representer's trade or commerce.  *Id.*  Fourth, the representation must have been of the type that "may, tends to or does, deceive or mislead any person."  *Id.*

Stevenson v. Louis Dreyfus Corp., 1991-NMSC-051, ¶ 12, 811 P.2d 1308, 1311.  "Generally speaking, [this UPA provision] is designed to provide a remedy against misleading identification and false or deceptive advertising."  Lohman v. Daimler-Chrysler Corp., 2007-NMCA-100, ¶ 22, 166 P.3d 1091, 1096.  "The gravamen of an unfair trade practice is a misleading, false, or deceptive statement made knowingly in connection with the sale of goods or services."  Diversey Corp. v. Chem-Source Corp., 1998-NMCA-112, ¶ 17, 965 P.2d 332, 338.  "The 'knowingly made' requirement is met if a party was actually aware that the statement was false or misleading when made, or in the exercise of reasonable diligence should have been aware that the statement was false or misleading."  Stevenson v. Louis Dreyfus Corp., 1991-NMSC-051, ¶ 17, 811 P.2d at 1311-12.  The recipient of a misleading message need not have transacted directly with the message's maker.  See Gandydancer, LLC v. Rock House CGM, LLC, 2019-NMSC-021, ¶ 32, 453 P.3d 434, 443 ("[T]he UPA does not necessarily require a direct transaction between the consumer and a defendant that supplied parts incorporated in the goods purchased when the defendant's 'misrepresentations . . . bear on downstream sales.'" (quoting Lohman v. Daimler-Chrysler Corp., 2007-NMCA-100, ¶¶ 25-26, 29-30, 142 N.M. at 442-43, 166 P.3d at 1096-97)).  The Court has noted that, "in the right circumstances, it could grant judgment as a matter of law on whether a statement is deceptive or misleading," although "generally the question is a matter of fact."  Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 728 F. Supp. 2d at 1192-93 (reasoning that the Supreme Court of New Mexico would reach this conclusion).  The Court has also concluded that a communication can mislead even if the representation is not false.  See Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 728 F. Supp. 2d at 1193-95 (concluding that the Supreme Court of New Mexico would reach this conclusion).

Unconscionable trade practices include:

act[s] or practice[s] in connection with . . . the extension of credit in the collection of debts that to a person's detriment:

(1)     take[] advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree; or

(2)     result[] in a gross disparity between the value received by a person and the price paid.

N.M.S.A. § 57-12-2(E).   An unconscionable trade practice, accordingly, can be procedurally unconscionable, per § 57-12-2(E)(1), or substantively unconscionable, per § 57-12-2(E)(2).  See Cordova v. World Fin. Corp., 2009-NMSC-021, ¶ 21, 308 P.3d 901, 907 ("The doctrine of contractual unconscionability can be analyzed from both procedural and substantive perspectives.").   The UPA's provisions regarding unconscionability "evince[] a legislative recognition that, under certain conditions, the market is truly not free, leaving it for courts to determine when the market is not free, and empowering courts to stop and preclude those who prey on the desperation of others from being rewarded with windfall profits."  State ex rel. King v. B & B Inv. Grp., Inc., 2014-NMSC-024, ¶ 34, 329 P.3d 658, 671.   "Procedural unconscionability . . . examines the particular factual circumstances surrounding the formation of [a] contract, including the relative bargaining strength, sophistication of the parties, and the extent to which either party felt free to accept or decline terms demanded by the other."  Cordova v. World Fin. Corp., 2009-NMSC-021, ¶ 23, 308 P.3d at 907-08.  Substantive unconscionability, on the other hand, "concerns the legality and fairness of the contract terms themselves," and "focuses on such issues as whether the contract terms are commercially reasonable and fair, the purpose and effect of the terms, the one-sidedness of the terms, and other similar policy concerns."  Cordova v. World Fin. Corp., 2009-NMSC-021, ¶ 22, 308 P.3d at 907.   Substantive unconscionability arises where a contract is illegal, or where it "is grossly unreasonable and against

our public policy under the circumstances," Cordova v. World Fin. Corp., 2009-NMSC-021, ¶ 31, 308 P.3d at 909, even if "there is not a statute that specifically limits [such] contract terms," because "[r]uling on substantive unconscionability is an inherent equitable power of the court, and does not require prior legislative action," State ex rel. King v. B&B Inv. Grp., Inc., 2014-NMSC-024, ¶ 33, 329 P.3d at 670.

Under the UPA, the Attorney General of New Mexico is entitled to bring an action in New Mexico's name for UPA violations.  See N.M.S.A. § 57-12-8(A).  In such an action, the Attorney General may "petition the district court for temporary or permanent injunctive relief and restitution."  N.M.S.A. § 57-12-8(B).  Special penalties are available against persons who act willfully:

> In any action brought under Section 57-12-8 NMSA 1978, if the court finds that a person is willfully using or has willfully used a method, act or practice declared unlawful by the Unfair Practices Act, the attorney general, upon petition to the court, may recover, on behalf of the state of New Mexico, a civil penalty of not exceeding five thousand dollars ($5,000) per violation.

N.M.S.A. § 57-12-11.  "Willful conduct is the intentional doing of an act with knowledge that harm may result."  N.M. Civ. UJI 13-1827.[8]

---

[8]The Court expects the Supreme Court of New Mexico to define the UPA's "willful" according to the New Mexico Civil Uniform Jury Instructions.  As discussed supra, the Court predicts that the Supreme Court of New Mexico would conclude that the New Mexico Civil Uniform Jury Instructions best defines New Mexico's understanding of "willful" in the punitive damages context as well.  The Court of Appeals of New Mexico has concluded that the UPA's civil penalties are punitive.  See Atherton v. Gopin, 2015-NMCA-003, ¶ 53, 340 P.3d at 641 (citing McLelland v. United Wis. Life Ins., 1999-NMCA-055, ¶ 10, 127 N.M. 303, 980 P.2d 86, 90).  The Court predicts that the Supreme Court of New Mexico would agree with Atherton v. Gopin.  In Hale v. Basin Motor Co., the Supreme Court of New Mexico concluded that multiplying civil penalties based on scienter creates punitive damages.  See 1990-NMSC-068, ¶ 20, 110 N.M. at 320.  The UPA does not multiply the otherwise applicable civil penalties for culpable defendants, but it increases the maximum penalty according to scienter.  Multiplying civil penalties differs from increasing maximum civil penalties only in the means of calculating penalties; both provision categories enhance penalties for culpable mental states and are likewise punitive.  The Court concludes, accordingly, that the Supreme Court of New Mexico would look to the New Mexico

**LAW REGARDING NEW MEXICO'S UNFAIR INSURANCE PRACTICES ACT**

The Unfair Insurance Practices Act (UIPA) imposes liability for a laundry list of unfair insurance claims practices, including the following:

A. misrepresenting to insureds pertinent facts or policy provisions relating to coverages at issue;

B. failing to acknowledge and act reasonably promptly upon communications with respect to claims from insureds arising under policies;

C. failing to adopt and implement reasonable standards for the prompt investigation and processing of insureds' claims arising under policies;

D. failing to affirm or deny coverage of claims of insureds within a reasonable time after proof of loss requirements under the policy have been completed and submitted by the insured;

E. not attempting in good faith to effectuate prompt, fair and equitable settlements of an insured's claims in which liability has become reasonably clear;

F. failing to settle all catastrophic claims within a ninety-day period after the assignment of a catastrophic claim number when a catastrophic loss has been declared;

G. compelling insureds to institute litigation to recover amounts due under policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds when such insureds have made claims for amounts reasonably similar to amounts ultimately recovered;

H. attempting to settle a claim by an insured for less than the amount to which a reasonable person would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application;

I. attempting to settle claims on the basis of an application that was altered without notice to, or knowledge or consent of, the insured, his representative, agent or broker;

---

Civil Uniform Jury Instructions to understand "willful" in the UPA provision for enhanced civil penalties. Cf. Atherton v. Gopin, 2015-NMCA-003, ¶¶ 53-54, 340 P.3d at 641 (reaching the same conclusion as the Court and using the N.M. Civ. UJI 13-1827 definition to define "willful" in the UPA).

J.      failing, after payment of a claim, to inform insureds or beneficiaries, upon request by them, of the coverage under which payment has been made;

K.      making known to insureds or claimants a practice of insurer of appealing from arbitration awards in favor of insureds or claimants for the purpose of compelling them to accept settlements or compromises less than the amount awarded in arbitration;

L.      delaying the investigation or payment of claims by requiring an insured, claimant or the physician of either to submit a preliminary claim report and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information;

M.      failing to settle an insured's claims promptly where liability has become apparent under one portion of the policy coverage in order to influence settlement under other portions of the policy coverage;

N.      failing to promptly provide an insured a reasonable explanation of the basis relied on in the policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement; or

O.      violating a provision of the Domestic Abuse Insurance Protection Act.

N.M.S.A. § 59A-16-20.

The Honorable Bruce D. Black, United States District Judge for the District of New Mexico, has concluded that a plaintiff failed to plausibly plead a UIPA claim:

> Dr. Yumukoglu alleges generally that Provident's conduct "violates one or more of the provisions of Section 59A-16-20 NMSA 1978 (1984)," the section of the New Mexico Unfair Insurance Practices Act that prohibits unfair claims practices.  Dr. Yumukoglu does not specify which of the fifteen provisions of this section he feels Provident has violated, and after a review of the statute, the Court cannot perceive which subsection could have been violated under the fact alleged.  At the very least, Dr. Yumukoglu has failed to comply with the pleading requirements of Federal Rule of Civil Procedure 8(a)(2).  Rule 8(a)(2) requires that a civil complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief."  Here, it is not clear either what Dr. Yumukoglu is claiming or to what relief he is entitled under § 56A-16-20.  Dr. Yumukoglu's claim appears, like his claim for breach of the duty of good faith and fair dealing, to be based on Provident's alleged bad faith in terminating his disability benefits.  As discussed above, the Court finds that Provident's decision to terminate Dr. Yumukoglu's benefits did not amount to bad faith.  Provident's motion for summary judgment on Plaintiff's claim for statutory violation is granted.

Estate of Gonzales v. AAA Life Ins. Co., 2012 WL 1132332, at *18-19 (quoting Yumukoglu v. Provident Life & Accident Ins. Co., 131 F. Supp. 2d at 1227, (D.N.M. 2001)(Black, J.)(footnote omitted)(citations omitted)). The Court has previously found that a plaintiff failed to state a claim under rule 12(b)(6) when the complaint did not contain even "a formulaic recitation of the elements of a cause of action" under the UIPA.  Estate of Gonzales v. AAA Life Ins. Co., No. CIV 11-0486, 2012 WL 1132332, at *7 (D.N.M. Mar. 28, 2012)(Browning, J.)(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  The UIPA's § 59A-5-26, titled "Suspension, limitation or revocation of authority; discretionary and special grounds," is also found within New Mexico's Insurance Code, and is listed within Article 16, which pertains to "Trade Practices and Frauds." See N.M.S.A. § 59A-5-26.  Section 59A-5-26 outlines specifically when a superintendent "may, at his discretion, suspend limit or revoke an insurer's certificate of authority."  See N.M.S.A. § 59A-5-26.  Sections 59A-5-26(C)(1) and § 59A-5-26(C)(1), (2)(a) and (b), in turn, provide that:

> C.   The superintendent shall suspend or revoke an insurer's certificate of authority on any of the following grounds, if found after a hearing thereon that the insurer:
>
> (1)   is in unsound condition, or being fraudulently conducted, or in such condition or using such methods and practices in conduct of its business as to render its further transaction of insurance in this state currently or prospectively hazardous or injurious to policyholders or the public;
>
> (2)   with such frequency as to indicate its general business practice in this state:
>
> > (a)   has without just cause failed to pay, or delayed payment of, claims arising under its policies, whether the claim is in favor of an insured or in favor of a third person with respect to the liability of an insured to such third person; or
> >
> > (b)   without just cause compels insureds or claimants to accept less than amount due them or to employ attorney or to bring suit against the insurer or such an insured to secure full payment or settlement of a claim;

N.M.S.A. § 59A-5-26(C)(1); § 59A-5-26(C)(1), (2)(a)-(b).

## NEW MEXICO LAW REGARDING INSURANCE CONTRACTS

Under New Mexico law, insurance policies are interpreted like any other contract, except that, "where a policy term is 'reasonably and fairly susceptible of different construction,' it is deemed ambiguous and 'must be construed against the insurance company as the drafter of the policy.'" United Nuclear Corp. v. Allstate Ins. Co., 2012-NMSC-032, ¶ 10, 285 P.3d 644, 648 (quoting Knowles v. United Serv. Auto. Ass'n, 1992-NMSC-030, ¶ 9, 832 P.2d 394, 396).  The Supreme Court of New Mexico has stated that: "Insurance policies almost always are contracts of adhesion, meaning that 'the insurance company controls the language' and 'the insured has no bargaining power.'" United Nuclear Corp. v. Allstate Ins. Co., 2012-NMSC-032, ¶ 10, 285 P.3d at 648 (quoting Cal. Cas. Ins. Co. v. Garcia-Price, 2003-NMCA-044, ¶ 20, 63 P.3d 1159, 1163)(citing Padilla v. State Farm Mut. Auto. Ins. Co., 2003-NMSC-011, ¶ 14 n.3, 68 P.3d at 907 n.3).  The Supreme Court of New Mexico described how insurance contracts are contracts of adhesion in Sanchez v. Herrera, 1989-NMSC-073, 783 P.2d 465 (1989):

> The typical insured does not bargain for individual terms within policy clauses; the insured makes only broad choices regarding general concepts of coverage, risk, and cost. Not only does the insurance company draft the documents, but it does so with far more knowledge than the typical insured of the consequences of particular words.

1989-NMSC-073, ¶ 21, 783 P.2d at 469.  "Cognizant of this imbalance in power, 'as a matter of public policy' courts 'generally construe[]' ambiguities 'in favor of the insured and against the insurer.'"  United Nuclear Corp. v. Allstate Ins. Co., 2012-NMSC-032, ¶ 11, 285 P.3d at 648 (quoting Ponder v. State Farm Mut. Auto. Ins. Co., 2000-NMSC-033, ¶ 26, 12 P.3d 960, 967)(citing 2 Steven Plitt et al., Couch on Insurance § 22:14 (3d ed. 2010)).  Accordingly, when a court finds that a term in an insurance policy is ambiguous, "[t]he court's construction of [the]

policy will be guided by the reasonable expectations of the insured." Rummel v. Lexington Ins. Co., 1997-NMSC-041, ¶ 22, 945 P.2d 970, 977. See Phx. Indem. Ins. Co. v. Pulis, 2000-NMSC-023, ¶ 23, 9 P.3d 639, 646 ("[T]he test is not what the insurer intended its words to mean, but what a reasonable person in the insured's position would have understood them to mean."). Additionally, "'[i]t is unnecessary to show that a construction against the insurer is more logical than a construction against the insured,' so long as both constructions are reasonable." United Nuclear Corp. v. Allstate Ins. Co., 2012-NMSC-032, ¶ 11, 285 P.3d at 648 (quoting 2 Plitt, supra § 22:17, at 22:98-22:99).

An insurer's obligation is a question of contract law and will be determined by reference to the insurance policy's terms. See Safeco Ins. Co. of Am., Inc. v. McKenna, 1977-NMSC-053, ¶ 18, 565 P.2d 1033, 1037. The clauses must be construed as intended to be a complete and harmonious instrument. See Erwin v. United Benefit Life Ins. Co., 1962-NMSC-067, ¶ 17, 371 P.2d 791, 794 (1962). On the other hand, where a clause "read alone is clear and unambiguous . . . it is not necessary to read the coverages together," because "there is a risk of creating, rather than identifying, ambiguity." Battishill v. Farmers Alliance Ins. Co., 2006-NMSC-004, ¶ 16, 127 P.3d at 1115. Exclusionary clauses in insurance policies are to be narrowly construed, with the insured's reasonable expectations providing the basis for the analysis. See King v. Travelers Ins. Co., 1973-NMSC-013, ¶ 22, 505 P.2d 1226, 1232 (1973).

## NEW MEXICO LAW REGARDING BREACH-OF-CONTRACT CLAIMS

A contract is a legally enforceable promise that must consist of an offer, an acceptance, consideration, and mutual assent. See UJI 13-801 NMRA. A person may breach a contract by failing to perform a contractual obligation when the performance is required, unless that performance is otherwise excused. See UJI 13-822 NMRA. Incomplete performance is a breach

of contract.  See Cochrell v. Hiatt, 1981-NMCA-152, ¶¶ 4-13, 97 N.M. 256, 258-59, 638 P.2d

1101, 1103-04 (holding that, where the contract called for the roof to be restored to a "healthy"

state and guaranteed the work for twenty-five years, because the roof leaked within the twenty-

five-year period, the defendant's performance was incomplete, and the defendant was in breach of

the contract).  Under New Mexico law, "[t]he elements of a breach-of-contract action are the

existence of a contract, breach of the contract, causation, and damages." Abreu v. N.M. Children,

Youth and Families Dep't, 797 F. Supp. 2d 1199, 1247 (D.N.M. 2011)(Browning, J.).

> [A] complaint on breach of contract must allege: (1) the existence of a valid and
> binding contract; (2) the plaintiff's compliance with the contract and his
> performance of the obligations under it; (3) a general averment of the performance
> of any condition precedent; and (4) damages suffered as a result of defendant's
> breach.

McCasland v. Prather, 1978-NMCA-098, ¶ 7, 92 N.M. 192, 194, 585 P.2d 336, 338 (citing Wright

and Miller, Federal Practice and Procedure: Civil § 1235 (1969)).

Applying these principles in Armijo v. N.M. Dep't of Transp., No. CIV. 08-0336, 2009

WL 1329192 (D.N.M. Apr. 6, 2009)(Browning, J.), the Court found that a plaintiff's allegations

failed to state a claim for breach of contract.  In support of the breach-of-contract claim, the

plaintiff asserted that "the Department would follow state employment policies and procedure, and

that the Department terminated him in breach of those policies without just cause."  2009 WL

1329192, at *7.  The Court noted that the plaintiff did not "indicate what contractual provisions or

employment policies the Department breached," and did not say "to what his employment contract

entitles him or of what the Department deprived him."  2009 WL 1329192, at *7.  The Court found

that there was "not enough . . . to determine whether, if taken as true, the Complaint's allegations

would support claims for breach of contract."  2009 WL 1329192, at *8.  On the other hand, the

Court has previously determined that a pro se plaintiff sufficiently alleged that his counsel

breached a contract for legal representation by alleging that his former counsel promised to

represent the plaintiff at forfeiture proceedings, that the plaintiff paid the counsel, and that the counsel failed to represent the plaintiff.  See Archuleta v. City of Roswell, No. CIV 10-1224, 2012 WL 4950324, at *16-17 (D.N.M. Sept. 30, 2012)(Browning, J.).

"Additionally, in spite of the general bar on punitive damages for breach-of-contract cases, the Supreme Court of New Mexico has recognized that punitive damages may be recoverable under some circumstances for a breach of contract."  Anderson Living Trust v. ConocoPhillips Co., LLC, No. CIV 12-0040, 2013 WL 3456913, at *42 (June 28, 2013)(Browning, J.).  As the Supreme Court of New Mexico stated in Romero v. Mervyn's: "Our previous cases clearly establish that, in contract cases not involving insurance, punitive damages may be recovered for breach of contract when the defendant's conduct was malicious, fraudulent, oppressive, or committed recklessly with a wanton disregard for the plaintiff's rights."  1989-NMSC-081, ¶ 23, 109 N.M. 249, 255, 784 P.2d 992, 998.  Punitive damages are not available when they are "predicated solely on gross negligence.  In addition to, or in lieu of, such negligence there must be evidence of an evil motive or a culpable mental state."  Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, 880 P.2d 300, 308 (internal quotation marks omitted).  The Supreme Court of New Mexico has defined "reckless disregard" sufficient for an award of punitive damages as "when the defendant knows of potential harm to the interests of the plaintiff but nonetheless utterly fails to exercise care to avoid the harm."  Paiz v. State Farm Fire & Cas. Co., 880 P.2d at 308 (citation and secondary quotations omitted).  A defendant does not act with reckless disregard to a plaintiff's rights merely by failing "to exercise even slight care," absent the requisite "culpable or evil state of mind."  Paiz v. State Farm Fire & Cas. Co., 880 P.2d at 308 (citation and secondary quotations omitted).  The New Mexico Civil Jury Instructions applicable at the time of Apodaca's insurance

contract define the elements necessary for an award of punitive damages for a breach of contract

as follows:

> If you find that _____ (*name of party making claim for punitive damages*)
> should recover compensation for damages, and if you further find that the conduct
> of _____ (*name of party whose conduct gives rise to a claim for punitive
> damages*) was [malicious], [reckless], [wanton], [oppressive], or [fraudulent], then
> you may award punitive damages.

UJI 13-861 NMRA (1991)(amended 2020).[9]

## NEW MEXICO LAW REGARDING CONTRACT INTERPRETATION

In contract cases, "the role of the court is to give effect to the intention of the contracting

parties." Bogle Farms, Inc. v. Baca, 1996-NMSC-051, ¶ 22, 925 P.2d at 1184.  "The primary

objective in construing a contract is not to label it with specific definitions or to look at form above

substance, but to ascertain and enforce the intent of the parties as shown by the contents of the

instrument." Bogle Farms, Inc. v. Baca, 1996-NMSC-051, ¶ 22, 925 P.2d at 1184 (citing Shaeffer

v. Kelton, 1980-NMSC-117, 619 P.2d 1226, 1229).  "The parol evidence rule 'bars admission of

evidence extrinsic to the contract to contradict and perhaps even supplement the writing.'"

Memorial Med. Ctr., Inc. v. Tatsch Const., Inc., 2000-NMSC-030, ¶ 16, 12 P.3d at 431 (citation

omitted).  On the other hand, New Mexico has "adopted the contextual approach to contract

interpretation, in recognition of the difficulty of ascribing meaning and content to terms and

expressions in the absence of contextual understanding." Mark V, Inc. v. Mellekas, 1993-NMSC-

001, ¶ 10, 845 P.2d 1232, 1235 (citation and internal quotation marks omitted).  See Pedroza v.

---

[9]"The Supreme Court of New Mexico's adoption of uniform jury instructions proposed by
standing committees of the Court establishes a presumption that the instructions are correct
statements of law." Back v. ConocoPhillps Co., 2012 WL 6846397, at *15 n.2 (D.N.M. Aug. 31,
2012)(Browning, J.)(citing State v. Wilson, 1994-NMSC-009, ¶ 5, 867 P.2d 1175, 1178).

Lomas Auto Mall, Inc., No. CIV 07-0594, 2013 WL 4446770, at *18 (D.N.M. Aug. 2, 2013)(Browning, J.).

"The question whether an agreement contains an ambiguity is a matter of law." Hartnett v. Papa John's Pizza USA, Inc., 912 F. Supp. 2d 1066, 1092 (D.N.M. 2012)(Browning, J.). See Mark V., Inc. v. Mellekas, 1993-NMSC-001, ¶ 12, 845 P.2d at 1235 (citing Levenson v. Mobley, 1987-NMSC-102, 744 P.2d 174, 176). When the "evidence presented is so plain that no reasonable person could hold any way but one, then the court may interpret the meaning as a matter of law." Mark V, Inc. v. Mellekas, 1993-NMSC-001, ¶ 10, 114 N.M. at 781, 845 P.2d at 1235. A contract "is not rendered ambiguous merely because a term is not defined; rather, the term must be interpreted in its usual, ordinary, and popular sense . . . and may be ascertained from a dictionary." Battishill v. Farmers Alliance Ins. Co., 2006-NMSC-004, ¶ 8, 127 P.3d at 1111 (internal quotation marks omitted)(applying principle to insurance policy). "A contract is deemed ambiguous only if it is reasonably and fairly susceptible of different constructions. The mere fact that the parties are in disagreement on the construction to be given does not necessarily establish ambiguity." Vickers v. N. Am. Land Dev., Inc., 1980-NMSC-021, 607 P.2d 603, 606 (citation omitted).

"An ambiguity exists in an agreement when the parties' expressions of mutual assent lack clarity." Mark V, Inc. v. Mellekas, 1993-NMSC-001, ¶ 12, 845 P.2d at 1235 (citation omitted). If the court finds that the contract is "reasonably and fairly susceptible of different constructions, an ambiguity exists." Mark V, Inc. v. Mellekas, 1993-NMSC-001, ¶ 12, 845 P.2d at 1235 (citing Vickers v. North Am. Land Dev., Inc., 1980-NMSC-021, ¶ 9, 94 N.M. at 68, 607 P.2d at 606 (1980)).

> [I]n determining whether a term or expression to which the parties have agreed is unclear, a court may hear evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance. . . . It is important to bear in mind that the meaning the court seeks

to determine is the meaning one party (or both parties, as the circumstances may require) attached to a particular term or expression at the time the parties agreed to those provisions.

. . . .

It may be that the evidence presented is so clear that no reasonable person would determine the issue before the court in any way but one. In that case, to the extent the court decides the issue, the question then may be described as one of law.

C.R. Anthony Co. v. Loretto Mall Partners, 1991-NMSC-070, 817 P.2d 238, 242-44 (affirming the trial court because it "considered all evidence adduced in response to the motion for summary judgment, including collateral or extrinsic evidence of the circumstances surrounding the execution of the lease amendment, and quite properly found no ambiguity")(citations and footnote omitted). In addition, in determining whether an ambiguity exists,

> [a] court may employ the many rules of contract interpretation that do not depend on evidence extrinsic to the contract. See, e.g., Smith v. Tinley, 100 N.M. 663, 665, 674 P.2d 1123, 1125 (1984) (reasonable interpretation of contract is favored); Schultz & Lindsay Constr. Co. v. State, 83 N.M. 534, 536, 494 P.2d 612, 614 (1972) (uncertainties construed strictly against drafter); Id. at 535, 494 P.2d at 613 (each part of contract is to be given significance according to its place in the contract so as to give effect to the intentions of the parties).

C.R. Anthony Co. v. Loretto Mall Partners, 1991-NMSC-070, ¶ 17 n.5, 817 P.2d at 244 n.5. Once the Court finds that an ambiguity exists, the resolution of that ambiguity becomes a question of fact. See Mark V, Inc. v. Mellekas, 1993-NMSC-001, ¶ 13, 845 P.2d at 1235. To decide the meaning of any ambiguous terms, "the fact finder may consider extrinsic evidence of the language and conduct of the parties and the circumstances surrounding the agreement, as well as oral evidence of the parties' intent." Mark V, Inc. v. Mellekas, 1993-NMSC-001, ¶ 13, 845 P.2d at 1236. "[I]f the court finds ambiguity, the jury (or court as the fact finder in the absence of a jury) resolves the ambiguity as an issue of ultimate fact before deciding breach and damages." C.R. Anthony Co. v. Loretto Mall Partners, 1991-NMSC-070, ¶ 11, 817 P.2d at 241.

## NEW MEXICO LAW REGARDING THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

"Whether express or not, every contract imposes upon the parties a duty of good faith and fair dealing in its performance and enforcement." Watson Truck & Supply Co., Inc. v. Males, 1990-NMSC-105, 801 P.2d 639, 642 (1990)(citations omitted). "Broadly stated, the covenant requires that neither party do anything which will deprive the other of the benefits of the agreement." Watson Truck & Supply Co. v. Males, 1990-NMSC-105, 801 P.2d at 642 (internal quotation marks omitted). "The breach of this covenant requires a showing of bad faith or that one party wrongfully and intentionally used the contract to the detriment of the other party." Sanders v. FedEx Ground Package Sys., 2008-NMSC-040, ¶ 7, 114 N.M. 449, 188 P.2d 1200 (secondary quotations omitted). The Supreme Court of New Mexico has expressed reluctance, however, to use the covenant of good faith and fair dealing "under circumstances where . . . it may be argued that from the covenant there is to be implied in fact a term or condition necessary to effect the purpose of a contract." Watson Truck & Supply Co. v. Males, 1990-NMSC-105, 801 P.2d at 642.

> "Generally, in the absence of an express provision on the subject, a contract contains an implied covenant of good faith and fair dealing between the parties. Under the implied covenant of good faith and fair dealing, courts can award damages against a party to a contract whose actions undercut another party's rights or benefits under the contract. Our Supreme Court has nevertheless refused to apply this implied covenant to override an express at-will termination provision in an integrated, written contract."

Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co, 407 F.3d 1091, 1114-15 (10th Cir. 2005)(quoting Kropinak v. ARA Health Servs., Inc., 2001-NMCA-081, ¶¶ 3-4, 33 P.3d 679)(secondary citations omitted)).

New Mexico has recognized that a cause of action for breach of the covenant of good faith and fair dealing sounds in contract. See Bourgeous v. Horizon Healthcare Corp., 1994-NMSC-

038, 117 N.M. 434, 872 P.2d 852, 857 ("Bourgeous").  The Supreme Court of New Mexico has also explained that tort recovery for breach of the covenant of good faith and fair dealing is permissible only where a special relationship exists, such as between an insurer and its insured. See Bourgeous, 1994-NMSC-038, ¶ 17, 117 N.M. at 439, 872 P.2d at 857.  The "relationship of insurer and insured is inherently unbalanced; the adhesive nature of insurance contracts places the insurer in a superior bargaining position." Bourgeous, 1994-NMSC-038, 872 P.2d at 857 (citations omitted)(internal quotation marks omitted).  Similarly, the Court of Appeals of New Mexico has held that "[t]he claim of breach of good faith and fair dealing sounds in contract, at least when no 'special relationship' such as that between an insured and insurer exists."  Heimann v. Kinder-Morgan CO2 Co., 2006-NMCA-127, ¶ 18, 144 P.3d 111.

The Supreme Court of New Mexico has indicated that "the duty to not act in bad faith or deal unfairly," which an implied covenant of good faith and fair dealing within a contract imposes, "becomes part of the contract and the remedy for its breach is on the contract itself." Bourgeous, 1994-NMSC-038, ¶ 17, 117 N.M. at 439, 872 P.2d at 857 (discussing an Arizona case and distinguishing this measure of damages from tort damages that are available for breach of this covenant in the insurance context).  In the insurance context, however, a plaintiff can recover tort damages for breach of this implied covenant.  See Bourgeous, 1994-NMSC-038, ¶ 17, 117 N.M. at 439, 872 P.2d at 857.

The Supreme Court of New Mexico has noted that it does "not recognize a cause of action for breach of an implied covenant of good faith and fair dealing in an at-will employment relationship." Melnick v. State Farm Mut. Auto. Ins. Co., 1998-NMSC-012, 749 P.2d 1105, 1109. This limitation is because "there is no contract of employment upon which the law can impose the

stated duty to exercise good faith and fair dealing."  Sanchez v. The New Mexican, 1987-NMSC-059, 738 P.2d 1321, 1324 (emphasis in original).

## ANALYSIS

The Court holds that the Third MTD is properly treated as a motion to dismiss, and not treated as a motion for summary judgment.  The Court holds also that Apodaca states multiple valid claims for relief, specifically for negligent misrepresentation, for UPA violations, for UIPA violations, and for breach of the covenant of good faith and fair dealing, and is accordingly entitled to injunctive relief, declaratory judgment, and punitive damages.  The Court holds, however, that Apodaca fails to state a claim for relief for breach of contract; and the Court holds Apodaca may not pursue a reformation-of-contract claim.  The Court predicts that when the Supreme Court of New Mexico addresses the question that Chief Judge Johnson certified to it in Smith v. Interinsurance Exch. of the Auto. Club, No. CIV 22-0447-WJ, 2022 WL 17093456 (D.N.M. Nov. 21, 2022)(Johnson, C.J.)("Smith"), the Supreme Court of New Mexico will hold that the rule it announced in Crutcher -- that an insurer must disclose to minimally insured consumers that they likely will receive no UIM benefits in a collision with a minimally insured tortfeasor -- does not apply on a prospective-only basis.  Accordingly, because a duty to disclose applies to her policy, and because Young America did not disclose that Apodaca's UIM policy would have little to no value, Apodaca states claims for relief for negligent misrepresentation and under the UPA and UIPA.  The Court holds, however, that Apodaca's breach-of-contract claims do not state claims for relief -- because she does not show that, although its conduct was deceptive, Young America failed to perform under the contract; Apodaca does, however, state claims for breach of the covenant of good faith and fair dealing.  As to Apodaca's injunctive relief, declaratory judgment, and punitive damages claims, these are valid insofar as they are forms of remedy sought; Apodaca

- 40 -

however, cannot seek reformation of the contract, because the insurance policy as reformed would be void under New Mexico law.

Accordingly, the Court reaches the following conclusions.  The Court will deny Young America's Third MTD as to these counts: (i) Count I, for negligent misrepresentation; (ii) Count II, for UPA violations; (iii) Count III, for UIPA violations; (iv) Count V, for breach of the covenant of good faith and fair dealing; (v) Count VI, for injunctive relief; (vi) Count VII, for declaratory judgment; and (vii) Count VIII, for punitive damages.  The Court grants Young America's Third MTD as to this count:  (i) Count IV, for breach of contract and claim for underinsured motorist coverage.

**I.      THE COURT WILL TREAT YOUNG AMERICA'S THIRD MTD AS A MOTION TO DISMISS, RATHER THAN AS A MOTION FOR SUMMARY JUDGMENT, EVEN THOUGH IT RELIES ON MATERIALS OUTSIDE THE PLEADINGS, SUCH AS APODACA'S INSURANCE POLICY AND THE CRUTCHER OPINION, BECAUSE THEY ARE REFERENCED IN THE COMPLAINT, ARE CENTRAL TO APODACA'S CLAIMS, AND THE PARTIES DO NOT DISPUTE THEIR AUTHENTICITY.**

The Court does not accept Apodaca's invitation to treat Young America's Third MTD as a motion for summary because it refers to such documents outside the complaint as the insurance policy Young America issued her and judicial opinions such as Crutcher.  See Response at 11-12. "In addition to the complaint, the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity."  Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002). Because Apodaca refers to her insurance policy in her SAC, because the insurance policy is "central" to her claims, and because she "do[es] not dispute the document['s] authenticity," the Court properly may consider it when deciding Young America's Third MTD without converting the Third MTD to a motion for summary judgment.  Jacobsen v. Deseret Book Co., 287 F.3d at

941.  Moreover, citation to controlling law does not transform a motion to dismiss into a motion for summary judgment.  Cf. Response at 12 (asserting that Crutcher and other "cases referred to in the Motion to Dismiss SAC [are] matters outside the pleadings").  If parties could not cite to cases when briefing a motion to dismiss, few if any filings would ever maintain the character of a motion to dismiss because such a document necessarily points to material beyond the pleadings -- namely, to controlling judicial decisions -- to argue that a plaintiff's claim does not state a claim for relief and that the court should dismiss the pleading.  Accordingly, the Court declines Apodaca's invitation to treat Young America's Third MTD as a motion for summary judgment and thus will not permit her to engage in "limited discovery."  Response at 12.

## II.    APODACA STATES VALID CLAIMS UNDER THE UPA AND UIPA, AND FOR NEGLIGENT MISREPRESENTATION, BECAUSE THE CRUTCHER OPINION APPLIES TO THE POTENTIALLY ILLUSORY CHARACTER OF UM/UIM POLICIES SUCH AS THE YOUNG AMERICA POLICY THAT APODACA PUCHASED.

Because, as will be discussed, the Supreme Court of New Mexico's decision in Crutcher applies to such policies as Apodaca's, she validly states claims for negligent misrepresentation, for UPA violations, and for UIPA violations.  The parties largely agree that, if Crutcher's disclosure requirement applies to policies issued before Crutcher, then Young America's failure to disclose supplies a sound basis for Apodaca's claims.  Although Crutcher itself did not explicitly speak to whether the deceptive practice it described constituted negligent misrepresentation, a UPA violation, or a UIPA violation, its holding that "the minimum limits UM/UIM coverage is illusory because it is misleading to the average insurance purchaser," Crutcher, 2022-NMSC-001, ¶ 27, 501 P.3d 433, 440, means that such a policy, if undisclosed, amounts to such a violation. Accordingly, the Court predicts that the Supreme Court of New Mexico will answer the question that Chief Judge Johnson certified to it in Smith, No. CIV 22-0447, 2022 WL 17093456, at *3

- 42 -

(D.N.M. Nov. 21, 2022)("Whether Crutcher v. Liberty Mut. Ins. Co., 2022-NMSC-001, 501 P.3d

433, applies prospectively or retroactively?), thus: retroactively.

> A. **THE COURT PREDICTS THAT THE SUPREME COURT OF NEW MEXICO WILL HOLD THAT THE DECISION IN CRUTCHER APPLIES TO APODACA'S YOUNG AMERICA POLICY, BECAUSE CRUTCHER DOES NOT OVERCOME THE PRESUMPTION OF RETROACTIVITY EITHER BY EXPRESSLY STATING ITS RULE IS PROSPECTIVE ONLY, OR UNDER THE THREE-FACTOR TEST FOR DETERMINING PROSPECTIVITY WHEN NOT STATED EXPLICITLY.**

The Court predicts that the Supreme Court of New Mexico, when it decides the question

certified in Smith, No. CIV 22-0447, 2022 WL 17093456, at *3 (D.N.M. Nov. 21, 2022), will hold

that the rule it announced in Crutcher does not apply prospectively only, and that therefore the

Crutcher rule applies to such policies as Apodaca's.  In reaching this conclusion, the Court follows

the familiar Erie approach, applying in diversity cases the law of the forum state, New Mexico,

and looking to the decisions its courts have made.  See Chisholm's Vill. Plaza, LLC v. Travelers

Com. Ins. Co., 621 F. Supp. 3d 1195, 1230 (D.N.M. 2022)(Browning, J.)("[I]f a district court

exercising diversity jurisdiction cannot find a Supreme Court of New Mexico 'opinion that

[governs] a particular area of substantive law . . . [the district court] must . . . predict how the

Supreme Court of New Mexico would [rule].'" (quoting Guidance Endodontics, LLC v. Dentsply

Int'l., Inc., 708 F. Supp. 2d 1209, 1224-25 (D.N.M. 2010)(Browning, J.))).

There is a presumption that judicial decisions in civil cases issued by the Supreme Court

of New Mexico apply retroactively, a presumption with constitutional dimensions.  Beavers, 1994-

NMSC-094, ¶ 21, 118 N.M. at 397-98, 881 P.2d at 1382-83 ("Just as there is a presumption that a

legislative enactment will operate prospectively only in the absence of clear indication of

legislative intent to the contrary, so we believe there should be a presumption that a new rule

adopted by a judicial decision in a civil case will operate retroactively." (citing Sw. Distrib. Co. v.

Olympia Brewing Co., 1977-NMSC-050, ¶ 24, 90 N.M. 502, 508, 565 P.2d 1019, 1025)).  Cf. De Niz Robles v. Lynch, 803 F.3d 1165 (10th Cir. 2015)(Gorsuch, J.)("In our constitutional order legislative enactments normally apply only prospectively while judicial decisions also bear retroactive application.").  New Mexico courts engage in a two-step analysis to determine whether that presumption is overcome such that a new rule applies on a merely prospective basis.  First, a court must determine whether the Supreme Court of New Mexico's decision explicitly states that the new rule it announces applies on a prospective only basis.  See Jordan, 2010-NMSC-051, ¶ 26, 149 N.M. at 170, 245 P.3d at 1222 ("[T]he presumption of retroactive application can be overcome by an express declaration . . . that the rule is intended to operate with selective prospectivity or pure prospectivity.")("Jordan").  Pure prospectivity means "applying [a new] rule only to conduct occurring after [the] decision is announced," while selective prospectivity means applying the decision "to the parties [then] before the court . . . and to parties whose conduct occurs after the announcement of the new rule but not to other parties whose conduct occurred before."  Jordan, 2010-NMSC-051, ¶ 25, 149 N.M. at 170, 245 P.3d at 1222 (citing Beavers, 1994-NMSC-094, ¶ 18 n.7, 118 N.M. at 397, 881 P.2d at 1382).

If there is no express statement that the new rule applies only prospectively, a three-factor analytical test may yet produce that result.  New Mexico courts look to the test that the Supreme Court of the United States of America articulated in Chevron, 404 U.S. 97, although the federal system no longer uses this test.  See Russ v. Russ, 2021-NMSC-014, 485 P.3d 223 (noting that the federal approach since Harper v. Va. Dep't of Tax'n, 509 U.S. 86, (1993), has been that "when a new federal rule of law is announced by the United States Supreme Court in a civil case it always applies retroactively").  See also Harper v. Virginia Dep't of Tax'n, 509 U.S. 86, 107 (1993)(Scalia, J., concurring)("[T]he province and duty of the judicial department to say what the

law is,' -- not what the law shall be." (quoting Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177

(1803)(emphasis in Harper v. Va. Dep't of Tax'n))).  But see Nunez-Reyes v. Holder, 646 F.3d

684, 691 (9th Cir. 2011)(holding that Chevron continues to be the federal test for civil cases "when

we announce a new rule of law . . . [and] the new rule does not concern our jurisdiction").  In any

event, when evaluating whether the presumption of full retroactive application has been overcome,

New Mexico Courts look to the following factors:

> (1) whether a new principle of law is established "either by overruling clear past
> precedent on which litigants may have relied, or by deciding an issue of first
> impression whose resolution was not clearly foreshadowed"; (2) whether
> "retrospective operation will further or retard its operation" when "weigh[ing] the
> merits and demerits in each case by looking to the prior history of the rule in
> question, its purpose and effect," and; (3) whether "substantial inequitable results"
> could occur if retroactivity is applied given that "there is ample basis in our cases
> for avoiding the injustice or hardship by a holding of nonretroactivity."

Russ v. Russ, 2020-NMCA-008, 456 P.3d 1100, rev'd on other grounds, 2021-NMSC-014, 485

P.3d 223 (quoting Beavers, 1994-NMSC-094, ¶ 23, 118 N.M. at 398, 881 P.2d at 1383)).  The

context of a case can affect the balance of equities involved in the third factor; thus, while

retroactive application may be inequitable in such areas as family law, where stable expectations

are key, it is otherwise in such areas as insurance.  Compare Whenry v. Whenry, 1982-NMSC-

067, ¶ 10, 98 N.M. at 740, 652 P.2d at 1191 ("[I]n no other area of law is the need for stability and

finality greater than in marriage and family law . . . .")("Whenry"), with Jordan, 2010-NMSC-051,

¶ 29, 149 N.M. at 171, 245 P.3d at 1223 ("On balance, we deem it more equitable to let the financial

detriments be borne by insurers, who were in a better position to ensure meaningful compliance

with the law, than to let the burdens fall on non-expert insureds, who are the Legislature's intended

beneficiaries.").

     The Court holds that these inquiries lead to the conclusion that the decision in Crutcher

does not apply prospectively only, but also applies to such policies as Apodaca's.  The language

that Crutcher uses that might suggest it announced a prospective only rule -- "hereafter," and "the Court will require" -- are not frequent or substantial enough to warrant the conclusion that Crutcher itself stated explicitly a prospective only rule.  Moreover, the three-part inquiry used when the decision does not state explicitly that it is prospective only does not mandate the conclusion that the rule must be prospective: (i) earlier cases clearly foreshadowed the decision in Crutcher, a subject the Court addressed at length in its decisions Bhasker I, 284 F. Supp. 3d 1191, and Bhasker II, 361 F. Supp. 3d 1045; (ii) prospective only application of the rule would retard its operation and purpose; and (iii) the balance of equities does not favor prospective only application of the rule.  In reaching this conclusion, the Court joins other courts in the United States District Court for the District of New Mexico that have also predicted that Crutcher does not apply prospectively only.  See Belanger, 588 F. Supp. 3d at 1260; Palmer, 584 F. Supp. 3d at 1028; Schwartz, 584 F. Supp. 3d at 1015; Bhasker v. Fin. Indem. Co., No. CIV 17-00260, 2022 WL 656354, at *1 (D.N.M. Mar. 4, 2022)(Riggs, J.)("Bhasker III"); Thaxton, No. CIV 18-0306, 2022 WL 424997, at *6.

1.       **Crutcher Does Not Explicitly State that Its Rule Applies Prospectively Only, and Such Language as "Hereafter" and "the Court Will" are Insufficient Reason to Interpret Crutcher as Explicitly Rendering a Prospective-Only Decision.**

Crutcher does not contain an explicit instruction that the rule it announces will apply on a prospective only basis; this fact thus does not help Young America overcome the presumption of retroactivity.  "The presumption of retroactive application 'can be overcome by an express declaration, in the case announcing the new rule,' that the rule is intended to operate with selective prospectivity or pure prospectivity."  Jordan, 2010-NMSC-051, ¶ 26, 149 N.M. at 170, 245 P.3d at 1222 (quoting Beavers, 1994-NMSC-094, ¶ 22, 118 N.M. at 398, 881 P.2d at 1383).  Young America highlights the following language in the Crutcher decision it says serves that function: (i) "hereafter, the insurer shall bear the burden of disclosure to the policyholder that a purchase of the

statutory minimum of UM/UIM insurance may come with the counterintuitive exclusion of UIM insurance if the insured is in an accident with a [minimally insured] tortfeasor," Crutcher, 2022-NMSC-001, ¶ 32, 501 P.3d at 441; and (ii) "we will now require every insurer to adequately disclose the limitations of minimum limits UM/UIM policies in the form of an exclusion in its insurance policy," Crutcher, 2022-NMSC-001, ¶ 33, 501 P.3d at 441.  Although this language has the quality of futurity, it is insufficiently explicit that the decision's rule applies only going forward.

When the Supreme Court of New Mexico makes prospective only a ruling, it so indicates explicitly.  In making a prospective-only ruling, the Supreme Court often self-analyzes its decision and the rule it announces, namely for whether that rule should apply on a prospective only basis -- it uses the three factors that lower courts employ when the Supreme Court of New Mexico has not itself said a rule should be prospective only.  See, e.g., Rodriguez v. Brand W. Dairy, 2016-NMSC-029, ¶ 51, 378 P.3d 13, 33 ("Weighing the Chevron, 404 U.S. 97, factors together, we conclude that . . . reliance    interests . . . [and]    practical    difficulties . . . result[ing]   from    retroactive application . . . overcome our presumption of retroactivity in this case. Accordingly, we . . . direct that our holding be prospectively applied to any injury that manifests after the date that our mandate issues in this case."); Marckstadt v. Lockheed Martin Corp., 2010-NMSC-001, ¶ 31, 147 N.M. 678, 689, 228 P.3d 462, 473 ("We do not believe that [the Chevron] factors weigh in favor of prospectivity."); Jordan, 2010-NMSC-051, ¶¶ 25-29, 149 N.M. at 170-71, 245 P.3d at 1222-23 (analyzing factors).  Indeed, there was some discussion at the hearing, see Tr. at 17:21-21:18 (Court, Vargo), whether the Supreme Court of New Mexico itself conducts the three-step analysis to determine whether a new rule ought to apply prospectively only. The case law is clear that the Supreme Court of New Mexico often does its own analysis.  The Chevron test used by New Mexico

courts is not only for lower courts to divine the character of a Supreme Court of New Mexico decision; the Supreme Court of New Mexico itself will in some circumstances conduct the Chevron analysis to determine the propriety of applying a new rule retroactively. Here, that analysis is wholly absent. Two references to the future do not make for an explicit statement that the rule applies only going forward, so the presumption of retroactivity is not overcome.

The Supreme Court of New Mexico holds that "minimum UM/UIM coverage is misleading because policyholders are not adequately informed that they are not eligible to receive UIM coverage pursuant to the Mandatory Financial Accountability Act and the corresponding offset rule articulated in Schmick." Crutcher, 2022-NMSC-001, ¶ 31, 501 P.3d at 441. While the prescriptive component of the Crutcher decision -- requiring more fulsome disclosures in the sale of UM/UIM policies -- applies going forward, and the Supreme Court of New Mexico is not requiring that insurers go back to the policies issued and mail out new sets with an additional disclosure line in the document, the descriptive component proposition that UM/UIM policies can be "misleading" still applies to decisions existing at the time of Crutcher's release, such as Apodaca's Young America policy. As Judge Riggs notes in Palmer, 584 F. Supp. 3d at 1026, the phrasing of the Crutcher decision is linked with the phrasing that Judge Herrera used in certifying to the Supreme Court of New Mexico, part of which phrasing speaks of insurance companies' future conduct. See Palmer, 584 F. Supp. 3d at 1026 ("[T]he word 'hereafter' was used in reference to the disclosure requirements for future minimum limit underinsured motorist coverage and did not concern misrepresentation claims which had already accrued."). Cf. Crutcher Certification Order, 2019 WL 12661166, at *4 ("[I]s underinsured motorist coverage on a policy that offers only minimum UM/UIM limits . . . illusory for an insured who sustains more than $25,000 in damages caused by a minimally insured tortfeasor because of the [Schmick] offset . . . ,

and, if so, <u>may insurers charge a premium</u> for that non-accessible underinsured motorist coverage?" (emphasis added)).  Consequently, <u>Crutcher</u> contains no explicit indication that its rule should be applied prospectively only.

> **2.      The Three-Part Chevron Test for Determining Whether a Rule Is Prospective Only When Not Explicitly Stated Does Not Yield the Result That the Crutcher Decision Applies on a Prospective Only Basis.**

Just as <u>Crutcher</u> contains no "express declaration" that its new rule applies prospectively only, neither does <u>Crutcher</u> satisfy the three-factor test of <u>Chevron</u> for retroactivity of judicially created rules in civil cases, such that its rule applies prospectively only.  A decision issued by the Supreme Court of New Mexico will apply prospectively only if it satisfies three elements:

> First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed.

> Second, it has been stressed that we must weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation.

> Finally, we have weighed the inequity imposed by retroactive application, for where a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity.

<u>Beavers</u>, 1994 -NMSC- 094 ¶ 23, 118 N.M. at 398, 881 P.2d at 1383 (quoting <u>Whenry</u>, 1982-NMSC-067 ¶ 7, 98 N.M. at 740, 652 P.2d at 1191).  The <u>Crutcher</u> decision cannot meet these factors -- and therefore it applies retroactively -- because: (i) prior decisions "clearly foreshadowed" its result; (ii) "retrospective operation will further . . . [the rule's] operation;" and (iii) retroactive application does not "produce substantial inequitable results."  <u>Beavers</u>, 1994-NMSC-094 ¶ 23, 118 N.M. at 398, 881 P.2d at 1383.

> **a.      Earlier Decisions "Clearly Foreshadowed" Crutcher's Result.**

Earlier Supreme Court of New Mexico decisions presaged the Crutcher decision.   The Court detailed these earlier Supreme Court of New Mexico decisions in the Court's decisions in Bhasker I and Bhasker II, which, looking to the Supreme Court of New Mexico's decision in Weed Warrior, 2010-NMSC-050, ¶ 10, 149 N.M. at 161, 245 P.3d at 1213, predicted correctly that the Supreme Court would hold illusory minimum-limits UIM policies and which set the stage for Judge Herrera's certified question that produced the Crutcher decision, see Crutcher Certification Order, 2019 WL 12661166, at *4.   Two strands in New Mexico caselaw "clearly foreshadowed," Beavers, 1994-NMSC-094 ¶ 23, 118 N.M. at 398, 881 P.2d at 1383, the result in Crutcher.   In Schmick v. State Farm Mutual Automobile Insurance Company, 1985-NMSC-073, 103 N.M. 216, 704 P.2d 1092 ("Schmick"), the Supreme Court of New Mexico announced that New Mexico follows the "offset rule" as to UIM insurance, allowing an insurer to reduce the amount it pays out to an insured by the amount the tortfeasor's liability coverage pays out to the insured, see Schmick, 1985-NMSC-073, ¶ 24, 103 N.M. at 222, 704 P.2d at 1098, rather than the "excess theory" coverage approach allowing recovery up to the limits of the UIM policy for the insured's injuries regardless of the amount the tortfeasor's liability insurance pays out to the insured, see, e.g., State Auto. Mut. Ins. Co. v. Youler, 396 S.E.2d 737, 748 (W. Va. 1990)(adopting "excess theory" approach). The Court in Bhasker II summarized the rationale thus: "[T]he goal behind UIM legislation is not to see insureds fully compensated for their damages but rather to see insureds compensated up to the amount equal to the UM/UIM protection purchased for their benefit." Bhasker II, 361 F. Supp. 3d at 1144-45 (citing Fasulo v. State Farm Mut. Auto. Ins. Co., 1989-NMSC-060, ¶ 13, 108 N.M. 807, 810, 780 P.2d 633, 636-37).   Because New Mexico is a gap state, an insured with a minimum limits UM/UIM policy will receive nothing from her UIM coverage in the event of an accident with a minimally insured tortfeasor, because the tortfeasor's liability

insurance -- $25,000.00 per person and $50,000.00 per incident -- will offset wholly the insured's

UIM coverage at $25,000.00 per person and $50,000.00 per occurrence.  Thus, in <u>Weed Warrior</u>,

the Supreme Court of New Mexico declared:

> If the tortfeasor carried the statutory minimum of liability insurance and the injured
> driver carried the statutory minimum of UM/UIM coverage, the injured driver
> would have no recourse for injuries suffered over the minimum amount of $25,000.
> The injured driver, though in theory having purchased UIM coverage, would in fact
> have purchased only UM coverage.

2010-NMSC-050, ¶ 10, 149 N.M. at 160-61, 245 P.3d at 1212-13.  It concluded that "[a]n insured

carries UIM coverage only if the UM/UIM limits on her or his policy are greater than the statutory

minimum of $25,000." <u>Weed Warrior</u>, 2010-NMSC-050, ¶ 10, 149 N.M. at 160-61, 245 P.3d at

1212-13.  This language "clearly foreshadowed" <u>Crutcher</u>.  <u>Beavers</u>, 1994-NMSC-094 ¶ 23, 118

N.M. at 398, 881 P.2d at 1383.

In noting that "a tortfeasor who carries minimum limits UM/UIM coverage or higher may

never fit the definition of an 'underinsured motorist' according to the statute, rendering a

policyholder unable to collect UIM insurance, . . . [<u>Crutcher</u>] simply identif[ies] the same

consequence previously illuminated in <u>Weed Warrior</u>." <u>Crutcher</u>, 2022-NMSC-001, ¶ 27, 501

P.3d at 439-40 (citing <u>Weed Warrior</u>, 2010-NMSC-050, ¶ 10, 149 N.M. at 161, 245 P.3d at 1213;

no citation given for quotation).  Accordingly, the holding that minimum-limits UIM coverage "is

illusory because it is misleading to the average policyholder," <u>Crutcher</u>, 2022-NMSC-001, ¶ 33,

501 P.3d at 441, does not "establish a new principle of law" or "overrul[e] clear past precedent."

<u>Beavers</u>, 1994-NMSC-094 ¶ 23, 118 N.M. at 398, 881 P.2d at 1383 (quoting <u>Whenry</u>, 1982-

NMSC-067 ¶ 7, 98 N.M. at 740, 652 P.2d at 1191).  Rather, <u>Crutcher</u> proceeds directly from earlier

decisions, like <u>Weed Warrior</u>, that "clearly foreshadowed" it.  <u>Beavers</u>, 1994-NMSC-094 ¶ 23,

118 N.M. at 398, 881 P.2d at 1383 (quoting <u>Whenry</u>, 1982-NMSC-067 ¶ 7, 98 N.M. at 740, 652

P.2d at 1191).  The Court in Bhasker I and Bhasker II first identified the lines of doctrine producing the result later reached in Crutcher, and this same line of doctrine militates against holding that, based on the first Chevron factor, Crutcher's rule should apply prospectively only.

>    **b.      The Crutcher Decision's History, Purpose and Effect, and the Fact That Retrospective Operation Will Further Its Operation Counsel Against Prospective Only Application.**

The second Chevron factor -- "looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation," Beavers, 1994-NMSC-094, ¶ 23, 118 N.M. at 398, 881 P.2d at 1383 (quoting Whenry, 1982-NMSC-067, ¶ 7, 98 N.M. at 740, 652 P.2d at 1191) -- counsels against Crutcher's prospective-only application.  The Crutcher decision promotes the "the UM/UIM statute's legislative purpose to place the burden on the policyholders to determine how much protection they would like to purchase, . . . [by requiring that] policyholders . . . be fully informed of the relative benefits and limitations of a given policy."  2022-NMSC-001, ¶ 30, 501 P.3d at 440.  Retrospective application promotes the decision's purpose -- maximally informing insurance customers.  Although the practice of selling minimum-limits UM/UIM policies has been lawful, it has been deceptive: "[W]hile the Legislature authorized the selling of [minimum-level UM and UIM] premiums together, its intent was not to sanction the deception of those consumers in their selection of policies and coverage levels."  Crutcher, 2022-NMSC-001, ¶ 26, 501 P.3d at 439.  Applying the rule retrospectively redresses injuries to insurance consumers who purchased coverage inadequate for their needs, because insurers misinformed them.  This second Chevron factor thus also militates against Crutcher's prospective-only application.

>    **c.      Crutcher's Retrospective Application Will Not Produce Inequitable Results.**

The final <u>Chevron</u> factor, "weigh[ing] the inequity imposed by retroactive application," <u>Beavers</u>, 1994-NMSC-094, ¶ 23, 118 N.M. at 398, 881 P.2d at 1383 (quoting <u>Whenry</u>, 1982-NMSC-067, ¶ 7, 98 N.M. at 739, 652 P.2d at 1190), also provides a reason not to restrict <u>Crutcher</u>'s rule to prospective only application. <u>Crutcher</u> itself suggests that the equities are in the insureds' favor. <u>See Crutcher</u>, 2022-NMSC-001, ¶ 26, 501 P.3d at 439 ("[W]hile the Legislature authorized the selling of [UM and UIM] premiums together, its intent was not to sanction the deception of those consumers in their selection of policies and coverage levels."). Elsewhere, the Supreme Court of New Mexico has held that placing on insurers the burdens of retroactive application of new rules is not inequitable. <u>See Jordan v. Allstate Ins. Co.</u>, 2010-NMSC-051, ¶ 29, 149 N.M. 162, 171, 245 P.3d 1214, 1223 ("On balance, we deem it more equitable to let the financial detriments be borne by insurers, who were in a better position to ensure meaningful compliance with the law, than to let the burdens fall on non-expert insureds, who are the Legislature's intended beneficiaries."). Moreover, no inequity results merely because a new "rule 'punishes conduct that was [previously] lawful in New Mexico'"; the Supreme Court of New Mexico rejects this "circular argument that the rule is not retroactive because pre-rule conduct was lawful." <u>Beavers</u>, 1994-NMSC-094, ¶ 38, 118 N.M. at 401, 881 P.2d at 1386 (quoting <u>Beavers v. Johnson Controls World Servs., Inc.</u>, 1993-NMCA-088, ¶ 7, 116 N.M. 29, 31, 859 P.2d 497, 499).

Accordingly, the Court holds that <u>Crutcher</u>'s rule does not overcome the presumption that new rules announced in civil cases apply retrospectively. The <u>Crutcher</u> rule does not apply prospectively only, because: neither (i) does <u>Crutcher</u> expressly state that its rule applies prospectively only; nor (ii) does it satisfy the three-factor <u>Chevron</u> analysis for making prospective-only rules not explicitly declared to be prospective only. In so holding, the Court joins in the conclusion that Chief Judge Johnson and Judge Riggs have reached on the subject, and

expressed in multiple issued opinions.  See Belanger, 588 F. Supp. 3d at 1260; Palmer, 584 F. Supp. 3d at 1028; Schwartz, 584 F. Supp. 3d at 1015; Bhasker III, No. CIV 17-00260, 2022 WL 656354, at *1; Thaxton, No. CIV 18-0306, 2022 WL 424997, at *6.

        **B.**   **BECAUSE THE RULE IN <u>CRUTCHER</u> APPLIES RETROSPECTIVELY TO APODACA'S YOUNG AMERICA POLICY, APODACA STATES VALID CLAIMS FOR RELIEF FOR NEGLIGENT MISREPRESENTATION, AND UNDER THE UPA AND UIPA.**

As noted above, whether Crutcher applies prospectively only is central to the success of Young America's Third MTD.  Young America argues that, because no disclosure duty existed before Crutcher, its failure to disclose the illusory character of Apodaca's UIM policy cannot support Apodaca's claims for negligent misrepresentation relief, or for relief under the UPA and UIPA.  See Third MTD at 7, 12-14.  Because, however, the Court holds that Crutcher does not apply prospectively only, Crutcher's holding that the sale of minimum limits UM/UIM policy without disclosure "dece[ives] . . . consumers in their selection of policies and coverage levels," Crutcher, 2022-NMSC-001, ¶ 26, 501 P.3d at 439, supplies a permissible basis for Apodaca's UPA, UIPA and negligent misrepresentation claims.  Assuming her factual allegations to be true, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 55 U.S. 308, 322 (2007), the Court, therefore, will not dismiss Apodaca's claims for negligent misrepresentation, UPA and UIPA relief.

        **1.**   <u>**Apodaca States a Valid Negligent Misrepresentation Claim, Because Young America Negligently Misrepresented to Her That the UIM Portion of Her UM/UIM Policy Would Be Valuable, When in Many Circumstances It Would Not Be.**</u>

Apodaca's negligent misrepresentation claim in Count I survives Young America's Third MTD because the Crutcher rule that minimum-limits UM/UIM policies like Apodaca's are illusory answers the question whether she states a claim for negligent misrepresentation relief.  To state a valid negligent misrepresentation claim, Apodaca must assert that Young America "breached a duty of disclosure owed to [her], [she] must have had a right to rely on the misinformation, and

[she] must have sustained damages." Ruiz v. Garcia, 1993-NMSC-009, ¶ 26, 115 N.M. 269, 274-75, 850 P.2d 972, 977-78.  Here, her SAC does just that:  It alleges that Young America breached a duty to "fully inform Ms. Apodaca of illusory underinsured coverage with a disproportionate premium/indemnification ratio when compared to the next tier of available coverage and to not materially misrepresent the terms of underinsured coverage." SAC ¶ 38, at 7.  If proven, her factual allegations fit the bill for negligent misrepresentation.

As with the UPA and UIPA claims, although Crutcher does not discuss explicitly the availability of a negligent misrepresentation claim, its holding resolves the viability of a negligent misrepresentation claim on the basis of the facts that Apodaca alleges.  Crutcher establishes that substantial disclosure must accompany such policies as Apodaca's -- minimum limits UM/UIM policies.  See Crutcher, 2022-NMSC-001, ¶ 31, 501 P.3d at 441 ("[That minimally insured policyholders] are not eligible to receive UIM coverage . . . should be explicitly disclosed to policyholders like Mr. Crutcher who are selecting a policy called "Uninsured and Underinsured Motorist Coverage" and expecting to receive insurance benefits . . . .").  Failure to provide such disclosures rises to the level of misrepresentation that is at least negligent.  Accordingly, Apodaca states a valid negligent misrepresentation claim.

**2.    Apodaca States a Valid UPA Claim Because Young America Engaged in an Unfair Trade Practice by Deceptively Selling Apodaca an Illusory UM/UIM Policy.**

Apodaca's SAC validly states a claim against Young America for violations of the UPA in Count II of her SAC.  Asserting that Young America deprived her of the "quality . . . of services applied for" by "failing to provide . . . sufficient information" about the character of her UIM insurance, as "to which Ms. Apodaca was under the reasonable belief that such coverage existed," SAC ¶ 72, at 16, Apodaca premises her claim on violations of N.M.S.A. §§ 57-12-2(D)(7),

(D)(14), (D)(15), (D)(17), (E), 57-12-3, see SAC ¶¶ 70-74, at 15-16.  Section 57-12-3 declares

"[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any

trade or commerce [to be] unlawful," while Subsections 57-12-2(D)-(E) define the central terms,

"unfair or deceptive trade practice" and "unconscionable trade practice":

> D.    "unfair or deceptive trade practice" means . . . a false or misleading . . . representation of any kind knowingly made in connection with the sale . . . of goods or services . . . by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person and includes . . .
>
> > (7)    representing that goods or services are of a particular standard, quality or grade or that goods are of a particular style or model if they are of another; . . .
> >
> > (14)    using exaggeration, innuendo or ambiguity as to a material fact or failing to state a material fact if doing so deceives or tends to deceive; . . .
> >
> > (15)    stating that a transaction involves rights, remedies or obligations that it does not involve; . . .
> >
> > (17)    failing to deliver the quality or quantity of goods or services contracted for . . . .
>
> E.    "unconscionable trade practice" means an act or practice in connection with the sale . . . [or] offering for sale . . . of any goods or services, including services provided by licensed professionals, . . . that to a person's detriment:
>
> > (1)    takes advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree; or
> >
> > (2)    results in a gross disparity between the value received by a person and the price paid.

N.M.S.A. §§ 57-12-2(D)(7), (D)(14), (D)(15), (D)(17), (E).  In essence, Apodaca must aver four

elements:

> First, the complaining party must show that the party charged made an "oral or written statement, visual description or other representation" that was either false or misleading. . . .  Second, the false or misleading representation must have been

"knowingly made in connection with the sale, lease, rental or loan of goods or services in the extension of credit or . . . collection of debts." . . . Third, the conduct complained of must have occurred in the regular course of the representer's trade or commerce. . . . Fourth, the representation must have been of the type that "may, tends to or does, deceive or mislead any person."

Stevenson v. Louis Dreyfus Corp., 1991-NMSC-051, ¶ 13, 112 N.M. 97, 100, 811 P.2d 1308, 1311

(quoting Ashlock v. Sunwest Bank of Roswell, N.A., 1988-NMSC-026, ¶ 4, 107 N.M. 100, 101, 753 P.2d 346, 347).

With the aid of Crutcher, the SAC meets each of these requirements.  First, it alleges that Young America made representations to her about the value of the policy that she purchased from Young America which are false or misleading.  See SAC ¶ 33, at 6 ("Defendants misrepresented to Ms. Apodaca that she would benefit from underinsured coverage when they knew, or should have known, that the coverage was meaningless.").  Second, the representation was made in connection with the sale to Apodaca of her insurance policy.  See SAC ¶ 33, at 6 ("Defendants' misrepresentations or lack of representations were made . . . to deceive and induce Ms. Apodaca in purchasing underinsured coverage.").  Third, the representation was made in the normal course of Young America's business -- in soliciting insurance customers and explaining policy features. See PSR ¶ 31, at 6.  Finally, fourth, the representation tended to and did mislead Apodaca about the nature of the policy that she purchased from Young America, specifically about what might happen in the event of an accident with a minimally insured tortfeasor.  See PSR ¶ 34, at 6 ("Based on the information provided by Defendants, Ms. Apodaca agreed to pay a premium for . . . [minimum limits] uninsured/underinsured motorist coverage.").

Although Crutcher does not address whether the plaintiff there stated a UPA claim, it answers the question here.  Because minimum-limits UM/UIM policies "may mislead minimum UM/UIM policyholders to believe that they will receive underinsured motorist benefits, when in

reality they may never receive such a benefit," Crutcher, 2022-NMSC-001, ¶ 2, 501 P.3d at 434, such policies "dece[ive] . . . consumers in their selection of policies and coverage levels," Crutcher, 2022-NMSC-001, ¶ 26, 501 P.3d at 439.  Where the "gravamen of an unfair trade practice is a misleading, false, or deceptive statement made knowingly in connection with the sale of goods or services," then Apodaca alleges sufficiently, and Crutcher confirms, that Young America's conduct is thus deceptive.  Diversey Corp. v. Chem-Source Corp., 1998-NMCA-112, ¶ 17, 125 N.M. 748, 754, 965 P.2d 332, 338.

That, as Young America argues, its sale of Apodaca's minimum-limits UM/UIM policy was lawful, and indeed legally compelled, does not mean that Apodaca cannot support a UPA claim on this basis.  See Third MTD at 11 ("[O]nce Plaintiff chose minimum liability coverage, New Mexico law required Young America to offer UM/UIM coverage to Plaintiff at minimum limits . . . .").  Crutcher explicitly rejects the proposition that, merely because New Mexico law permits insurers to sell and apply the Schmick offset rule to policies such as Apodaca's, for this reason the policies are not misleading:

> [W]e find no merit in Defendant's argument that the language of the statute provides immunity from claims that it misrepresented the coverage available to consumers like Mr. Crutcher. Certainly, while the Legislature authorized the selling of premiums together, its intent was not to sanction the deception of those consumers in their selection of policies and coverage levels.

2022-NMSC-001, ¶ 26, 501 P.3d at 439.  The issue is not whether the policies can be sold, but whether an insurer adequately explains them.  The same principle applies to the fact that the New Mexico Office of the Superintendent of Insurance "approved . . . Young America's policy."  Third MTD at 12 n.4.  Merely because the conduct is lawful does not mean it is not misleading.  As Crutcher and Apodaca emphasize, insurers cannot rely on inaccessible statutory language to shield them from improper disclosure claims, because lay persons do not shoulder the burden of

understanding complex insurance law provisions.  See Crutcher, 2022-NMSC-001, ¶ 26, 501 P.3d at 439 ("New Mexico assume[s] the average purchaser of automobile insurance [possesses] limited knowledge of insurance law, and [do] not impose on the consumer an expectation that she [can] . . . make an informed decision as to the amount of UM/UIM coverage desired or required without first receiving information from the insurance company." (quoting Weed Warrior, 2010-NMSC-050, ¶ 13, 149 N.M. at 162, 245 P.3d at 1214)).

Crutcher also implicitly rejects another argument that Young America offers here:  that its policy is not actually illusory, because it offers some value to minimum-limits customers.  See Third MTD at 15.  Young America emphasizes that, if a minimally insured tortfeasor's liability insurance has to be divvied up among multiple injured parties, then Young America's UIM policy will make up the difference between the full cost of an insured's injuries and the tortfeasor liability payout.   See Third MTD at 15.  Even if an insured recovers on her UIM policy under this narrow circumstance, this transaction is not the "selection of policies and coverage levels," Crutcher, 2022-NMSC-001, ¶ 26, 501 P.3d at 439,  that consumers such as Apodaca believe they are making; Apodaca did not aim to insure herself only for such situations as this one, but for the more intuitive circumstances, where the tortfeasor's liability insurance cannot cover her full damages, regardless whether there are other injured people.  Cf. Crutcher, 2022-NMSC-001, ¶ 30, 501 P.3d at 440 ("If a person pays for something called 'underinsured motorist' insurance, we think it reasonable [that she is under the impression that] . . . she is, in fact, eligible to receive UIM coverage if involved in an accident with someone who does not have enough insurance to cover the costs of [her] injuries.").  In sum, Apodaca's SAC sufficiently states a claim for relief under the UPA.

**3.**      **Apodaca States a Valid UIPA Claim, Because Young America Engaged in an Unfair Insurance Practice by Deceptively Selling Apodaca an Illusory UM/UIM Policy.**

As with Apodaca's negligent misrepresentation and UPA claims, Crutcher supports amply Apodaca's UIPA claim in Count III.  To survive on a motion to dismiss a UIPA claim, Apodaca's SAC cannot assert merely "a formulaic recitation of the elements of a cause of action" under the UIPA.  Estate of Gonzales v. AAA Life Ins. Co., 2012 WL 1132332, at *7 (D.N.M. March 28, 2012)(Browning, J.)(citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555).  Here, Apodaca does not assert a mere recitation of the statutory elements.  Instead, the facts that she alleges meet the requirements for the following UIPA provisions on which she bases her claim: (i) N.M.S.A. § 59A-16-30, which provides that "[a]ny person . . . who has suffered damages as a result of a violation of [the UIPA] by an insurer or agent is granted a right to bring an action in district court to recover actual damages"; and (ii) N.M.S.A. § 59A-16-20(A), which "define[s] an unfair and deceptive practice[,] and . . . prohibit[s] . . . misrepresenting to insureds pertinent facts or policy provisions relating to coverages at issue."  She also asserts that she is entitled to attorneys' fees under N.M.S.A. § 59A-16-30, which allows the trial court to award attorneys' fees if "the party charged with the [UIPA] violation . . . has willfully engaged in the violation."

The UIPA demands full disclosure by both parties, and is especially attentive to the disparity in information and expertise between insurers and insureds.  The UIPA "seeks to prohibit unfair or deceptive acts and practices in the insurance industry," and insurers "have a duty to disclose material facts about the policies they sell under the UIPA."  Brule v. Blue Cross & Blue Shield of N.M., 455 F. App'x 836, 840 (10th Cir. 2011)(citing Azar v. Prudential Ins. Co. of Am., 2003-NMCA-062, 133 N.M. 669, 68 P.3d 909, 930).  As Crutcher declares, "minimum UM/UIM coverage is misleading because policyholders are not adequately informed that they are not eligible to receive UIM coverage pursuant to the Mandatory Financial Accountability Act and the corresponding offset rule articulated in Schmick."  Crutcher, 2022-NMSC-001, ¶ 31, 501 P.3d at

441.  This statement answers in the affirmative the question whether Apodaca's allegation -- the "Defendants misrepresented to Ms. Apodaca that she would benefit from underinsured coverage when they knew, or should have known, that the coverage was meaningless," SAC ¶ 33, at 6 -- states a claim for relief under the UIPA as to her Young America policy.   As with the Court's conclusion about the retrospective application of <u>Crutcher</u>'s holding, so too with its conclusion about the viability of negligent misrepresentation, UPA, and UIPA claims regarding UM/UIM insurance post-<u>Crutcher</u>, the Court shares in the conclusions of Chief Judge Johnson and Judge Riggs in this District.  <u>See</u> <u>Belanger</u>, 588 F. Supp. 3d at 1263-64, 1266 (declining to dismiss UPA, UIPA, and negligent misrepresentation claims); <u>Palmer</u>, 584 F. Supp. 3d at 1031-32, 1034 (same); <u>Schwartz</u>, 584 F. Supp. 3d at 1016 (same); <u>Bhasker III</u>, 2022 WL 656354, at *6 (same); <u>Thaxton</u>, 2022 WL 424997, at *6 (same).

## III.   APODACA FAILS TO STATE A CLAIM FOR BREACH OF CONTRACT BUT STATES A CLAIM FOR BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING.

Apodaca fails to state a claim for relief in Count IV for breach of contract, but Apodaca states a valid claim for relief in Count V for breach of the covenant of good faith and fair dealing. <u>See</u> SAC ¶¶ 90-96, at 18-19; <u>id.</u> ¶¶ 97-103, at 20-21.  Assuming her factual allegations to be true, <u>see</u> <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 55 U.S. 308, 322 (2007), the essence of Apodaca's lawsuit is that Young America "deceive[d]" her into contracting with it by misrepresenting "that she would benefit" from the contract, at least its UIM portion.  SAC ¶ 33, at 6.  This scenario supports a claim that she was mistaken unilaterally about what the contract entailed, or that Young America induced her deceptively into entering the contract, but these allegations do not support a claim that Young America breached the contract.  These same allegations, however, do make out a breach of the implied covenant of good faith and fair dealing.  The Court will, therefore, grant

Young America's Third MTD as to Count IV of Apodaca's SAC, and dismiss her claim for breach of contract; the Court will not, however, grant the Third MTD as to Count V of Apodaca's SAC, because the Court will not dismiss her claim for breach of the covenant of good faith and fair dealing.  In reaching these conclusions, the Court in part arrives at the conclusion that Judge Brack reached in his Jan. 16 MOO, when he dismissed both the contractual breach claim and the good-faith-fair-dealing claim which appeared in Apodaca's FAC.  See Jan. 16 MOO at 15-16.  At the same time, the Court diverges in part from Chief Judge Johnson and Judge Riggs' opinions that hold that both contract and good-faith-fair-dealing claims will lie on these facts.  See Belanger, 588 F. Supp. 3d at 1266 (declining to dismiss good-faith-and-fair-dealing claim, but not addressing breach-of-contract issue because plaintiffs there did not bring such a claim); Schwartz, 584 F. Supp. 3d at 1016-17 (declining to dismiss contract claim and good-faith-and-fair-dealing claim); Palmer, 584 F. Supp. 3d at 1032-33 (declining to dismiss good-faith-and-fair-dealing claim, but not addressing explicitly plaintiff's breach-of-contract claim); Bhasker III, 2022 WL 656354, at *6 (declining to grant summary judgment on plaintiff's claims, including for contractual breach and for good-faith-and-fair-dealing breach); Thaxton, 2022 WL 424997, at *6 (declining to dismiss plaintiff's claims, including for contractual breach and for good-faith-and-fair-dealing breach).

### A.   APODACA FAILS TO STATE A CONTRACTUAL BREACH CLAIM, BECAUSE YOUNG AMERICA'S MISREPRESENTATIONS TO HER REGARDING THE VALUE OF HER UIM POLICY DO NOT GIVE RISE TO A BREACH OF THE CONTRACT BETWEEN THEM.

The Court will grant Young America's Third MTD as to the claim in Count IV, because the facts in Apodaca's SAC do not sustain a claim that Young America breached its contract with her.  See SAC ¶¶ 90-96, at 18-19.  The Court on this issue departs from the conclusion that Judge Riggs reached in Schwartz, 585 F. Supp. 3d at 1016-17, and that she reached but did not discuss

at length in two other cases, see Bhasker III, 2022 WL 656354, at *6 (declining to grant summary judgment on plaintiff's claims, including for contractual breach and for good-faith-and-fair-dealing breach); Thaxton, 2022 WL 424997, at *6 (declining to dismiss plaintiff's claims, including for contractual breach and for good-faith-and-fair-dealing breach).  Under New Mexico law, "[t]he elements of a breach-of-contract action are the existence of a contract, breach of the contract, causation, and damages."  Abreu v. N.M. Children, Youth and Families Dep't, 797 F. Supp. 2d at 1247.

The Court can consider the contents of Apodaca's insurance contract, see supra Part I, and the insurance contract here obligates Young America to provide minimum limits UM/UIM coverage.  Apodaca purchased UM/UIM coverage at the following, minimum limits: $25,000.00 per person, $50,000.00 per accident, and $10,000.00 per property damage.  See Policy at 1.  Young America promises to Apodaca that "[s]ubject to the Limits of Liability, if you pay a premium for Uninsured Motorist Bodily Insurance Coverage, we will pay for damages which an insured person is legally entitled to recover from the owner or operator of an uninsured motor vehicle or underinsured motor vehicle because of bodily injury" that the uninsured or underinsured driver causes the insured.  Policy at 13.  Young America makes a similar commitment regarding property damage that an uninsured or underinsured motor vehicle causes.  See Policy at 13.  The contract defines an underinsured motor vehicle in two ways: (i) "a land motor vehicle for which the sum of all bodily injury liability bonds or policies applicable at the time of the accident, is . . . less than the coverage page limit for Uninsured Motorist Coverage shown on the Declarations Page,"  Policy at 14; and (ii) "a land motor vehicle for which the . . . proceeds of the liability bond or policy available for bodily injury to the insured person, after payment to other injured persons, is less than the coverage limit for Uninsured Motorist Coverage shown on the Declarations Page."  Policy

at 14.  The first definition draws from New Mexico's statutory definition on an underinsured motor vehicle.  <u>See</u> N.M.S.A. § 66-5-301(B) ("'[U]nderinsured motorist' means an operator of a motor vehicle with respect to the ownership . . . of which the sum of the limits of liability under all bodily injury liability insurance . . . is less than the limits of liability under the insured's uninsured motorist coverage.").

Apodaca alleges that Young America breached this contract in the following ways:

> 92.    By accepting premium payments for underinsured motorist coverage Defendants tacitly or impliedly agreed to provide a benefit for the premium charged.
>
> 93.    . . . Defendant has wrongfully and unlawfully breached its agreement to provide a benefit for the premium charged by failing to provide underinsured coverage and/or denying underinsured claims for benefits to Ms. Apodaca and the other members of the Class.
>
> 94.    Defendant further breached their contractual obligations to Ms. Apodaca and members of the Class by creating ambiguity and uncertainty in the underinsured motorist coverage provisions of the policy by failing to properly identify, explain, and/or clarify the illusory nature and application of the offset provisions in regard to underinsure motorist coverage purchased at a minimum level.
>
> 95.    . . . The ambiguity and uncertainty in regard to the uninsured and underinsured motorist provisions of the policy has resulted in the collection of premiums by Defendant without the obligation to provide a benefit to Ms. Apodaca and members of the Class.

SAC ¶¶ 92-95, at 18-19.  In sum, Apodaca's SAC alleges that Young America breached the contract in two ways: (i) by not "provid[ing] a benefit" for the consideration she paid by "failing to provide underinsured coverage," SAC ¶¶ 92-93, at 18; and (ii) by "failing to explain" the contract, SAC ¶ 95, at 19.  Arguments that Apodaca makes in her briefing on the Third MTD and that she made at the hearing on the Third MTD, however, demonstrate that her dispute with Young America focuses on what she believed allegedly her insurance contract to provide her, not on

Young America's alleged failure to perform up to its contractual obligations.  The positions that

Apodaca takes make clear that Apodaca's SAC does not state a breach-of-contract claim.

> **1.**      **Apodaca Cannot State a Claim for Breach of Contract on the Theory That Young America Failed to Provide a Benefit.**

At the hearing, Apodaca explained how she amended her contract claims after Judge

Brack's Jan. 16 MOO dismissed them:

> Judge Brack pointed out, basically, that we had not shown a breach; that what we were claiming was that -- what Ms. Apodaca was claiming was that they had followed the policy in withholding these amounts, and so it didn't really amount to a breach of contract.
>
> So the complaint was amended in that way.  And so there was an ambiguity and uncertainty in failing to explain the lack of benefits payable under the minimum limits UIM coverage. And the contract was breached by acceptance of premiums and failing to pay benefits after acceptance of those premiums.

Tr. at 38:13-24 (Holt).[10]  As Apodaca explained it, her FAC failed to allege that Young America

did other than "follow[] the policy in withholding [the claimed] amounts," so she amended the

---

[10]The breach of contract claims in Apodaca's FAC appear thus:

> 86.      By issuing the policy in question to Ms. Apodaca, Defendants entered into a contract with Ms. Apodaca and entered into the same contractual obligations with each member of the Class Ms. Apodaca seeks to represent.
>
> 87.      By undertaking the acts described above, Defendants have wrongfully and unlawfully failed to provide underinsured coverage and/or denied underinsured claims for benefits to Ms. Apodaca and other members of the Class.
>
> 88.      By engaging in the conduct alleged herein, Defendants breached their contractual obligations to Ms. Apodaca and to the Class.
>
> 89.      Pursuant to New Mexico law, and because of Defendants' breaches of their contractual obligations to Ms. Apodaca and to the Class, Ms. Apodaca and other members of the Class are entitled to actual damages, including but not limited to, underinsured coverage in an amount equal to liability limits and may be entitled to payment of underinsured benefits, or payment of additional underinsured benefits accordingly and damages to Ms. Apodaca and the Class in an amount to be proven at trial.

complaint so now contract breach lies in "acceptance of premiums and fail[ure] to pay benefits after acceptance of those premiums."  Tr. at 38:16-17 (Holt); id. at 38:22-24 (Holt).  These two statements do not differ, however, from each other:  Her SAC does no more than the FAC, because she does not allege how "acceptance of premiums and fail[ure] to pay benefits," Tr. at 38:16-17 (Holt), means that Young America did not "follow[] the policy in withholding the [claimed] amounts,"  Tr. at 38:22-24 (Holt).  Apodaca thus fails to assert that Young America did not act within its rights -- and was not merely "following the policy," Tr. at 38:16-17 (Holt) -- in withholding the payment Apodaca sought.

Other statements that Apodaca made at the hearing and in her briefing indicate she seeks only to hold Young America liable for Young America's misleading her, and not for withholding from her something to which her insurance contract entitles her.  At the hearing, regarding her reformation claim, she stated:

> The problem is not that the statute was making it illusory coverage. . . . The problem . . . is that she was not advised that it was illusory.  Defendant Young America was selling minimum limits UIM coverage, and knew that it was illusory coverage, knew it was very unlikely that any benefit would ever be paid to the insureds, but still collected premiums for that coverage.

Tr. at 36:20-37-5 (Holt).  Her assertion that "[t]he problem is not that the statute was making [her coverage] illusory" is tantamount to saying there was no breach.  It is not disputed that Young America's contractual provision adopted the statutory language that Schmick interpreted to provide for gap theory UIM coverage.  Compare Policy at 14 ("Underinsured means a land motor vehicle for which the sum of all bodily injury liability policies . . . is[] . . . less than the coverage limit for Uninsured Motorist Coverage shown on the Declarations Page."), with N.M.S.A. § 66-5-

---

FAC ¶¶ 86-89, at 18-19.

301(B) ("'[U]nderinsured motorist' means an operator of a motor vehicle with respect to the

ownership . . . of which the sum of the limits of liability under all bodily injury liability

insurance . . . is less than the limits of liability under the insured's uninsured motorist coverage.").

Thus, her acknowledgement that "the statute was making [her coverage] illusory," Tr. at 36:20-21

(Holt), is equivalent to acknowledging that the contract, which incorporates the statutory language

that makes coverage largely illusory, does not provide for coverage in such situations as this one.

Accordingly, because she admits effectively that the contract did not here mandate benefits, she

cannot also maintain that Young America breached the contract by withholding those benefits.

> Statements in her Response are to the same effect:

> [The arguments in Young America's Third MTD] are based on its continued
> misinterpretation of the crux of Ms. Apodaca's claims.   Defendant Young
> continuously mischaracterizes Ms. Apodaca's claims as being based on its
> application of the Schmick offset rule to deny her bodily injury claim under her
> UIM policy, which had coverage limits of $25,000 per person and $50,000 per
> accident.  See SAC, ¶ 42.  However, it is not Defendant Young's application of the
> Schmick offset rule, in and of itself, upon which Ms. Apodaca bases her claims.
> Rather, it is Defendant Young's failure to adequately inform her of what its
> application of the Schmick offset rule would mean to the amount of UIM benefits
> she was ultimately paid should she be in the type of accident anticipated by
> Progressive Nw. Ins. Co. v. Weed Warrior Services, 2010-NMSC-050, 149 N.M.
> 157, 245 P.3d 1209.  Had Defendant Young explained to her were she to be in an
> accident like that divined in Weed Warrior, and identical to the accident that
> actually occurred at issue in this action, that despite paying premiums for UIM
> coverage, she would not be entitled to recover any UIM benefits, Ms. Apodaca
> could have opted to increase her liability coverage or selected "stacked" UM/UIM
> coverage, so as to increase the amounts she would ultimately be able to receive
> from her UIM benefits.  But because Defendant Young failed to alert her to this
> exclusionary provision, it misled her to believe that her contract for insurance
> included coverage it did not. . . .

Response at 2.  The last line gives up the ghost:  Apodaca's theory of liability is based not on the

contract but on misrepresentation.  Young America did not breach the agreement by withholding

payment because "her contract for insurance . . . did not . . . include[ such] coverage," Response

at 2;  Young America "misled her to believe that" it provided such coverage, Response at 2.

- 67 -

The two core propositions in her SAC, therefore -- that Young America breached the contract (i) by not "provid[ing] a benefit" insofar as it "fail[ed] to provide underinsured coverage," SAC ¶¶ 92-93, at 18; and (ii) by "failing to explain" the contract, SAC ¶ 95, at 19 -- do not state claims for breach of contract. First, Count IV's circular assertion that Young America breached a contractual duty to provide "a benefit," SAC ¶ 92-93, at 18-19, is an insufficient basis for her claim. Cf. Armijo v. New Mexico Department of Transportation, No. CIV 08-0336, 2009 WL 1329192, at *7 (D.N.M. April 6, 2009)(Browning, J.)(concluding no contractual breach claim lies when plaintiff did not "indicate what contractual provisions or employment policies the Department breached," and did not say "to what his employment contract entitles him or of what the Department deprived him"). To the extent that she relies on the theory of implied contract, cf. Response at 22 ("[A] contract may be implied on the basis of the course of conduct of the parties. . . . Moreover, a contract may be implied based on the conduct of the parties regardless of the language of a policy or contract." (citing Hillis v. Meister, 1971-NMCA-034, ¶ 14, 82 N.M. 474, 477, 483 P.2d 1314, 1317; Zaccardi v. Zale Corp., 856 F.2d 1473, 1476 (10th Cir. 1988))), this argument is untenable, because a court "cannot imply a term or promise in a contract which is inconsistent with an express term of the contract itself," 23 Williston on Contracts § 63:21 (4th ed. 2023)(quoting United States v. Croft-Mullins Elec. Co., 333 F.2d 772 (5th Cir. 1964))("Williston"). The promise that Apodaca would have the Court imply is one that conflicts with her contract's express terms and that goes to the heart of the bargain -- namely, what consideration Young America gives her, whether in the form of gap or excess UIM coverage. It adds little to say that Young America failed to provide such "a benefit" by not "provid[ing] underinsured coverage," SAC ¶ 93, at 19, an assertion that misstates the underlying issue, namely, that the dispute concerns Young America's misrepresentations to Apodaca, not its failure to

provide her something to which the contract entitled her.  See Tr. at 36:20-37-5 (Holt)("The problem is not that the statute was making it illusory coverage . . . . The problem . . . is that she was not advised that it was illusory."); Response at 2 ("[B]ecause Defendant Young failed to alert her to this exclusionary provision, it misled her to believe that her contract for insurance included coverage it did not . . . .")

Young America provided UIM coverage -- the meagre kind that the Schmick offset necessitates in New Mexico.  Cf. Schmick, 1985-NMSC-073, ¶ 31, 103 N.M. at 224, 704 P.2d at 1100 (acknowledging that excess-theory UIM coverage is "more equitable in that the injured insured collects all proceeds for which, ostensibly, a premium has been paid and has his or her damages compensated more fully," but concluding that New Mexico's UIM statute "does not allow for such recovery").  Young America did not "fail[] to provide" this underinsured coverage -- entirely offset by the tortfeasor's minimum-limit liability coverage -- when it "den[ied] underinsured claims for benefits to Ms. Apodaca."  SAC ¶ 93, at 19.  Apodaca's assertion that Young America breached her insurance contract by "fail[ing] to provide a benefit," SACT ¶ 92, at 19, is, in essence, an assertion that Young America has "fail[ed] to provide" excess theory "underinsured coverage" -- covering the full extent of her injuries.  Because her UIM contract does not provide for such coverage, however, and no UIM policy in New Mexico provides such coverage, no contractual breach claim lies in Young America's failure to provide "a benefit."  SAC ¶ 92, at 19.  See Jan. 16 MOO at 15 ("Rather than seeking a remedy for a breach, it appears that Plaintiff seeks to somehow get around the offset provision, so that Defendant is forced to pay the full $25,000 underinsured motorist coverage." (quoting Schwartz v. State Farm Mut. Auto. Ins. Co., No. CIV 18-0328, 2018 WL 4148434, at *8 (D.N.M. Aug. 30, 2018)(Johnson, C.J.))).

- 69 -

Moreover, as Young America notes, <u>see</u> Third MTD at 16, and as <u>Crutcher</u> confirms, <u>see</u> 2022-NMSC-001, ¶ 27, 501 P.3d at 440, minimum-limits UM/UIM policies provide some "benefit," SAC ¶ 92, at 18.  Minimum limits UM/UIM policies provide a "benefit," SAC ¶ 92, at 18, in two ways.  The first benefit is in the form of UM coverage for accidents with uninsured motorists; it was for this reason <u>Crutcher</u> continued to permit minimum-limits UM/UIM policies to be sold, provided there is disclosure.  <u>See Crutcher</u>, 2022-NMSC-001, ¶ 27, 501 P.3d at 440 ("[M]inimum limits UM/UIM coverage . . . still retains some value for policyholders").  Moreover, the policy has value in the form of UIM coverage when a tortfeasor's liability insurance distributions diminish because shared among multiple injured parties.  For that reason, Young America has not failed to provide "a benefit," SAC ¶ 92, at 18; the "benefit" was only not what Apodaca believed it to be.  This first proposition that the SAC offers, that Young America breached the contract by not providing "a benefit" insofar as it "fail[ed] to provide underinsured coverage," SAC ¶¶ 92-93, at 18, therefore, cannot serve as a basis on which to predicate contract breach liability.

## 2.    **Apodaca Cannot State a Claim for Breach of Contract on the Theory That Young America Interjected Ambiguity in the Contract.**

The second prong of the SAC's contract breach allegation, Apodaca's assertion that Young America breached the contract "by creating ambiguity and uncertainty" in the contract, also fails to provide a solid basis for contractual liability.  SAC ¶ 94, at 19.  A drafting party does not breach a contract yet to be consummated by introducing into it ambiguity, even if it is an ambiguity later exploited for the drafter's benefit and even when the contract is one of adhesion, as is this insurance contract.  The issue of contractual ambiguity raises the question whether particular conduct conforms to the contract or represents breach; the drafter's use of ambiguous language is not itself a breach.  Making an ambiguous promise is analytically before breach.  <u>Cf. Mark V, Inc. v.</u>

Mellekas, 1993-NMSC-001, ¶ 13, 114 N.M. 778, 782, 845 P.2d 1232, 1236 ("The factual issues . . . presented by an ambiguity must be resolved by the jury . . . prior to deciding breach and damages." (citing C.R. Anthony Co. v. Loretto Mall Partners, 1991-NMSC-070, ¶ 17, 112 N.M. 504, 510, 817 P.2d 238, 244)).  Breach lies in failure to perform a promise, not on misrepresenting what the promisor's promise entails.  Cf. 23 Williston, supra, § 63:1 ("As a contract consists of a binding . . . set of promises, a breach of contract is a failure, without legal excuse, to perform any promise that forms . . . part of a contract.").  Corbin, for example, states that "[w]here a contract requires a party to provide information to the other . . . a negligent misrepresentation constitutes a breach of contract," 7 Corbin on Contracts § 28.13 (2023)("Corbin"); but when a contract, like Apodaca's insurance contract, does not include among its obligations a duty to provide information, then misrepresentation is not breach, but rather, as discussed further below, is ground for avoidance and restitution, see Corbin, supra, § 28.13 ("Whenever a party has fraudulently induced another to enter into a transaction [as permits a] tort action for deceit, the deceived party may instead elect to avoid the transaction and claim restitution. . . . [But m]isrepresentation or nondisclosure may render a transaction voidable even . . . [without tort for] deceit.").

Young America had no contractual duty to breach that it "properly . . . explain," SAC ¶ 94, at 19, the provisions of the contract Apodaca was to purchase.  The first element of breach of contract is showing "the existence of a contract," Abreu v. N.M. Children, Youth and Families Dep't, 797 F. Supp. 2d at 1247, but the wrongful conduct alleged here, Young America's failure to adequately explain the policy it offers, occurred before the contract's formation.  There thus can be no contractual breach claim, because Young America had no contractual duty to explain a contract yet to come into existence.

Furthermore, even if the alleged ambiguity could be the basis for a contract breach, the contract here is not ambiguous, which means that Apodaca cannot not benefit from various presumptions.  It adopts in part the statutory definition of underinsured motorist.  <u>Compare</u> Policy at 14 ("Underinsured means a land motor vehicle for which the sum of all bodily injury liability policies . . . is[] . . . less than the coverage limit for Uninsured Motorist Coverage shown on the Declarations Page."), <u>with</u> N.M.S.A. § 66-5-301(B) ("'[U]nderinsured motorist' means an operator of a motor vehicle with respect to the ownership . . . of which the sum of the limits of liability under all bodily injury liability insurance . . . is less than the limits of liability under the insured's uninsured motorist coverage.").  The other portion, defining an underinsured motorist as one where the distributions from their liability policy is less than the insured's coverage limit, is also unambiguous.

The policy's language may be technical, <u>cf.</u> <u>Crutcher</u>, 2022-NMSC-001, ¶ 26, 501 P.3d at 439 ("We refuse to impose on the insured the obligation to be aware of and understand the consequences of . . . [the statute's] technical language."), but not all technical language is ambiguous, <u>cf.</u> 43 Am. Jur. 2d Insurance § 283 ("An insurance policy is not ambiguous merely because a reader may have to stop and think about what it means . . . [and a]n ambiguity is not invariably present in an insurance contract when the contract requires interpretation." <u>See</u> 16 <u>Williston</u>, <u>supra</u>, § 49:17 ("[T]he fact that an insurance policy is a complex instrument requiring analysis or the need to interrelate multiple and various policy provisions, will not alone create an ambiguity to be resolved in favor of the insured.").  Notably, a different portion of the <u>Schmick</u> decision, dealing with whether the plaintiff could stack the coverage in her two motor vehicle policies, finds that the provisions at issue are ambiguous and applies the interpretive presumption in favor of the insured's reasonable expectations.  <u>See</u> <u>Schmick</u>, 1985-NMSC-073, ¶ 19, 103 N.M.

216, 221, 704 P.2d 1092, 1097 ("We find that State Farm's exclusionary clause is difficult to construe. . . . Consequently, given that Schmick reasonably expected to be covered by both policies[,] . . . we will not allow an abstruse policy provision to exclude her from coverage under the policy on the Ford.").  Absent from <u>Schmick</u>, however, is any suggestion that the offset language, which now appears in Young America's contract, is ambiguous, <u>cf.</u> <u>Schmick</u>, 1985-NMSC-073, ¶¶ 22-27, 103 N.M. at 1098-99, 704 P.2d at 1098-99, and courts since then have not declared it ambiguous.

Because the provision is not ambiguous, Apodaca cannot benefit from the rule favoring coverage and the insured's reasonable expectations because "[t]he doctrine of reasonable expectations only applies where the policy terms are ambiguous."  <u>Riordan v. Laws. Title Ins. Corp.</u>, 393 F. Supp. 2d 1100, 1104 (D.N.M. 2005)(Brack, J.)(citing <u>Slack v. Robinson</u>, 2003-NMCA-083, ¶ 8, 134 N.M. 6, 9, 71 P.3d 514, 517).  <u>See</u> 43 Am. Jur. 2d Insurance § 287 ("The reasonable expectations of an insured are not assessed unless the language of the policy is ambiguous." (citing <u>Cincinnati Ins. Co. v. Becker Warehouse, Inc.</u>, 635 N.W.2d 112 (Neb. 2001)). <u>See</u> 43 Am. Jur. 2d Insurance § 290 (noting that courts require ambiguity to invoke the interpretive rule favoring coverage).  In sum, the SAC's two primary allegations about how Young America breached the contract -- by failing to "provide a benefit" insofar as it "fail[ed] to provide underinsurance coverage," SAC ¶ 93, at 19, and by "creating ambiguity and uncertainty" in the contract, SAC ¶ 94, at 19 -- do not state claims for breach of contract liability.

### 3.    <u>Apodaca Cannot Establish Breach of Contract Liability on the Basis of Breach of Warranty</u>.

If her contract with Young America was for a sale of goods or for certain services, then Apodaca's allegations that Young America misled her about what the contract provided could make out a breach of warranty claim, which is a contract breach claim.  <u>Cf.</u> <u>Camino Real Mobile</u>

Home Park P'ship v. Wolfe, 1995-NMSC-013, ¶ 17, 119 N.M. 436, 442, 891 P.2d 1190, 1196 ("An action for breach of an express warranty of the quality or condition of real property sounds in contract, insofar it arises out of the agreement of the parties and the plaintiff sues to recover what he contracted to receive."), overruled on other grounds by Sunnyland Farms, Inc. v. Cent. N.M. Elec. Co-op., Inc., 2013-NMSC-017, ¶ 17, 301 P.3d 387.  Breach of warranty is available for misrepresentation of the character of goods sold, which is a claim under New Mexico's UCC statute.  See Badilla v. Wal-Mart Stores E., Inc., 2017-NMCA-021, ¶ 9, 389 P.3d 1050, 1053-54 ("A breach of warranty presents an objective claim that the goods do not conform to a promise, affirmation, or description, or that they are not merchantable." (quoting Jaramillo v. Gonzales, 2002-NMCA-072, ¶ 13, 132 N.M. 459, 50 P.3d 554)).  Warranty breach claims are also available in professional services contracts and trade services contracts, where the defendant provides substandard services.  See Adobe Masters, Inc. v. Downey, 1994-NMSC-101, ¶ 3, 118 N.M. 547, 548, 883 P.2d 133, 134 ("When professional services arising from contract are substandard, a plaintiff may bring a cause of action for malpractice based on negligence or for breach of contract arising from the breach of the implied warranty to use reasonable skill." (citing Ruiz v. Southern Pac. Transp. Co., 97 N.M. 194, 200, 638 P.2d 406, 412 (Ct. App.)); Mascarenas v. Jaramillo, 1991-NMSC-014, ¶ 8, 111 N.M. 410, 412, 806 P.2d 59, 61 ("[W]e have long recognized that breach of implied warranty by a tradesman to perform in a skilled and workmanlike fashion is a common-law theory of recovery in New Mexico.");  Robey v. Parnell, 2017-NMCA-038, ¶ 14, 392 P.3d 642, 648 ("Defendant told Plaintiff that the [water] well [that Defendant installed] would last fifty years, [which] supports the district court's determination that Defendant made the sort of affirmation that, in these circumstances, amounts to an express warranty.").

Breach of warranty disputes in the insurance contract context, however, revolve around an unrelated subject: the insured's warranties to the insurer before a policy's issuance about the risks to which the insured will expose the insurer, where the breaching party is the insured, and the result is that the insurer escapes the obligation to compensate. Cf. D & S Realty, Inc. v. Markel Ins. Co., 789 N.W.2d 1, 16 (Neb. 2010)("Warranties are effectively policy stipulations that function as conditions on an insurer's obligation to pay a loss."); 6 Steven Plitt et al., Couch on Insurance § 83:21 (3d ed. 2023)("As a general rule, if there is a breach of warranty, the contract of insurance is or may be voided by the insurer."). The Court has identified no case that holds, however, that a breach of warranty claim exists on the failure of an insurer to provide coverage of the character that an insured alleges the insurer warranted to her. Even assuming that Apodaca alleges that Young America made a warranty to her about the quality or character of her insurance contract -- cf. SAC ¶ 33, at 6 ("Defendants misrepresented to Ms. Apodaca that she would benefit from underinsured coverage. . . .") -- still there is no breach-of-warranty claim on these facts, so this too provides no available theoretical basis for Count IV's breach of contract claim.

4.   **Apodaca's Claims are More Properly Cast as Claims Premised on Misrepresentation and Mistake and as Such Do Not Give Rise to Contractual Breach Liability.**

Rather than providing a basis for breach of contract, Apodaca's allegations give rise to: (i) a claim that she unilaterally was mistaken; or (ii) that Young America induced her deceptively into entering the contract. First, mistake: As noted above, the essence of Apodaca's allegations is that Young America misled her as to the nature of the contract into which she entered; she was under the impression it provided for excess theory UIM coverage and not for gap theory coverage. See SAC ¶ 49, at 9. See Tr. at 36:20-37-5 (Holt)("The problem is not that the statute was making it illusory coverage. . . . The problem . . . is that she was not advised that it was illusory."); Response

- 75 -

at 2 ("[B]ecause Defendant Young failed to alert her to this exclusionary provision, it misled her to believe that her contract for insurance included coverage it did not. . . .").  This posture, alleging mistake, would permit her to rescind the contract, avoiding liability in the event she is alleged responsible for a breach of the contract.  See City of Raton, 760 F. Supp. 2d at 1142 ("[W]hen a party makes a mistake regarding a basic assumption of the contract and the mistake has an adverse effect, the contract may be voidable if the party does not bear the risk of the mistake." (citing Restatement (Second) of Contracts § 153, at 394 (1981))("City of Raton"); 17A Am. Jur. 2d § 202 (noting that unilateral mistake, accompanied by the unmistaken party's misconduct, makes a contract "voidable" and makes "recission" available).

Based on her mistake, therefore, Apodaca would be able to "void the contract when . . . the other party had reason to know of the mistake or his fault caused the mistake," City of Raton, 760 F. Supp. 2d at 1142 (quoting Restatement (Second) of Contracts § 153, at 394 (1981)) -- knowledge of her mistake that she charges Young America with possessing, see SAC ¶ 33, at 6.  See Twin Forks Ranch, Inc. v. Brooks, 1995-NMCA-128, ¶ 8, 120 N.M. 832, 834, 907 P.2d 1013, 1015 (noting that contracts are rescindable if "(1) unilateral mistake is established; (2) the party requesting relief does not bear the risk of mistake; and (3) among other grounds, enforcement of the contract would be unconscionable" (citing Restatement (Second) of Contracts § 153 (1981)). Although as discussed below, see infra section IV.D, reformation is unavailable in Apodaca's unique circumstances, she could, as a general rule, seek reformation of the contract on the basis of unilateral mistake.  See 43 Am. Jur. 2d Insurance § 210 ("If an insured contends that a policy does not conform to the policy allegedly ordered from the agent, the insured's remedy is not a suit at law, but the proper remedy is for a reformation of the policy to conform to the alleged oral understanding." (citing Continental Cas. Co. v. Calinger, 265 Neb. 557, 657 N.W.2d 925 (2003)));

2 Steven Plitt et al., <u>Couch on Insurance</u> § 27:10 (3d ed. 2023)("[A unilateral] mistake . . . induced or contributed to in some way by the other party is generally sufficient to justify reformation. This is particularly true where the inequitable conduct contributes to the making of the unilateral mistake by the other party.").

 Second, misrepresentation: The facts that the SAC's Count IV alleges could maintain a claim for misrepresentation, which is a contract defense, and allow Apodaca to seek recission or restitution.  <u>Cf.</u> Restatement (Second) of Contracts 7 Intro. Note (1981)("At most, the rules stated in this Chapter [on misrepresentation] make the contract voidable, rather than giving the aggrieved party the right to a claim for damages."); Restatement (Second) of Contracts § 376 (1981)("A party who has avoided a contract on the ground of lack of capacity, mistake, misrepresentation, duress, undue influence or abuse of a fiduciary relation is entitled to restitution for any benefit that he has conferred on the other party by way of part performance or reliance.").  Misrepresentation, or deceit, is also a tort claim and, indeed, is the claim that she makes in Count I; while the misrepresentation tort gives rise to affirmative liability, misrepresentation in the contract context is a defense.  <u>See</u> <u>First Nat. Bank & Tr. Co. of Racine v. Notte</u>, 97 Wis. 2d 207, 213-14, 293 N.W.2d 530, 534 (1980)("[T]here is an affirmative liability for damages in a tort action, while a defense alleging that a contract is void or voidable for misrepresentation or non-disclosure does not itself result in a damage award, [so] the requirements imposed by contract law are in some instances less stringent.").   "Misrepresentations by one party as to a writing can make a contract voidable by the other party," <u>Sisneros v. Citadel Broad. Co.</u>, 2006-NMCA-102, ¶ 19, 140 N.M. 266, 272, 142 P.3d 34, 40 (citing Restatement § 164)("<u>Sisneros</u>").   "Where one party to the contract has perpetrated a fraud upon the other, by means of which the latter was induced to enter into the contract," among the available actions are "recission of the contract or . . . damages for

deceit." Golden Cone Concepts, Inc. v. Villa Linda Mall, Ltd., 1991-NMSC-097, ¶ 6, 113 N.M. 9, 11, 820 P.2d 1323, 1325 (quoting Berrendo Irrigated Farms Co. v. Jacobs, 1917-NMSC-055, ¶ 7, 23 N.M. 290, 296, 168 P. 483, 484). "[A] misrepresentation can include a false representation 'as to the . . . legal effect of a writing that is to evidence or embody the contract.'" Sisneros, 2006-NMCA-102, ¶ 20, 140 N.M. at 272, 142 P.3d at 40 (quoting 1 E. Allan Farnsworth, Farnsworth on Contracts § 4.11 (3d ed. 2004)). Apodaca's factual allegations make out this kind of contract claim, which empower Apodaca to avoid the contract or to rescind the contract and seek restitution, but, as with the theory of mistake, they do not establish that Young America breached the contract.

The Court identifies no commentator that makes out contract breach on the type of facts that Apodaca alleges; instead, the commentators all suggest that Apodaca's misunderstanding of what the contract entailed makes out a claim for mistake in contract or misrepresentation in contract or tort, and as such are grounds for reformation,[11] recission or restitution. Cf. 2 Steven Plitt et al., Couch on Insurance § 27:10 (3d ed. 2023)("[A unilateral] mistake . . . induced or contributed to in some way by the other party is generally sufficient to justify reformation. This is particularly true where the inequitable conduct contributes to the making of the unilateral mistake by the other party."); 2 Steven Plitt et al., Couch on Insurance § 31:70 (3d ed. 2023)("Where judicial rescission is sought by a beneficiary, the beneficiary must prove the existence of such grounds as would have entitled the insured to avoid the contract; must allege and prove that such written application was procured by fraud, trickery, mistake, or some similar means."); 17A Am. Jur. 2d § 204 (noting that if there is "fraud or mistake[, then] . . . ignorance of a written contract's

---

[11]As discussed below, however, see infra section IV.D, reformation is not available because the resulting contract would be illegal under New Mexico law. Reformed, as Apodaca wishes, see Tr. at 36:14-38:4 (Holt), to provide excess theory UIM coverage, the contract would violate the Schmick rule that only gap theory UIM coverage is available in New Mexico.

contents [may] negate its effect"); 17A Am. Jur. 2d § 210 ("Fraud in the inducement can serve as both a basis for tort liability and as grounds for rescinding the contract. One who has been fraudulently induced to enter into a contract may rescind the contract and recover the benefits that he or she has conferred on the other party.");  John D. Calamari & Joseph M. Perillo, Contracts 277-78 (2d ed., 1978)("Whenever a party has fraudulently induced another to enter into a transaction under the circumstances giving the latter the right to bring a tort action for deceit, the deceived party may instead elect to avoid the transaction and claim restitution."); 2 Dan B. Dobbs, Law of Remedies: Damages, Equity, Restitution § 11.5, at 737 (2d ed. 1993)("If the aggrieved party has delivered some or all of the performance due under the contract before discovering the mistake, he may not only defend a suit but may also avoid the contract by recission or otherwise and recover restitution for the benefits he has conferred.")("Law of Remedies").

That Apodaca's claims would be improperly cast as contract breach claims is understandable, however: "Because the setting for misrepresentation claims is usually an economic or bargaining transaction, claims for misrepresentation often resemble claims for contract breach." Law of Remedies, supra, § 9.1, at 545.  Her negligent misrepresentation, UPA, and UIPA claims, serve this remedial function, and they therefore represent the proper legal framework for redress.  Cf. SAC ¶ 88, at 18 ("Defendants' conduct was in bad faith, malicious, willful, wanton, fraudulent and/or in reckless disregard of Ms. Apodaca's rights.").

The Court, therefore, agrees with Young America that Apodaca did not cure, with its SAC, problems in her contractual breach claim that Judge Brack identified and that supported his dismissal of the contractual breach claims appearing in her FAC.  See Jan. 16 MOO at 15-16.  As Judge Brack held there, the "Plaintiff has not pled facts to show that Young America breached the parties' contract. Instead, it appears that Young America complied with the contract in paying only

property damage benefits." Jan. 16 MOO at 15. The SAC attempted to remedy problems in the FAC by introducing the language discussed above, namely, that "[b]y accepting premium payments for underinsured motorist coverage Defendants . . . agreed to provide a benefit," and that the "Defendant further breached their contractual obligations . . . by creating ambiguity and uncertainty in the underinsured motorist coverage provisions." SAC ¶¶ 92, 94, at 18-19. Compare FAC ¶¶ 85-89, at 18-19 (lacking this language), with SAC ¶¶ 90-96, at 18-19 (including this language). This language, novel to the SAC, does not undermine Judge Brack's conclusion that the "Plaintiff has not pled facts to show that Young America breached the parties' contract. . . . [and that instead] 'it appears that Plaintiff seeks to somehow get around the offset provision, so that Defendant is forced to pay the full $25,000 underinsured motorist coverage.'" Jan. 16 MOO at 15 (quoting Schwartz v. State Farm Mut. Auto. Ins. Co., No. CIV 18-0328, 2018 WL 4148434, at *8 (D.N.M. Aug. 30, 2018)(Johnson, C.J.)).

Because Young America did not fail to provide something it contracted to provide, it did not breach its contract with Apodaca. Young America may have misled Apodaca about what her insurance policy meant, but that does not mean it failed to perform up to the policy's demands; she does not allege sufficiently that, in withholding UIM payments, Young America was not "follow[ing] the policy." Tr. at 38:16 (Holt). As discussed above, see supra section II.B, and below, see infra section III.B, Apodaca states multiple viable claims for relief -- multiple avenues for recovery -- based on Young America's misrepresentations to her, i.e., her negligent misrepresentation, UPA, UIPA, and good-faith-and-fair-dealing claims. It is only that the same alleged factual basis cannot supply a basis for breach of contract. The Court therefore will dismiss Apodaca's claim in Count IV for breach of contract.

### B. APODACA STATES A VALID CLAIM FOR RELIEF, SOUNDING IN EITHER CONTRACT OR IN TORT, THAT YOUNG AMERICA

**BREACHED THE COVENANT OF GOOD FAITH AND FAIR DEALING BY FAILING TO DISCLOSE ADEQUATELY THE ILLUSORY NATURE OF HER UIM COVERAGE.**

The Court will not dismiss Apodaca's claim that Young America breached the implied covenant of good faith and fair dealing because, unlike her breach-of-contract claim, Apodaca's assertion that Young America failed to disclose adequately the nature of her UIM coverage supplies a viable basis for good-faith-and-fair-dealing liability that sounds in either contract or tort. See SAC ¶¶ 97-103, at 20-21. The covenant of good faith and fair dealing is a rule of contract interpretation and provides that one party cannot willfully engage in conduct that deprives the other party of the benefit of the bargain. See Watson Truck & Supply Co. v. Males, 1990-NMSC-105, ¶ 12, 111 N.M. 57, 60, 801 P.2d 639, 642 ("Broadly stated, the covenant requires that neither party do anything which will deprive the other of the benefits of the agreement." (quoting Romero v. Mervyn's, 109 N.M. 249, 257, 784 P.2d 992, 1000 (1989)). Normally, covenant-of-good-faith-and-fair-dealing claims sound in contract. See Bourgeous, 1994-NMSC-038, ¶ 17, 117 N.M. at 439, 872 P.2d at 857 ("[T]he duty to not act in bad faith or deal unfairly becomes part of the contract and the remedy for its breach is on the contract itself." (citing Wagenseller v. Scottsdale Mem'l Hosp., 710 P.2d 1025, 1040 (Ariz. 1985))). However, "tort recovery for breach of the covenant of good faith and fair dealing [is] permissible . . . where a special relationship existed, such as between insurer and insured." City of Raton, 611 F. Supp. 2d at 1199 (citing Bourgeous, 1994-NMSC-038, ¶ 17, 117 N.M. at 439, 872 P.2d at 857).

Apodaca's good-faith-and-fair-dealing-breach claim is articulated primarily as a contract claim; she asserts that Young America failed to exercise good faith and fair dealing in executing the contract, causing her to be deprived of the benefit of her bargain. See SAC ¶ 100, at 20 ("Implicit in the contract of insurance between Ms. Apodaca and Defendants was the covenant that

Defendants would, at all times, act in good faith and deal honestly and fairly with Ms. Apodaca."). She asserts that Young America breached the covenant by:

> a.      Failing to meet the reasonable expectations of the insured, including Ms. Apodaca and members of the Class, in regard to the performance of the underinsured motorist provisions of the policy;
>
> b.      Failing to properly inform Ms. Apodaca and members of the Class of the illusory coverage it solicited and sold;
>
> c.      Charging a premium for coverage that was not provided;
>
> d.      Failing and refusing to acknowledge that the subject occurrence triggers the subject insurance policy.
>
> e.      Failing and refusing to disclose, admit, and acknowledge coverage in this matter;
>
> f.      Failing and refusing to promptly and fairly investigate, process, determine and decide Ms. Apodaca's claims under the policy referenced above;
>
> g.      Denying coverage to its insured, Ms. Apodaca, under the policy;
>
> h.      Failing and refusing to cover its insured, Ms. Apodaca, under the underinsured motorist portion of the policy referenced above; and
>
> i.      Failing and refusing to mediate, resolve, and settle Ms. Apodaca's underinsured motorist claims

SAC ¶ 101(a)-(i), at 20.  Her good-faith-and-fair-dealing claim is similar to her contract claim, and suffers from some of the same flaws.

As with her claim that Young America breached the contract in failing to provide "a benefit" for premiums collected because it did not "provide underinsured coverage," SAC ¶ 93, at 19, Apodaca's assertion that Young America breached the covenant of good faith and fair dealing by "denying coverage to . . . Ms. Apodaca[] under the policy, [and] . . . refusing to cover . . . Ms. Apodaca[] under the underinsured motorist portion of the policy," SAC ¶ 101(g)-(h), at 20-21, is flawed, because it states incorrectly an assumption central to the parties' dispute:  Apodaca's

factual allegations, assuming them to be true, support a theory of Young America's liability that focuses not on what her UIM policy entitled her to, but on what Young America misled her to believe the policy entitled her to.  See Tr. at 36:20-37-5 (Holt)("The problem is not that the statute was making it illusory coverage . . . . The problem . . . is that she was not advised that it was illusory."); Response at 2 ("[B]ecause Defendant Young failed to alert her to this exclusionary provision, it misled her to believe that her contract for insurance included coverage it did not. . . .").

Young America did not "deny coverage" or "refus[e] to cover" her under that portion, because her UIM coverage would not call for benefits here, given that it offers gap-theory -- not excess -- coverage.  SAC ¶ 101(g)-(h), at 20-21.  Other asserted good-faith-and-fair-dealing violations assume the same proposition -- that Young America violated the covenant by not paying out excess-theory UIM coverage -- and so they fail for the same reason.  See SAC ¶ 101(c)-(f), (i), at 20-21.  Ordinarily, therefore, she lacks a sustainable basis for her good-faith-and-fair-dealing claim: Young America did not breach the contractual covenant of good faith and fair dealing by refusing to provide Apodaca benefit for which the contract unambiguously did not call.  Cf.  17A Am. Jur. 2d Contracts § 577 ("A claim [for] breach of the implied [good-faith] covenant . . . is itself contractual in nature; thus, the elements of the claim are the same as those for an ordinary breach of contract claim, the only difference being that the contractual obligation breached is implied, not express." (citing In re Universal Marketing, Inc., 541 B.R. 259, 88 U.C.C. Rep. Serv. 2d 286 (Bankr. E.D. Pa. 2015)).

Count V's assertion that Young America failed to disclose adequately the illusory nature of her UIM policy, however, states permissible bases for good-faith-and-fair-dealing relief. Although these good-faith-breach claims are similar to asserted contractual breaches that Apodaca makes in Count IV, see SAC ¶ 94, at 19, basing liability on Young America's pre-contract-

formation conduct does not affect Apodaca's good-faith claims as it does her contractual breach claims.  Like her claim that Young America breached the contract "by creating ambiguity . . . in the underinsured motorist coverage provisions of the policy by failing to properly . . . explain . . . the illusory nature" of her UIM coverage, SAC ¶ 94, at 19, Apodaca alleges that Young America breached the covenant of good faith and fair dealing implied in the contract by "[f]ailing to meet the reasonable expectations of the insured . . . in regard to the performance of the underinsured motorist provisions of the policy . . . [and by f]ailing to properly inform Ms. Apodaca and members of the Class of the illusory coverage it solicited and sold," SAC ¶ 101(a)-(b), at 20.

The problem affecting Apodaca's contractual breach claim that she cannot predicate liability on pre-contract conduct, cf. Abreu v. N.M. Children, Youth and Families Dep't, 797 F. Supp. 2d at 1247 (noting that the first element for a successful breach-of-contract claim is demonstrating "the existence of a contract"), is inapplicable here, because Young America's pre-contract conduct can serve as a basis for good-faith breach liability under a contract theory, see Salas v. Mountain States Mut. Cas. Co., 2009-NMSC-005, ¶¶ 12-14, 145 N.M. 542, 546-47, 202 P.3d 801, 805-06 ("[I]f an insurer fails to disclose to its insured the existence of an exclusionary provision contained in the insurance contract, then the covenant of good faith and fair dealing precludes the insurer from relying on the provision to limit or deny the insured's right to coverage." (citing Homestead Invs., Inc. v. Found. Reserve Ins. Co., 1971-NMSC-108, ¶¶15-16, 83 N.M. 242, 245, 490 P.2d 959, 962)); Ramirez v. USAA Cas. Ins. Co., 285 Cal. Rptr. 757, 761 (Cal. Ct. App. 1991)("One important facet of the [covenant of good faith and fair dealing] is the duty reasonably to inform an insured of the insured's rights and obligations under the insurance policy.").  See also Steven J. Burton, Breach of Contract and the Common Law Duty to Perform in Good Faith, 94

Harv. L. Rev. 369, 371 (1980)("[T]he courts employ the good faith doctrine to effectuate the intentions of parties, or to protect their reasonable expectations.").  Young America's failure to disclose the illusory character of Apodaca's UIM policy and its failure to meet her reasonable expectations, therefore, form viable bases for good-faith-and-fair-dealing liability, theorized as based on the contract.

In addition, although Apodaca asserts her failure-to-explain and failure-to-meet-reasonable-expectations, good-faith-and-fair-dealing claims as contract claims, she also may pursue a tort claim on the same bases, because of her insurance contract's unique status under New Mexico law.  New Mexico permits claims for breaches of the covenant of good faith and fair dealing to sound in both contract and in tort when at issue is an insurance contract.  See City of Raton, 611 F. Supp. 2d at 1210 ("New Mexico . . . do[es] not allow a cause of action in tort for breach of the covenant of good faith except in insurance contracts, or possibly contracts that are adhesive in nature.").  The good-faith-breach tort's unique availability in the insurance contract context derives from the "special relationship[]" between insurer and insured.  Salopek, Tr. for Salopek Fam. Heritage Tr. v. Zurich Am. Life Ins. Co., 428 F. Supp. 3d 609, 620-22 (D.N.M. 2019)(Parker, J.)(citing Bhasker II, 361 F. Supp. 3d at 1132).

In Foley v. Interactive Data Corp., 765 P.2d 373 (Cal. 1988)("Foley"), a case that the Supreme Court of New Mexico cites with approval, see Bourgeous, 1994-NMSC-038, ¶¶ 15-17, 117 N.M. at 438-39, 872 P.2d at 856-57, the Supreme Court of California explained the propriety of making available tort recovery for good-faith-and-fair-dealing breach in the insurance contract context, but not in the employment contract context.  Noting that "insurers' obligations are . . . rooted in their status as purveyors of a vital service labeled quasi-public in nature," Foley, 765 P.2d at 390 (quoting Egan v. Mutual of Omaha Ins. Co., 620 P.2d 141 (Cal. 1979)), the Foley

court identified three unique circumstances that make appropriate tort recovery in the insurance sphere:

> [(i) W]hen an insurer in bad faith refuses to pay a claim or to accept a settlement offer within policy limits . . . the insured cannot turn to the marketplace to find another insurance company willing to pay for the loss already incurred. The wrongfully terminated employee, on the other hand, can . . . make reasonable efforts to seek alternative employment[;]
>
> [(ii)] the role of the employer differs from that of the "quasi-public" insurance company with whom individuals contract specifically in order to obtain protection from potential specified economic harm. The employer does not similarly "sell" protection to its employees; it is not providing a public service [as is an insurance company;]
>
> [and (iii)] in the insurance relationship, the insurer's and insured's interest are financially at odds. If the insurer pays a claim, it diminishes its fiscal resources. . . . [T]here is less inherent relevant tension between the interests of employers and employees than exists between that of insurers and insureds. Thus the need to place disincentives on an employer's conduct in addition to those already imposed by law simply does not rise to the same level as that created by the conflicting interests at stake in the insurance context.

Foley, 765 P.2d at 396.  It notes that these insurance-contract tort claims represent "a major departure from traditional principles of contract law," because the covenant of good faith aims to redress alleged breaches of "'ex contractu' obligation[s], namely one[s] arising out of the contract itself," Foley, 765 P.2d at 394; the covenant exists "to protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purposes."  Foley, 765 P.2d at 394.

Accordingly, courts have permitted good-faith tort recovery for such conduct as an insurer's failure reasonably to investigate a claim, see Ambassador Ins. Co. v. St. Paul Fire & Marine Ins. Co., 1984-NMSC-107, ¶¶ 12, 102 N.M. 28, 31, 690 P.2d 1022, 1025 ("[W]hen failure to settle the claim stems from a failure to properly investigate the claim or to become familiar with the applicable law, etc., then [such] negligence in defending the suit[, the insurer's express

contractual duty,]. . is strong evidence of bad faith in failing to settle."), and an insurer's failure unreasonably to pay on an insured's claim, see Gruenberg v. Aetna Ins. Co., 510 P.2d 1032, 1032 (Cal. 1973)("[W]hen the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort."). Conduct regarding inadequate disclosures -- i.e., conduct occurring before the insurance contract's consummation -- forms a permissible basis, therefore, for tort liability for good-faith breaches in the insurance context. Cf. Salas v. Mountain States Mut. Cas. Co., 2009-NMSC-005, ¶ 16, 145 N.M. 542, 547, 202 P.3d 801, 806 ("The duty of disclosure is premised on the principle of fundamental fairness, which dictates that an insurer must notify a known insured of the scope of available insurance coverage and the terms and conditions governing that coverage."). Apodaca's claim that Young America breached the covenant of good faith and fair dealing by failing to explain adequately her UIM coverage -- and thus by failing to meet her reasonable expectations, see SAC ¶¶ 101(a)-(b), at 20 -- supplies a valid basis for claiming tort recovery.

Apodaca's assertions in Count V therefore state valid claims for good-faith-covenant relief. The assertions that Young America failed to explain adequately her UIM coverage and thereafter upset her reasonable expectations, see SAC ¶ 101(a)-(b), at 20, which the Court, reviewing Young America's Third MTD, assumes to be true, supply an adequate basis for relief for breaches of the covenant of good faith and fair dealing, when that claim is sounded either in contract or in tort; Apodaca may pursue either theory of liability. The Court therefore will not dismiss Count V of Apodaca's SAC.

## IV. APODACA STATES VALID CLAIMS FOR INJUNCTIVE RELIEF, DECLARATORY JUDGMENT, AND PUNITIVE DAMAGES, BUT SHE MAY NOT SEEK REFORMATION OF HER CONTRACT.

Apodaca states valid claims for relief in Count VI for injunctive relief, in Count VII for declaratory judgment, and in Count VIII for punitive damages.  See SAC ¶¶ 104-111, at 20-21. Conceptualized as assertions about the kind of remedy sought rather than as independent bases for relief, these claims are appropriate, and so the Court will not grant Young America's Third MTD as to these counts.  Although her SAC does not seek explicitly reformation of the contract, some of Apodaca's remedial goals are tantamount to contract reformation, and she argued for reformation at the hearing; Apodaca cannot, however, seek reformation of the contract to provide excess-theory UIM coverage because the resulting contract would be void under New Mexico law. The Court will therefore not permit Apodaca to pursue this claim.

## A.  APODACA MAY SEEK INJUNCTIVE RELIEF ENJOINING YOUNG AMERICA FROM COLLECTING PREMIUMS FOR ILLUSORY UM/UIM POLICIES.

The Court will deny Young America's Third MTD as to Apodaca's claim for injunctive relief in Count VI, because, although it does not state a claim for independent, substantive liability, still it states a viable form of remedy for her underlying substantive claims.  See SAC ¶¶ 104-106, at 20-21.  Injunctive relief, an equitable form of relief, empowers the Court to prevent continued unlawful conduct, on contempt of court.  Federal law permits a permanent injunction, but the party requesting such relief bears the burden of showing: "(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction if issues, will not adversely affect the public interest." New Mexico ex rel. Balderas v. Real Est. L. Ctr., P.C., 401 F. Supp. 3d 1229, 1318 (D.N.M. 2019)(Browning, J.)(quoting Southwest Stainless, LP v. Sappington, 582 F.3d 1176, 1191 (10th Cir. 2009)).  New Mexico makes injunctions available under similar circumstances.  See New Mexico ex rel. Balderas v. Real Est. L. Ctr., P.C., 401 F. Supp. 3d at

1320 ("An injury is irreparable at law where, for instance, 'the imminent harm or conduct is or will be of a continuous nature, the constant recurrence of which renders a remedy at law inadequate, except by a multiplicity of suits.'" (quoting <u>Winrock Enters., Inc. v. House of Fabrics of N.M., Inc.</u>, 1978-NMSC-038, ¶ 16, 91 N.M. 661, 579 P.2d 787, 790)).

      Apodaca asserts the following bases for injunctive relief:

> 105.   Ms. Apodaca and the Class are entitled to injunctive relief requiring that Defendants be enjoined from continuing practices that violate the duties, contractual, and legal obligations owed to Ms. Apodaca and the Class.

> 106.   Defendants must be compelled to stop their practice of failing to provide underinsured coverage benefits equal to the limits of liability coverage where they have failed to fully inform their insureds throughout the application and policy underwriting process.

SAC ¶¶ 105-06, at 21.  Although, as discussed above, Apodaca cannot maintain a contract breach claim, she does allege a permissible basis for injunctive relief to the extent her allegations revolve around Young America's alleged misrepresentations to Apodaca and the class -- <u>i.e.</u>, Young America's "failure to fully inform their insureds." SAC ¶ 106, at 21.  Apodaca has not yet achieved success on the merits, but the other elements for federal injunctive relief are met here because: (i) "irreparable harm" would be visited upon consumers misled as to the character of their insurance; (ii) the burden on Young America, preventing it from offering UIM policies without disclosure, does not outweigh the threatened harm; and (iii) such an injunction would be in the public interest.  <u>Cf.</u> <u>New Mexico ex rel. Balderas v. Real Est. L. Ctr., P.C.</u>, 401 F. Supp. 3d at 1318.  The same factors would make appropriate an injunction under New Mexico law.  <u>Cf.</u> <u>New Mexico ex rel. Balderas v. Real Est. L. Ctr., P.C.</u>, 401 F. Supp. 3d at 1320.

      Although a claim for injunctive relief cannot stand alone, without some ground for the enjoined party's substantive liability, <u>see</u> <u>Kaywal, Inc. v. Avangrid Renewables, LLC</u>, 2021-NMCA-037, ¶ 34, 495 P.3d 550, 566 ("Injunctive relief is not a separate claim, but is only available

where the underlying claim is meritorious." (citing <u>Alabama v. U.S. Army Corps of Eng'rs</u>, 424 F.3d 1117, 1127 (11th Cir. 2005))), Apodaca's SAC validly asserts such grounds.  Her claims for negligent misrepresentation, UPA, UIPA, and tort of good-faith-and-fair-dealing violations are appropriate bases for injunctive relief.  The statutes under which she asserts claims permit injunctive relief by private persons.  <u>See</u> N.M.S.A. § 57-12-10(A) (making available injunctive relief for UPA claims); N.M.S.A. § 59A-16-30 (making available for UIPA claims "remedies otherwise available against the same conduct under the common law or other statutes of this state").  Accordingly, the Court will not dismiss Apodaca's claim for injunctive relief as a remedy and will not grant Young America's Third MTD to this extent.

## B.   APODACA MAY SEEK DECLARATORY JUDGMENT FOR YOUNG AMERICA'S CONDUCT.

The Court will deny Young America's Third MTD as to Apodaca's claim for declaratory judgment in Count VII, because, although it does not state an independent basis for relief, it articulates a viable form of remedy for the substantive liability she would impose on Young America.  Declaratory relief exists to declare the rights of parties in a dispute -- federal courts, with the jurisdiction conferred by the Declaratory Judgment Act, 28 U.S.C. § 2201(a), may supply this remedy when "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." <u>Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.</u>, 921 F. Supp. 2d 1137, 1187 (D.N.M. 2013)(Browning, J.)(quoting <u>Maryland Cas. Co. v. Pac. Coal & Oil Co.</u>, 312 U.S. 270, 273 (1941)). The Tenth Circuit instructs district courts to look to the following factors:

> [1] whether a declaratory action would settle the controversy; [2] whether it would serve a useful purpose in clarifying the legal relations at issue; [3] whether the declaratory remedy is being used merely for the purpose of procedural fencing or to provide an arena for a race to res judicata; [4] whether use of a declaratory action would increase friction between our federal and state courts and improperly

encroach upon state jurisdiction; and [5] whether there is an alternative remedy
which is better or more effective.

State Farm Fire & Cas. Co. v. Mhoon, 31 F.3d 979, 983 (10th Cir. 1994).  "[T]he existence of

another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate."

Fed. R. Civ. P. 57.  Similar principles exist in New Mexico's declaratory judgment law.  See

N.M.S.A. § 44-6-2 ("In cases of actual controversy, district courts within their respective

jurisdictions shall have power to declare rights, status and other legal relations whether or not

further relief is or could be claimed."); Am. Linen Supply of N.M., Inc. v. City of Las Cruces,

1963-NMSC-176, ¶ 7, 73 N.M. 30, 32, 385 P.2d 359, 360 ("[U]nless a valid cause of action is

stated under the rules of substantive law, there can be no recourse to declaratory judgment

procedure to reach the desired end. No new substantive rights were created by the declaratory

judgment act.").

>   Apodaca asserts:
>
>   An actual controversy exists between the parties thereby rendering declaratory
>   relief proper pursuant to FRCP 57 and 28 U.S.C. 2201, the Declaratory Judgment
>   Act[, and that] Ms. Apodaca and the Class are entitled to a declaratory judgment
>   establishing the respective rights and obligations of the parties with respect to the
>   claims set forth herein.

SAC ¶¶ 108-09, at 21.  This claim for declaratory relief is not Apodaca's sole claim for relief,

because, as discussed above, Apodaca's SAC asserts more than one viable underlying claim for

substantive relief:  her negligent misrepresentation, UPA, UIPA, and good-faith-and-fair-dealing

claims.  Each issue relates to a "sufficient[ly] immediat[e] and real[] . . . substantial controversy"

between Apodaca and Young America, parties with "adverse legal interests," thus "warrant[ing]

the issuance of a declaratory judgment."  Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.,

921 F. Supp. 2d at 1187 (quoting Maryland Cas. Co. v. Pac. Coal & Oil Co., 312 U.S. at 273).

Accordingly, the Court will not dismiss this claim for relief.

**C.     APODACA MAY SEEK PUNITIVE DAMAGES, BECAUSE SHE PLAUSIBLY ALLEGES A CLAIM THAT YOUNG AMERICA ACTED WANTONLY AND RECKLESSLY WHEN IT SOLD HER UIM INSURANCE THAT IT KNEW WAS LESS VALUABLE THAN APODACA MIGHT HAVE BELIEVED.**

The Court will deny Young America's Third MTD as to the punitive damages claims in Count VIII, because Apodaca's SAC sufficiently alleges conduct that could give rise to punitive damages.   Apodaca asserts therein that the "Defendants' conduct in failing to provide their insureds with underinsured policy benefits in an amount sold and solicited was willful, wanton, and in reckless disregard of Ms. Apodaca's rights and the rights of the Class."  SAC ¶ 111, at 22. Punitive damages exist "to punish reprehensible conduct and to deter similar conduct in the future."  Akins v. United Steel Workers of Am., AFL-CIO, CLC, Local 187, 2010-NMSC-031, ¶ 20, 148 N.M. 442, 237 P.3d 744, 749 (citing Bogle v. Summit Inv. Co., 2005-NMCA-024, ¶ 34, 137 N.M. 80, 107 P.3d 520, 531).  "[T]he award of punitive damages requires a culpable mental state because such damages aim to punish and deter 'culpable conduct beyond that necessary to establish the underlying cause of action.'"  Yedidag v. Roswell Clinic Corp., 2015-NMSC-012, ¶ 58, 346 P.3d 1136, 1152 (quoting Walta v. Gallegos Law Firm, P.C., 2002-NMCA-015, ¶ 56, 131 N.M. 544, 40 P.3d 449, 461).

Punitive damages must be based on an appropriate substantive claim for liability:  Although Apodaca's UPA, and UIPA claims do not form a permissible basis upon which to seek punitive damages, her negligent misrepresentation and good-faith-and-fair-dealing claims form permissible bases upon which to seek punitive damages.  Regarding the former, New Mexico law instructs that punitive damages cannot be based on claims for UPA and UIPA violations.  See Hovet v. Allstate Ins. Co., 2004-NMSC-010, ¶ 28 n.5, 135 N.M. 397, 406, 89 P.3d 69, 78 (noting that punitive damages are available for "common-law bad-faith actions, and not . . . [for] violations of Article

16 of the Insurance Code," i.e., the UIPA); id. ("[W]hen treble damages are statutorily prescribed in the Unfair Practices Act, punitive damages are only available for independent common-law actions for fraud and not under the statute." (citing McLelland v. United Wis. Life Ins. Co., 1999-NMCA-055, ¶¶ 13-14, 127 N.M. 303, 980 P.2d 86)).  Punitive damages may be properly awarded, however, on the basis of a claim that is labeled a negligence claim, when the plaintiff establishes actual damages flowing therefrom and also establishes conduct that is sufficiently wrongful to warrant punitive damages.  See Eckhardt v. Charter Hosp. of Albuquerque, Inc., 1998-NMCA-017, ¶ 58, 124 N.M. 549, 563, 953 P.2d 722, 736 (recognizing that negligent conduct may "rise to the level of culpability required for imposition of punitive damages"); Cf. Sanchez v. Clayton, 1994-NMSC-064, ¶ 14, 117 N.M. 761, 767, 877 P.2d 567, 573 ("In actions based on negligence, . . . punitive damages may be awarded [with] proof of actual damages. . . ."). Cf. Brand Mktg. Grp. LLC v. Intertek Testing Servs., N.A., Inc., 801 F.3d 347, 359 (3d Cir. 2015)("[A] plaintiff [may] undertake the additional burden of proving the heightened culpability required to sustain a punitive damages claim in negligence suits -- and in negligent misrepresentation cases specifically"); NMRA, UJI 13-1827 cmt. (stating that, "[i]n a negligence action, punitive damages [can] be awarded [if there is] recovery of compensatory damages"); 1 John J. Kircher & Christine M. Wiseman, Punitive Damages: Law and Practice § 9:3 (2d ed., 2023)("It is a generally accepted rule that if the facts alleged in the plaintiff's complaint or petition are sufficient to demonstrate that the wrong complained of was attended with the type of aggravated conduct requisite for punitive damages recovery, those damages may be recovered without being specifically pled.").  Punitive damages also can be based on a good-faith-and-fair-dealing claim that sounds in contract or in tort, in the context unique to insurance and other special relationship cases.  See Romero v. Mervyn's, 1989-NMSC-081, ¶ 23, 109 N.M. 249, 255, 784

P.2d 992, 998 ("[I]n contract cases not involving insurance, punitive damages may be recovered for breach of contract when the defendant's conduct was malicious, fraudulent, oppressive, or committed recklessly with a wanton disregard for the plaintiff's rights."); Sloan v. State Farm Mut. Auto. Ins. Co., 2004-NMSC-004, ¶ 5, 135 N.M. 106, 109, 85 P.3d 230, 233 (discussing the jury instructions appropriate for "punitive damages in insurance-bad-faith claims").

Notably, although Apodaca titles her claim in Count I as one for negligent misrepresentation, see SAC ¶¶ 64-69, at 14, her SAC alleges a mens rea more serious than mere negligence; in other words, she alleges that Young America was not only negligent in misrepresenting the value of her UIM policy, but that Young America acted knowingly, cf. SAC ¶ 33, at 6 ("Defendants' misrepresentations or lack of representations were made, knowingly and willfully, with the intent to deceive. . . ."). While Apodaca did not also include a claim for fraudulent misrepresentation, the facts that her SAC alleges make out such a claim. Compare SAC ¶ 33, at 6 ("Defendants' misrepresentations or lack of representations were made, knowingly and willfully, with the intent to deceive. . . ."), with Encinias v. Whitener L. Firm, P.A., 2013-NMSC-045, ¶ 22, 310 P.3d 611, 620 (stating that elements of fraudulent misrepresentation are "(1) a[n untrue] representation was made (either by commission or by omission), (2) . . . knowingly or recklessly, (3) . . . with the intent to induce the plaintiff to rely upon it, and (4) that the plaintiff relied on the representation" (citing UJI 13-1633)). Fraudulent misrepresentation can form a basis upon which she could maintain punitive damages. See Encinias v. Whitener L. Firm, P.A., 2013-NMSC-045, ¶ 22, 310 P.3d at 620 ("[N]ominal and punitive damages are available in suits for intentional torts, and Encinias can pursue both in a claim for fraudulent misrepresentation." (citing Sanchez v. Clayton, 1994-NMSC-064, ¶ 15, 117 N.M. 761, 877 P.2d 567)). Regardless of the fact that Apodaca does not assert a claim labeled fraudulent misrepresentation, she still may seek

punitive damages on the basis of Count I's claim labeled negligent misrepresentation, and she may seek punitive damages on the basis of Count V's good-faith-and-fair-dealing claim, because the facts that her SAC alleges, assumed to be true, suffice for punitive damages.

The crux of Young America's argument against punitive damages is that it was complying with the insurance laws applicable to it at the time: that the then applicable law permitted its sale of minimum limits UM/UIM policies without a Crutcher disclosure, and that the applicable law required it to sell the UM/UIM policies at the limits it sold. See Third MTD at 24-25. Young America argues that, "[a]lthough Crutcher imposed a disclosure requirement regarding the 'limitations of minimum limits UM/UIM policies in the form of an exclusion in its insurance policy,' this requirement was on a prospective basis only" and that, therefore, "Young America's lawful conduct cannot give rise to a claim for punitive damages." Third MTD at 24-25. Young America therefore argues it lacks the requisite wanton and willful mens rea.

Despite Young America's argument to the contrary, Apodaca sufficiently alleges conduct that, assuming the allegations to be true, could give rise to punitive damages. Crutcher disclaims that statutory compliance alone will insulate insurers from misrepresentation claims. See Crutcher 2022-NMSC-001, ¶ 26, 501 P.3d at 439 ("The language of the statute [does not] provide[] immunity from claims that it misrepresented the coverage available to consumers like Mr. Crutcher. . . . [W]hile the Legislature authorized the selling of premiums together, its intent was not to sanction the deception of those consumers in their selection of policies and coverage levels."). Young America thus may still have possessed the requisite mens rea, especially if it knew that Apodaca assigned to the policy a much higher value than it in fact would provide. That is, punitive damages would lie if Young America knew that Apodaca interpreted the UIM policy to provide excess coverage, not gap coverage. Young America already knew that the policy,

because of the Schmick offset, had significantly less use to consumers than consumers reasonably might believe. See Crutcher, 2022-NMSC-001, ¶ 27, 501 P.3d at 440 ("In this case, we are simply identifying the same consequence previously illuminated in Weed Warrior." (citing Weed Warrior, 2010-NMSC-050, ¶ 10, 149 N.M. at 160-61, 245 P.3d at 1212-13)). Indeed, Apodaca asserts that Young America did "knowingly and willful . . . misrepresent[] to Ms. Apodaca that she would benefit from underinsured coverage when they knew, or should have known, that the coverage was meaningless." SAC ¶ 33, at 6. Such an assertion suffices for the motion to dismiss stage. The Court states in Bhasker II:

> [R]egardless whether minimum limits UIM coverage provides value, Financial Indemnity remains liable for material misrepresentations that compelled insureds to purchase its UIM coverage under the mistaken belief that such coverage entitles insureds to not only tortfeasors' liability limits but also to the full amount of UIM coverage reflected on insureds' declarations pages. If such misrepresentations were willful or reckless, as Bhasker's Complaint alleges, then a jury may properly consider whether punitive damages are appropriate.

Bhasker II, 361 F. Supp. 3d at 1151-52. Taking Apodaca's factual allegations as true and viewing them in the light most favorable to her, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 55 U.S. 308, 322 (2007), her assertions state a plausible basis for punitive damages that Young America knew that the policy it sold to Apodaca, and on which it collected premiums for a lengthy period, was, in many contexts, worthless. Accordingly, the Court will deny Young America's Third MTD as to Apodaca's claim for punitive damages in Count VIII.

### D.   APODACA MAY NOT REFORM THE CONTRACT AS A REMEDY FOR HER UPA, UIPA, AND NEGLIGENT MISREPRESENTATION CLAIMS, BUT SHE MAY SEEK DAMAGES.

Apodaca may not seek reformation of her insurance contract as a remedy for Young America's substantive violations because the contract that would result, providing for excess theory UIM coverage, would be void under New Mexico law. On this point, the Court reaches a

conclusion different from the ones that Chief Judge Johnson reached in Belanger, 588 F. Supp. 3d at 1264-65, and that Judge Riggs reached in Palmer, 585 F. Supp. 3d at 1018.  In New Mexico, a court may grant the equitable relief of reforming a contract "where either by mutual mistake of the parties, or through mistake on the part of one party and fraud or inequitable conduct on the part of the other party, the written instrument drafted to evidence a contract fails to express the real agreement and intentions of the parties."  Buck v. Mountain States Inv. Corp., 1966-NMSC-090, ¶ 7, 76 N.M. 261, 264, 414 P.2d 491, 493 (citing Dearborn v. Niagara Fire Ins. Co., 17 N.M. 223, 125 P 606)("Buck").  The party's agent may perpetrate the inequitable conduct, and the "agent's conduct need not be characterized as fraud in order to warrant reformation of an insurance policy," Buck, 1966-NMSC-090, ¶ 8, 76 N.M. at 264-65, 414 P.2d at 494 (discussing Portella v. Sonnenberg, 181 A.2d 385 (N.J. Super. Ct. App. Div. 1962)); instead, the agent's "lack of good faith and fair dealing," or merely "some fault or negligence on the part of the agent," can suffice to make reformation appropriate.  Buck, 1966-NMSC-090, ¶ 8, 76 N.M. at 264-65, 414 P.2d at 494 (discussing Mortenson v. Hawkeye Casualty Co., 12 N.W.2d 823 (Iowa 1944)).

In the insurance context, reformation may be available when insurers violate an insured's reasonable expectations.  See Marckstadt v. Lockheed Martin Corp., 2010-NMSC-001, ¶ 19, 147 N.M. 678, 685, 228 P.3d 462, 469 ("Unless the rejection requirements of 13.12.3.9 NMAC are strictly met, UM/UIM coverage will be read into an automobile liability policy." (citing Romero v. Dairyland Ins. Co., 1990-NMSC-111, 111 N.M. 154, 155, 803 P.2d 243, 244)).  See also Jimenez v. Foundation Reserve Ins. Co., Inc., 1988-NMSC-052, ¶ 10, 107 N.M. 322, 324, 757 P.2d 792, 794 (holding that it would be "repugnant to public policy" to charge a premium and not to provide the coverage).  New Mexico permits reformation even when the resulting contract violates some statutory provision if the equities call for the reformation and no statute declares

void such contracts as the resultant one.  See Buck, 1966-NMSC-090, ¶ 11, 76 N.M. at 266, 414 P.2d at 495 ("A court of equity will not withhold relief where it is necessary in the interest of justice and of sound public policy to enforce a contract which is inhibited by statute, but is not declared void, provided the parties are not in pari delicto." (citing Baldwin v. Equitable Life Assurance Society of U.S., 108 N.W.2d 66 (Iowa 1961))).  Cf. Kuebler v. Equitable Life Assur. Soc. of the U.S., 219 Mich. App. 1, 11, 555 N.W.2d 496, 501 (1996)(rejecting argument against reformation where policies against illegal contracts -- including considerations of moral turpitude, in pari declicto, unjust enrichment, disproportionate harshness, and the purpose of the statute -- did not necessitate declining reformation (citing Homestead Supplies, Inc. v. Exec. Life Ins. Co., 147 Cal. Rptr. 22 (Cal. Ct. App. 1978)); Mountain Fir Lumber Co. v. Emp. Benefits Ins. Co., 679 P.2d 296, 300-01 (Or. 1984)("Just as [state law] forbid[s] covert agreements for reductions of premiums, [it] forbid[s] overt agreements. We [both] refuse[] to reform a contract legal on its face into one that would be unlawful . . . [and] decline to reform an agreement unlawful in one way so that it is unlawful in another.").

Whether a contract should not be reformed because the resultant contract would be void raises a similar analytical question as that for enforcement of illegal contracts.  Cf. 2 Jordan Plitt et al., Couch on Insurance § 27:86 (3d ed. 2023)("[I]t would seem obvious that an insurance policy may not be reformed so as to include terms which are illegal.").  The Supreme Court of New Mexico holds the following rule about the enforcement of unlawful contracts:

> [C]ontracts are "void as being contrary to public policy, [when] they are clearly contrary to what the legislature or judicial decision has declared to be the public policy, or they manifestly tend to injure the public in some way." Yates Petroleum Corp., 2012-NMCA-064, ¶ 20, 281 P.3d 1235 (internal quotation marks and citations omitted). The basis of Yates' argument is that there is no clear policy statement in the language of the statute, therefore the parties should be free to contract around its mandate. We disagree. Every statute is a manifestation of some public policy. Just because the Legislature did not expressly include a statement of

what the public policy is in the text of the statute does not mean that it does not intend to further a strong public policy. In this case, the public policy is in favor of interest owners.

First Baptist Church of Roswell v. Yates Petroleum Corp., 2015-NMSC-004, ¶ 12, 345 P.3d 310, 313–14 ("First Baptist Church").

Although Apodaca does not ask explicitly for reformation in the SAC, she, in effect, makes such a request there, and she argued in favor of reformation at the hearing.  See Tr. at 36:14-38:4 (Holt).  As discussed above, her contract does not provide for excess theory UIM coverage, but rather gap coverage, because of the Schmick offset, and for that reason Young America did not breach the contract by applying the offset.  Despite acknowledging effectively that her contract operated as it was supposed to operate, see Response at 2 ("Defendant Young failed to alert her to this exclusionary provision, [and] it misled her to believe that her contract for insurance included coverage it did not. . . ."), she continues to press the Court to, in effect, rewrite her policy to provide excess UIM coverage -- the insurance to which she "had a reasonable expectation" she was entitled, SAC ¶ 28, at 5.   See id. ¶ 49, at 9 ("Because Defendants failed to fully inform Ms. Apodaca of the New Mexico offset law . . . Defendants should be required to fully compensate Ms. Apodaca for the . . . damages she sustained as a result of . . . [her] accident, via the underinsured benefits ($25,000.00) for which she paid a premium."); id. ¶ 93, at 19 ("Defendant . . . breached its agreement to provide a benefit for the premium charged by failing to provide underinsured coverage and/or denying underinsured claims . . . .").  Although Apodaca's SAC contains adequate assertions that, because of the "inequitable conduct on the part of the other party, the written instrument drafted to evidence a contract fails to express the real agreement and intentions of the parties," Buck, 1966-NMSC-090, ¶ 7, 76 N.M. at 264, 414 P.2d at 493 (citing Dearborn v. Niagara Fire Ins. Co., 1912-NMSC-024, 17 N.M. 223, 125 P. 606), she cannot

- 99 -

maintain her effective claim for reformation because the contract, reformed as she wishes, would be void.

At the hearing, Young America asserted that reformation is impermissible, because New Mexico statutes provide for gap and not excess UIM coverage. See Tr. at 33:11-35:18 (Vargo); id. at 41:25-42:18 (Vargo); id. at 33:22-34:1 (Vargo)("[A]s Crutcher explained, our statute doesn't just allow for gap coverage, it requires it. So the plaintiff seeks for the Court to reform her policy, to make it illegal, in essence, to make it void, to make it contrary to the statute."). Young America insists that, instead, rescission alone is available for Apodaca's claims. See Tr. at 35:19-24 (Vargo).

The Court agrees with Young America that, were the insurance contract reformed as Apodaca in effect seeks that it be reformed, then it would be void, and, accordingly, that such a reformation is impermissible as a remedy. The Court notes that Chief Judge Johnson and Judge Riggs, in approving reformation as a viable remedy, did not address this subject of the resulting contract's potential voidness. Cf. Belanger, 588 F. Supp. 3d at 1264-65; Palmer, 584 F. Supp. 3d at 1032. Schmick interprets N.M.S.A. § 66-5-301, the UM/UIM provision, as disallowing an insured to recover any more on her UIM policy than the amount she purchases in UM coverage, reduced by the tortfeasor's liability policy distribution, rather than the total amount of her injuries reduced by the tortfeasor's liability policy distribution. See Schmick, 1985-NMSC-073, ¶ 30, 103 N.M. at 224, 704 P.2d at 1100 ("[Because] the most an insured can receive is the amount of underinsurance purchased for his benefit, that amount must be offset by available liability proceeds."). "To the extent that [a] policy['s] provisions . . . require the [insurer] to pay underinsurance benefits by reference to the insured's total damages rather than [by reference to the insured's] aggregate . . . uninsured motorist coverage[,] . . . the provisions are void." Schmick,

1985-NMSC-073, ¶ 27, 103 N.M. at 223, 704 P.2d at 1099.  See Martinez v. Allstate Ins. Co.,

1997-NMCA-100, ¶ 14, 124 N.M. 36, 39, 946 P.2d 240, 243 ("Schmick . . . clearly holds that the

insurance policy may not provide either more or less than Section 66-5-301(B) allows." (emphasis

in original)).

Given that here the tortfeasor's minimum-limit, $25,000.00 liability policy wholly offset

her Apodaca's minimum-limit, $25,000.00 UM policy, and that, accordingly, her contract called

for no disbursement under the UIM portion, then to reform the contract to provide her the

difference between her total damages and the tortfeasor's liability benefits would require Young

America to "pay underinsurance benefits by reference to the insured's total damages," an approach

that Schmick declares "void" under N.M.S.A. § 66-5-301.  Apodaca is incorrect that New Mexico

law makes available the offset approach but does not make it mandatory, see Tr. at 37:10-22 (Holt);

instead, "offset is required," Schmick, 1985-NMSC-073, ¶ 28, 103 N.M. at 223, 704 P.2d at 1099.

See id. ¶ 28, 103 N.M. at 223, 704 P.2d at 1099 ("[A]n offset is inherent in our statutory definition

of underinsured motorist.").

Because, therefore, Apodaca seeks to reform her policy in such a way as New Mexico's

insurance code has declared void, reformation is unavailable to offer excess theory coverage.  See

Buck, 1966-NMSC-090, ¶ 11, 76 N.M. at 266, 414 P.2d at 495 ("A court of equity will not

withhold relief where it is necessary in the interest of justice and of sound public policy to enforce

a contract which is inhibited by statute, but is not declared void, provided the parties are not in pari

delicto." (citing Baldwin v. Equitable Life Assurance Society of U.S., 108 N.W.2d 66 (Iowa

1961)).  The resulting contract would be "void as being contrary to public policy," because it is

"clearly contrary to what . . . [a] judicial decision has declared to be the public policy."  First

Baptist Church, 2015-NMSC-004, ¶ 12, 345 P.3d 310, 314 (quoting Yates Petroleum Corp., 2012-

NMCA-064, ¶ 20, 281 P.3d 1235).  "Every statute is a manifestation of some public policy," <u>First Baptist Church</u>, 2015-NMSC-004, ¶ 12, 345 P.3d at 314, and <u>Schmick</u> identifies the relevant public policy here as one that requires that insureds receive only as much UIM coverage as they purchased in UM coverage, <u>see</u> <u>Crutcher</u>, 2022-NMSC-001, ¶ 19, 501 P.3d 433, 437 ("In <u>Schmick</u>, this Court determined that the New Mexico Legislature intended to 'put an injured insured [driver] in the same position [the driver] would have been in had the tortfeasor had liability coverage in an amount equal to the uninsured/underinsured motorist protection purchased for the insured's benefit.'" (quoting <u>Schmick</u> 1985-NMSC-073, ¶ 10, 103 N.M. 216, 704 P.2d 1092, 1095)(alterations in <u>Crutcher</u>).  <u>See also</u> <u>Bhasker II</u>, 361 F. Supp. 3d 1045, 1144-48 (discussing policy rationale for gap theory UIM coverage).  Although the resulting contract may not implicate the public morals, <u>see</u> <u>Flemma v. Haliburton Energy Servs., Inc.</u>, 2013-NMSC-022, ¶ 18, 303 P.3d 814, and even when the equities fall on Apodaca's side, <u>cf.</u> <u>Homestead Supplies, Inc. v. Exec. Life Ins. Co.</u>, 147 Cal. Rptr. 22, 29 (Cal. Ct. App. 1978), still to reform the contract to allow excess theory UIM coverage would be against the <u>Schmick</u> rule; given the cavalcade of litigation asserting claims identical to Apodaca's, the result would be to rewrite New Mexico's laws on UM/UIM coverage, a step the Court is not, as a federal judge sitting in diversity, able to take.

The Court does not accept, however, Young America's contention that Apodaca's only remaining remedy is recission, and that, because recission here involves Apodaca repaying Young America part of what it distributed to her, that, therefore, "there is no legal remedy alleged."  Tr. at 35:25-36:1 (Vargo).  Although recission of the insurance contract would be an appropriate remedy, so too would money damages.[12]  Because the heart of Apodaca's claims is that Young

---

[12]Apodaca's compensatory damages can be measured according to two theories: (i) restitution for the value by which Young America unjustly enriched itself by deceiving Apodaca and others about the value of their insurance; and (ii) the value of the informational harm, which

lies in Young America's depriving Apodaca of the opportunity to make an informed selection of insurance policies. Apodaca cannot tack her damages, however, either to a loss-of-bargain or expectancy damages measure based on the value that she would have received from the contract into which she allegedly believed she had entered, namely the excess-theory UIM insurance contract. Instead, her damages can be measured only by either the loss she experienced from being informed inadequately or the value by which Young America was enriched unjustly; it is only these values which can form the basis of her damages award. Nevertheless, it may seem intuitive that Apodaca should receive the benefit of the bargain that she alleges Young America mislead her to believe she was entering -- i.e., she should receive the UIM coverage disbursement that an excess-theory UIM policy provides, instead of what she received, i.e., what a gap theory UIM policy provides. Because this intuitively appealing damages framework is inappropriate, however, the Court devotes some attention to explaining why.

Were Apodaca to claim the expected value of an excess theory UIM policy, she would receive as damages the benefit conferred by an insurance contract that is void under New Mexico law. Loss-of-bargain damages, a measure for tort recovery, compensate a plaintiff in misrepresentation torts for the difference between the value received and the value as represented. See Reg. v. Roberson Const. Co., 1987-NMSC-072, ¶ 13, 106 N.M. 243, 245-46, 741 P.2d 1364, 1367-68 ("[I]n fraud cases such as this, we have followed the benefit-of-the-bargain rule with respect to damages, in which the defrauded party may recover the difference between the actual and represented values of the property purchased."). Loss-of-bargain damages for misrepresentation torts are much like expectancy damages in breach-of-contract claims: both intend to place the plaintiff in the position in which she would have been had the breaching party fully performed the contract as the breaching party represented it. See Law of Remedies § 9.2(1), at 551.

Apodaca might identify the relevant bargain here as the bargain that she believed reasonably she executed: an excess-theory UIM coverage insurance contract. Cf. Crutcher, 2022-NMSC-001, ¶ 30, 501 P.3d at 440 ("If a person pays for something called 'underinsured motorist' insurance, . . . it [is] reasonable . . . to be under the impression that . . . she [can] . . . receive UIM coverage if involved in an accident with someone who does not have enough insurance to cover the costs of the insured's injuries."); Schmick, 1985-NMSC-073, ¶ 31, 103 N.M. 216, 224, 704 P.2d 1092, 1100 (recognizing that an excess UIM statutory scheme is "more equitable in that the injured insured collects all proceeds for which, ostensibly, a premium has been paid"). Two impediments stand in the way of this approach to damages: one impediment appears to defeat such a measure of damages, but, upon closer analysis, does not defeat it; a second impediment prevents Apodaca from securing such damages.

First, the apparent impediment is that loss-of-bargain damages are available for intentional misrepresentation torts, but not for negligent misrepresentation torts. See Law of Remedies, § 9.2(1), at 551 (explaining that loss-of-bargain damages are often made available for intentional torts and that this approach "guarantees that the plaintiff will achieve any economic gains he would have had if the representations had been correct"). New Mexico does not provide loss-of-bargain damages for misrepresentations that are negligent and, instead, provides out-of-pocket damages, allowing a plaintiff to recover what value has been conferred on the defendant. See First Interstate Bank of Gallup v. Foutz, 1988-NMSC-087, ¶¶ 8-14, 107 N.M. 749, 751-53, 764 P.2d 1307, 1309-11 (holding that, for negligent misrepresentation torts, the proper measure of damages is out-of-pocket damages and not loss-of-bargain-damages).

- 103 -

Because Apodaca asserts a claim titled negligent misrepresentation and not one titled fraudulent misrepresentation, the above rule appears to prevent Apodaca from securing loss-of-bargain damages and to limit her recovery only to out-of-pocket losses. This rule, however, does not produce that result, because, although Apodaca labels her claim as negligent misrepresentation, she alleges that Young America acted with a mens rea beyond negligence. The SAC's thrust is that Young America defrauded her as to the value of the insurance policy she purchased. Cf. SAC ¶ 33, at 6 ("Defendants[ acted] knowingly and willfully, [and] with the intent to deceive . . . Ms. Apodaca. . . ."). It is for this reason that, although she labels her misrepresentation tort a "negligent misrepresentation," SAC ¶¶ 64-69, at 14, her factual allegations support her claim for punitive damages based on her negligent misrepresentation and good-faith-and-fair-dealing claims, as the Court held above, see supra section III.C. The reckless-and-wanton conduct in which Apodaca alleges that Young America engaged, which support her claim for punitive damages, therefore does not limit Apodaca to receiving for her misrepresentation tort only out-of-pocket damages. Cf. First Interstate Bank of Gallup v. Foutz, 1988-NMSC-087, ¶¶ 8-14, 107 N.M. 749, 751-53, 764 P.2d 1307, 1309-11 (allowing only out-of-pocket damages for negligent misrepresentation torts). It is, therefore, not for this reason that Apodaca cannot secure loss-of-bargain damages.

Second, the true impediment to Apodaca's receipt of loss-of-bargain damages is the following: were Apodaca to receive loss-of-bargain damages in the form of damages equaling excess-theory UIM coverage, then she would receive the benefit of an illegal bargain. The story of UIM coverage in New Mexico has been one in which the Supreme Court of New Mexico has invited repeatedly the State Legislature, if it is so inclined, to amend its insurance laws to allow insurers to offer such policies as the one that Apodaca believed she entered. See Crutcher, 2022-NMSC-001, ¶ 28, 501 P.3d at 440 ("New Mexico lawmakers have purposefully chosen to adopt a gap theory of underinsurance coverage, and it is within their power to do so. If they are so inclined, state lawmakers are also empowered to revisit the state's uninsured motorist coverage statutory scheme. . . ."). That form of coverage, however, remains currently unavailable. For the reasons discussed above, see section IV.D, therefore, she cannot reform her contract to provide UIM insurance, because to reform it as she wishes would render the contract void. What she cannot achieve via reformation, she should not achieve via damages: she should not receive in money damages for her misrepresentation tort such a prohibited policy's value. In New Mexico, "damages are unavailable as relief to a party to an illegal contract." Dacy v. Vill. of Ruidoso, 1992-NMSC-066, ¶ 21, 114 N.M. 699, 704, 845 P.2d 793, 798 (citing Restatement (Second) of Contracts § 346(1) (1979)("The injured party has a right to damages for any breach by a party against whom the contract is enforceable . . . .")(emphasis in Dacy v. Vill. of Ruidoso, but not in Restatement)). See Arch, Ltd. v. Yu, 1988-NMSC-101, ¶ 19, 108 N.M. 67, 72, 766 P.2d 911, 916 ("[A]n option agreement for the conveyance of community real property, which was void under [State law], would neither be specifically enforced nor could damages be awarded for the contract's breach." (discussing Sims v. Craig, 1981-NMSC-046, 96 N.M. 33, 627 P.2d 875)).

Damages on the contract, therefore, are not available, but "[t]hat void agreements may give rise to certain equitable rights under proper circumstances is not open to doubt." Walter E. Heller & Co. of Cal. v. Stephens, 1968-NMSC-036, ¶ 23, 79 N.M. 74, 79-80, 439 P.2d 723, 728-29. Among the equitable relief available is restitution. See Law of Remedies, § 13.6, at 568 (stating that "the plaintiff is permitted. . . at least to have restitution" if "[t]he plaintiff does not know facts that would make the transaction or its purpose illegal, or because he is unaware of some relatively

- 104 -

minor legal requirement").  For her misrepresentation tort, therefore, Apodaca's damages must be based on the extent of her own out-of-pocket costs, and the extent to which Young America was unjustly enriched -- not based on the loss-of-bargain value or expectancy value of the bargain that she believed she consummated, because such a bargain is void.  She thus cannot peg her damages "by reference to the insured's total damages rather than the aggregate of uninsured motorist coverage purchased for the insured's benefit." Schmick, 1985-NMSC-073, ¶ 27, 103 N.M. at 223, 704 P.2d at 1099.  See id., 1985-NMSC-073 ¶ 30, 103 N.M. at 224, 704 P.2d at 1100 ("[U]nder a statute like ours, where the most an insured can receive is the amount of underinsurance purchased for his benefit, that amount must be offset by available liability proceeds.").

The above discussion was specifically about what damages Apodaca can secure for her negligent misrepresentation claim, but the same limiting principle should inform what damages she can secure on her other viable claims for relief, namely, her UPA, UIPA, and good-faith-and-fair-dealing claims.  UPA and UIPA claims concern tortious-like conduct, cf. Carl Kelley Const. LLC v. Danco Techs., 656 F. Supp. 2d 1323, 1339 (D.N.M. 2009)(Browning, J.)("A UPA claim is more like a tort claim than a contract claim. . . .  [A]ffirming dismissal of a UPA claim, [the appellate court] observed that the plaintiff's allegations 'sound[ed] in contract rather than in tort,' and thus did not state a claim under the UPA." (quoting Kreischer v. Armijo, 1994-NMCA-118, ¶ 11, 118 N.M. 671, 675, 884 P.2d 827, 831)), and Apodaca's good-faith-and-fair-dealing claim also centers around Young America's alleged misrepresentations, see supra section III.B.  All of Apodaca's theories of liability thus revolve around Young America misleading her as to the transaction she executed with it.  The contract that she believed she executed, however, is a contract void under New Mexico law, even if it is the more intuitive and favorable UIM coverage. Cf. Crutcher, 2022-NMSC-001, ¶ 30, 501 P.3d at 440 ("If a person pays for something called "underinsured motorist" insurance, . . . it [is] reasonable . . . to be under the impression that . . . she [can] . . . receive UIM coverage if involved in an accident with someone who does not have enough insurance to cover the costs of the insured's injuries."); Schmick, 1985-NMSC-073, ¶ 31, 103 N.M. 216, 224, 704 P.2d 1092, 1100 (recognizing that an excess UIM statutory scheme is "more equitable in that the injured insured collects all proceeds for which, ostensibly, a premium has been paid").  Because this would-be contract is not lawful, Apodaca's damages for her UPA, UIPA, and good-faith-and-fair-dealing claims cannot be pegged to what she would have received under the contract.

Apodaca's relief, therefore, can be pegged to two available measures: (i) restitution; and (ii) the value of the informational harm inflicted on her.  The Court discussed the former concept in part already; the Court will discuss the latter concept below.  As noted above, restitutionary awards are available to relieve a party to a void contract where equity so requires.  See Walter E. Heller & Co. of Cal. v. Stephens, 1968-NMSC-036, ¶ 23, 79 N.M. 74, 79-80, 439 P.2d 723, 728-29 ("That void agreements may give rise to certain equitable rights under proper circumstances is not open to doubt."); Law of Remedies, § 13.6, at 568 (stating that "the plaintiff is permitted to . . . at least to have restitution" if "[t]he plaintiff does not know facts that would make the transaction or its purpose illegal, or because he is unaware of some relatively minor legal requirement").  Although, in New Mexico, "equity will not act if there is a complete and adequate remedy at law," Sims v. Sims, 1996-NMSC-078, ¶ 28, 122 N.M. 618, 930 P.2d 153, 159, the Court has explained that Apodaca has no claim under her contract, cf. Hunt v. N.C. Logistics, Inc., 193 F. Supp. 3d 1253, 1267 (D.N.M. 2016)("[T]he 'hornbook rule [is] that quasi-contractual remedies . . . are not to be created when an enforceable express contract regulates the relations of

the parties with respect to the disputed issue.'" (quoting Elliott Indus. Ltd. Partnership v. BP Am. Prod. Co., 407 F.3d 1091, 1117 (10th Cir. 2005))(alterations in Hunt v. N.C. Logistics, Inc.)). Apodaca's situation is the rare one where an unjust enrichment claim and restitutionary damages are appropriate.  She has no contract claim, which precludes expectancy damages, and it is inappropriate to award her loss-of-bargain tort damages based on the benefit that a void, excess-theory UIM contract provides.  Because it is inequitable, however, only to reward her and the class out-of-pocket losses, the extent by which Apodaca and other customers unjustly enriched Young America represents an appropriate measure of damages here.

A second, independent measure of compensatory damages, beyond restitution, links Apodaca's damages to the informational harm at the heart of Apodaca's claims.  At the core both of the Crutcher decision and of Apodaca's claims is the proposition that insurance companies deprived their customers of the information that customers needed to make an informed choice about their selection of UM/UIM policies  Compare Crutcher, 2022-NMSC-001, ¶ 32, 501 P.3d at 441 ("[D]isclosure will allow purchasers to make a fully informed decision when selecting UM/UIM insurance coverage."); id. ¶ 26, 501 P.3d at 439 (stating that the Legislature's "intent was not to sanction the deception of those consumers in their selection of policies and coverage levels"); SAC ¶ 46, at 8 ("Defendants failed to inform Ms. Apodaca and other insureds about . . . available levels of coverage and failed to offer their insureds a fair opportunity to reconsider the decision to select a higher amount of underinsured coverage.").  The harm visited on consumers like Apodaca is not that they were deprived of an insurance policy's benefits that, under other circumstances, they might have enjoyed: because the would-be contract is void, Young America could not deprive Apodaca of the benefits of a contract that, under no circumstances, in New Mexico, she could enjoy.  Instead, the harm only is that Apodaca and others were deprived of the opportunity to make an informed choice about UM/UIM policies.  Thus, this theory of damages will look to the choices that Apodaca and others would have made if they had been fully informed; if they would have insured themselves to a greater extent, then they can point to the difference between the insuring of their injuries under the fully informed conditions and the insuring of their injuries under the status quo.  Damages will lie in the delta between these two scenarios.  Cf. De Simone v. VSL Pharms., Inc., 36 F.4th 518, 534 (4th Cir. 2022)(recognizing that "[c]ustomer 'confusion' is one example of" compensable "informational harm" (quoting Consumer Fin. Prot. Bureau v. Klopp, 957 F.3d 454, 465 (4th Cir. 2020))).

Obviously, determinations like these are highly factual and context specific, so nothing beyond the above should be decided at the motion to dismiss stage of litigation.  Cf. Howard S. v. Lillian S., 928 N.E.2d 399, 402-403 (N.Y. 2010)(permitting adjudication on motion to dismiss of available theories of damages).  Nonetheless, it is important to set out the appropriate framework in which Apodaca may seek compensatory damages.  In conclusion, Apodaca possesses two such frameworks: (i) the value by which Young America unjustly enriched itself by deceiving Apodaca as to the value of her insurance policy; and (ii) the value of the informational harm.  These limitations should inform the award of damages on each of her claims for substantive liability, i.e., her negligent misrepresentation, UPA, UIPA, and good-faith-and-fair-dealing claims.  The conclusion reached here affects also the amount recoverable in UPA treble damages, which turn on a multiplier of Apodaca's actual damages for her UPA claim.  See N.M.S.A. § 57-12-10(B) ("Where the trier of fact finds that the party charged with an unfair or deceptive trade practice . . . has willfully engaged in the trade practice, the court may award up to three times actual damages. . . .").  The conclusion does not, however, affect substantially the amount recoverable in

- 106 -

America wronged her by misrepresenting to her what the insurance she purchased provides, she plausibly can establish some harms flowing therefrom for which money damages are an appropriate remedy.  She alleges that Young America fleeced its customers by selling them insurance on which it knew that it rarely would ever have to pay; much turns on how the insurance was represented to would-be customers and what Young America knew about the likelihood or not of having to pay on the UIM insurance sold.  This situation makes discovery appropriate and dismissal of all Apodaca's claims inappropriate.  Although relief cannot take the form of rewriting Apodaca's existing contract, there may yet remain for her some legal remedy.

   **IT IS ORDERED** that the Motion of Defendant Young America Insurance Company to Dismiss Plaintiff's Second Amended Complaint, filed December 17, 2021 (Doc. 45)("Third MTD"), is granted in part and denied in part.  The Court concludes as follows: (i) the Court will not treat the Third MTD as a motion for summary judgment; (ii) the Court predicts that the Supreme Court of New Mexico will hold that the rule its Crutcher decision announced does not apply on a prospective only basis, and accordingly the Court will not dismiss for failing to state a claim Apodaca's claims in Plaintiff Yvonne Apodaca's Class Action Second Amended Complaint for Breach of Statutory, Common Law, and Contractual Duties, filed March 1, 2019 (Doc. 30), for negligent misrepresentation, UPA, and UIPA relief; (iii) the Court will dismiss Apodaca's breach-

_____

punitive damages, an amount which remains subject only to normal substantive and procedural limitations on the imposition of punitive damages awards.  Cf. Chavarria v. Fleetwood Retail Corp., 2006-NMSC-046, ¶¶ 36-39, 140 N.M. 478, 489-91, 143 P.3d 717, 728-30 (describing constitutional limitations).  Assuming Apodaca's allegations to be true, that Young America knew that Apodaca interpreted her UM/UIM policy to provide what is, in reality, insurance coverage it could under no circumstances provide in New Mexico is relevant to establishing the mens rea required for punitive damages.  It is only that this same would-be insurance contract's expected value cannot form the basis for Apodaca's actual damages.

of-contract claim, but the Court will not dismiss her breach of the covenant-of-good-faith-and-fair-dealing claim; and (iv) the Court will not dismiss Apodaca's claims for declaratory judgment, injunctive relief, and punitive damages, but the Court will not permit Apodaca to seek reformation of the contract.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Corbin Hildebrandt
Corbin Hildebrandt, P.C.
Albuquerque, New Mexico

-- and --

Geoffrey R Romero
Law Offices of Geoffrey R. Romero
Albuquerque, New Mexico

-- and --

Kedar Bhasker
Bhasker Law
Albuquerque, New Mexico

-- and --

Adrian O. Vega
Buckingham Barrera Law Firm
Albuquerque, New Mexico

*Attorneys for the Plaintiff*

Alicia M. Santos
O'Brien & Padilla, PC
Albuquerque, New Mexico

-- and --

Michael Mumford
Baker Hostetler LLP
Cleveland, Ohio

*Attorneys for the Defendant*